ORIGINAL

1  GEORGE E. GREER (pro hac vice pending)
   ggreer@orrick.com
2  CATHERINE Y. LUI (STATE BAR NO. 239648)
   clui@orrick.com
3  DARREN S. TESHIMA (STATE BAR NO. 238875)
   dteshima@orrick.com
4  SHANNON C. LEONG (STATE BAR NO. 268612)
   sleong@orrick.com
5
   ORRICK, HERRINGTON & SUTCLIFFE LLP
6  The Orrick Building
   405 Howard Street
7  San Francisco California 94105-2669
   Telephone:    +1-415-773-5700
8  Facsimile:    +1-415-773-5759
9
   Attorneys for Plaintiffs
10 Habeas Corpus Resource Center and the Office of the
   Federal Public Defender for the District of Arizona
11

**FILED**

**SEP 30 2013**

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*JCS*

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                **CV 13 4517**

15 Habeas Corpus Resource Center and the Office      Case No. _____
   of the Federal Public Defender for the District
16 of Arizona,                                        **COMPLAINT AND REQUEST FOR**
                                                      **INJUNCTIVE RELIEF**
17              Plaintiffs,
                                                      **ADMINISTRATIVE PROCEDURE ACT**
18      v.                                            **CASE**

19 United States Department of Justice and Eric
   H. Holder, in his official capacity as United
20 States Attorney General,

21              Defendants.

22

23

24

25

26

27

28

                                                                    COMPLAINT

OHSUSA:754396943.13

## I.   **INTRODUCTION**

1.     Plaintiffs Habeas Corpus Resource Center ("HCRC") and Office of the Federal Public Defender for the District of Arizona ("FDO-AZ") bring this action under the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 551–559 and 701–06, and the United States Constitution for injunctive and other relief to set aside the September 23, 2013 Final Rule regarding Certification of State Capital Counsel Systems (the "Final Rule"), (78 Fed. Reg. 58,160 (Sept. 23, 2013)) issued by Defendants United States Department of Justice ("DOJ") and United States Attorney General Eric Holder (the "Attorney General") (together with DOJ, "Defendants"). The Final Rule governs Defendants' review and certification of mechanisms established by the states for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel for prisoners sentenced to death.  The Final Rule is defective for a number of reasons, including that it (i) fails to protect against Defendants' inherent conflict of interests and the risk of bias in the certification process; (ii) insufficiently responds to public comments regarding deficiencies in the proposed regulations; (iii) does not include adequate certification procedures; and (iv) fails to include appropriate criteria for Defendants' certification decisions. Plaintiffs bring this complaint to enjoin or postpone the effective date of the Final Rule, currently October 23, 2013, until these defects are cured.

## II.   **BACKGROUND**

### A.   **Chapter 154**

2.     The Antiterrorism and Effective Death Penalty Act of 1996 added Chapter 154 to Title 28 of the United States Code ("Chapter 154") to provide procedural incentives in federal review of state capital convictions to states that guarantee death-sentenced prisoners the appointment and compensation of competent counsel and reasonable litigation resources necessary to develop constitutional claims in collateral proceedings.  Once a state is certified to have established a satisfactory mechanism to fulfill that guarantee, the statute of limitations for federal habeas corpus proceedings in federal court is greatly shortened, the federal habeas corpus proceedings are greatly expedited, and judicial review of state judgments is sharply curtailed.

///

COMPLAINT

OHSUSA:754396943.13

1      3.      Chapter 154 was modeled on the recommendations of the Ad Hoc Committee on

2 Federal Habeas Corpus in Capital Cases, often referred to as the "Powell Committee," which

3 identified the "pressing need for qualified counsel to represent inmates in collateral review" as

4 one of the most serious obstacles to the resolution of capital post-conviction litigation. Ad Hoc

5 Committee on Federal Habeas Corpus in Capital Cases Committee Report, 135 Cong. Rec.

6 S13471-04, S13482 (1989). To address this deficiency, Congress enacted Chapter 154 to provide

7 a "quid pro quo arrangement under which states are accorded stronger finality rules on federal

8 habeas review in return for strengthening the right to counsel for indigent capital defendants."

9 House Comm. on the Judiciary, Effective Death Penalty Act of 1995, H.R. Rep. No. 104-23, at 16

10 (1995).

11      4.      The USA PATRIOT Improvement and Reauthorization Act of 2005 ("Patriot

12 Act") included provisions to amend Chapter 154. Whereas federal courts previously determined

13 a state's eligibility under Chapter 154, the Patriot Act amendments placed authority for certifying

14 a state mechanism's compliance with Chapter 154's requirements with the Attorney General.

15 The Patriot Act amendments also directed the Attorney General to promulgate regulations to

16 implement this certification process in accordance with the provisions of the APA. Although the

17 Patriot Act amendments altered the certification mechanics of Chapter 154, they left intact the

18 critical requirements that states appoint and compensate competent counsel and provide

19 reasonable litigation expenses for indigent death-sentenced individuals in state post-conviction

20 proceedings in order to qualify for the truncated statute of limitations, procedural limitations, and

21 "fast track" deadlines for federal habeas corpus actions reviewing state court death penalty

22 convictions.

23      5.      Defendants have issued a rule that purports to be the "Attorney General's

24 reconsideration of the appropriate standards and procedures for chapter 154 certification." On

25 September 23, 2013, Defendants published the new rule, with an effective date of October 23,

26 2013. 78 Fed. Reg. 58,160. But fatal defects—many similar to those that led this Court to issue

27 the preliminary injunction against the December 11, 2008 version of the Attorney General's rule,

28 73 Fed. Reg. 75,327—still exist with the Final Rule. Defendants again seek to promulgate a rule

- 3 -

COMPLAINT

1   without providing the public notice of key issues and justifications informing the rule making,

2   and have issued a final rule that establishes deficient certification procedures and criteria and fails

3   to protect against the inherent bias resulting from Defendants' involvement in the rulemaking and

4   certification processes.

5       6.      Numerous public comments were submitted in the process of publishing the Final

6   Rule. A number of comments addressed the Final Rule's failure to protect against the inherent

7   conflicts of interest and appearance of bias by the Defendants in creating the Final Rule and

8   evaluating requests for certification. There is an inherent bias and appearance of impropriety

9   from having capital *prosecutors* shape a rule and conduct the factual inquiry that affects the rights

10   of capital prisoners to effective *defense counsel* and their ability to seek post-conviction relief.

11   Failing to protect against this inherent risk of bias violates the APA, the Constitution, the

12   statutory regulations governing the Executive Branch's ethical conduct, 5 C.F.R. §§ 2635.101,

13   2635.502, and the American Bar Association, Model Rules of Judicial Conduct, Rule 1.2, and

14   Model Rules of Professional Conduct, Rule 1.7(a)(2).

15       7.      In addition, the Final Rule sets forth a certification process that is both

16   procedurally and substantively deficient. Although the certification determination turns on

17   specific and critical decisions about a state's mechanism, the Final Rule does not require a state

18   applicant (when requesting certification) to provide any information concerning the state's

19   mechanism for assuring competent counsel and providing adequate compensation and litigation

20   expenses, or adherence to that mechanism in practice. In effect, a state seeking certification

21   under the Final Rule is required to do little, if anything, more than assert it is compliant with the

22   requirements of Chapter 154. Because there is no requirement that the state demonstrate its

23   eligibility for certification, there is no meaningful opportunity for the public and interested parties

24   to comment on and challenge the presumptive certification, and the state carries no burden of

25   establishing its entitlement to the benefits of Chapter 154 in violation of Congressional intent.

26       8.      The Final Rule also fails to establish adequate minimum standards of counsel

27   competency. By including a vague "catch-all" provision that allows for certification if the state

28   standards "reasonably assure a level of proficiency appropriate for State post-conviction litigation

-4-                                                COMPLAINT

1  in capital cases," the Final Rule creates a certification process that is based on ad hoc and
2  arbitrary determinations, rather than the objective standards the APA and the Constitution
3  demand.

4      9.    Critically, the Final Rule also does not provide any reasonable explanation as to
5  what facts or criteria the Attorney General will use in reviewing certification applications. The
6  preamble to the Final Rule states that the Attorney General believes that his review *does not*
7  require "a data-intensive examination of the State's record of compliance with the established
8  mechanism in all or some significant subset of postconviction cases," 78 Fed. Reg. at 58,174.
9  The Final Rule, however, also states that the Attorney General *will* "consider State-specific
10  circumstances that may establish . . . that standards generally expected to be sufficient in most
11  instances are for some reason not reasonably likely to lead to the timely provision and adequate
12  compensation of competent counsel." *Id.* at 58,168-69. The Final Rule provides no explanation
13  how the Attorney General will conduct this necessary inquiry without a factually detailed
14  examination of how a State actually implements its mechanism.

15      10.    Finally, in justifying the Final Rule, Defendants for the first time revealed an
16  unexpected and controversial interpretation of certification proceedings as not governed by
17  rulemaking requirements. Defendants also simply ignored or inadequately responded to
18  comments on the numerous troubling issues that *were* apparent from the Notice of Proposed
19  Rulemaking and carried out the rulemaking in an arbitrary and unconstitutionally biased manner.

20      **B.**    **The 2008 Regulation**

21      11.    The Final Rule has a protracted history. The Certification of State Capital Counsel
22  Systems has been litigated previously in this Court. In 2007, the former Attorney General
23  Alberto Gonzales published Proposed Regulations to govern the process for certification
24  determinations. Certification Process for State Capital Counsel Systems, Notice of Proposed
25  Rulemaking, 72 Fed. Reg. 31,217 (June 6, 2007). The final rule was published on December 11,
26  2008 ("2008 Regulation"). Plaintiff HCRC sued Defendants for violations of the Freedom of
27  Information Act and later amended its complaint to postpone the enforcement of the 2008
28  Regulation due to significant constitutional and APA violations, including failure to abide by the

- 5 -

COMPLAINT

1  APA's notice and comments procedures, inadequate notice of the proposed rule, and bias

2  stemming from Defendants' undisclosed collaboration and professional ties with interested state

3  prosecutors and the involvement of Department of Justice capital prosecutors in drafting the rules.

4  Compl., *Habeas Corpus Resource Ctr. v. U.S. Dep't of Justice*, No. 08-cv-2649 (N.D. Cal.

5  May 27, 2008).

6      12.    In January 2009, this Court granted a preliminary injunction, enjoining Defendants

7  from putting into effect the 2008 Regulation without first providing an additional comment period

8  of at least thirty days and publishing a response to any comments received during such period.

9  *See Habeas Corpus Resource Ctr v. U.S. Dep't of Justice*, Case No. 08-cv-02649, 2009 WL

10  185423, at *10 (N.D. Cal. Jan. 20, 2009).

11      13.    The 2008 Regulation never went into effect. After the entry of the preliminary

12  injunction, Defendants held a second public comment period on the 2008 Regulation and on May

13  25, 2010, published a notice in the Federal Register, proposing to remove the 2008 Regulation

14  pending the completion of a new rulemaking process. On November 23, 2010, Defendants

15  published a final rule removing the 2008 Regulation.

16      **C.**    **The 2013 Final Rule**

17      14.    On September 23, 2013, the Final Rule was published (attached as Ex. 1). The key

18  provisions of the Final Rule are detailed below. The Final Rule is scheduled to go into effect on

19  October 23, 2013.

20                            **§ 26.22 Requirements.**

21                   The Attorney General will certify that a State meets the

22  requirements for certification under 28 U.S.C. 2261 and 2265 if the
                Attorney General determines that the State has established a

23  mechanism for the appointment of counsel for indigent prisoners
                under sentence of death in State postconviction proceedings that

24  satisfies the following standards:

25                   ...

26                   (b) The mechanism must provide for appointment of

27  competent counsel as defined in State standards of competency for
                such appointments.

28

- 6 -             COMPLAINT

(1) A State's standards of competency are presumptively adequate if they meet or exceed either of the following criteria:

(i) Appointment of counsel who have been admitted to the bar for at least five years and have at least three years of postconviction litigation experience. But a court, for good cause, may appoint other counsel whose background, knowledge, or experience would otherwise enable them to properly represent the petitioner, with due consideration of the seriousness of the penalty and the unique and complex nature of the litigation; or

(ii) Appointment of counsel meeting qualification standards established in conformity with 42 U.S.C. 14163(e)(1) and (2)(A), if the requirements of 42 U.S.C. 14163(e)(2)(B), (D), and (E) are also satisfied.

(2) Competency standards not satisfying the benchmark criteria in paragraph (b)(1) of this section will be deemed adequate only if they otherwise reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases.

78 Fed. Reg. at 58,183. *See* Ex. 1.

. . .

### § 26.23 Certification process.

(a) An appropriate State official may request in writing that the Attorney General determine whether the State meets the requirements for certification under § 26.22 of this subpart.

(b) Upon receipt of a State's request for certification, the Attorney General will make the request publicly available on the Internet (including any supporting materials included in the request) and publish a notice in the Federal Register—

(1) Indicating that the State has requested certification;

(2) Identifying the Internet address at which the public may view the State's request for certification; and

(3) Soliciting public comment on the request.

(c) The State's request will be reviewed by the Attorney General. The review will include consideration of timely public comments received in response to the Federal Register notice under paragraph (b) of this section, or any subsequent notice the Attorney General may publish providing a further opportunity for comment. The certification will be published in the Federal Register if certification is granted. The certification will include a

-7-

COMPLAINT

1    determination of the date the capital counsel mechanism qualifying
     the State for certification was established.
2

3        (d) A certification by the Attorney General reflects the
     Attorney General's determination that the State capital counsel
4    mechanism reviewed under paragraph (c) of this section satisfies
     chapter 154's requirements. A State may request a new certification
5    by the Attorney General to ensure the continued applicability of
     chapter 154 to cases in which State postconviction proceedings
6    occur after a change or alleged change in the State's certified
     capital counsel mechanism. Changes in a State's capital counsel
7    mechanism do not affect the applicability of chapter 154 in any case
     in which a mechanism certified by the Attorney General existed
8    throughout State postconviction proceedings in the case.

9
         (e) A certification remains effective for a period of five
10   years after the completion of the certification process by the
     Attorney General and any related judicial review. If a State requests
11   re-certification at or before the end of that five-year period, the
     certification remains effective for an additional period extending
12   until the completion of the re-certification process by the Attorney
     General and any related judicial review.
13

14   78 Fed. Reg. at 58,184. *See* Ex. 1.

15   **III.    JURISDICTION AND VENUE**

16       15.    This Court has subject matter jurisdiction over this action and personal jurisdiction

17   over the parties pursuant to 5 U.S.C. § 552(a)(4)(A)(vii) and (a)(4)(B).  The Court also has

18   jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-06.  Venue lies in this district

19   under 5 U.S.C. §§ 552(a)(4)(B) and 703.

20   **IV.    PARTIES**

21       16.    Plaintiff HCRC is an entity in the Judicial Branch of the State of California.

22   HCRC provides legal representation to indigent men and women under sentence of death in state

23   and federal habeas corpus proceedings and in executive clemency proceedings.  HCRC also is

24   responsible for providing legal advice and developing resources on significant, recurring issues

25   for use by appointed counsel in capital post-conviction proceedings.  In addition to these duties,

26   HCRC works in conjunction with the California Supreme Court and other state agencies and

27   actors to evaluate and contribute to rules and policies related to the representation of individuals

28   sentenced to death.

                                                  - 8 -                                   COMPLAINT

OHSUSA:754396943.13

1    17.    Plaintiff FDO-AZ is a Federal Defender organization that operates under the

2    authority of the Criminal Justice Act of 1964, 18 U.S.C. § 3006A(g). FDO-AZ provides legal

3    representation to indigent men and women including those individuals sentenced to death. The

4    mission of FDO-AZ includes ensuring, on behalf of those who are unable to afford retained

5    counsel and other necessary defense services, that the right to the effective assistance of counsel

6    guaranteed by the Sixth Amendment and the Criminal Justice Act is enforced within the District

7    of Arizona. FDO-AZ represents a significant number of death-sentenced state prisoners in their

8    federal habeas proceedings, including proceedings before this Court.

9    18.    Defendant DOJ is an agency within the meaning of 5 U.S.C. § 552(f)(1) of the

10   Executive Branch of the United States government. The Office of the Attorney General and the

11   Office of Legal Policy are among DOJ's components.

12   19.    Defendant Eric H. Holder is the United States Attorney General and is head of the

13   United States Department of Justice. The Attorney General is responsible for DOJ's compliance

14   with the laws of the United States and corresponding agency regulations, including the laws and

15   regulations at issue in this case.

16   **V.    STATEMENT OF FACTS**

17   **A.    The Public Comment Period**

18   20.    Defendants published a notice of proposed rulemaking (the "NPRM") for the

19   certification regulations on March 3, 2011, identifying the Office of the Attorney General as the

20   agency issuing the proposed regulations and the Office of Legal Policy as the agency contact.

21   Certification of State Capital Counsel Systems, Proposed Rule, 76 Fed. Reg. 11,705 (Mar. 3,

22   2011).

23   21.    The NPRM provided a public comments period from March 3, 2011, to June 1,

24   2011. During that period, numerous members of the public including Plaintiffs submitted written

25   comments detailing deficiencies with the proposed regulation. HCRC submitted comments that

26   focused on the following issues, among others:

27          •    The Attorney General must implement safeguards to protect against the effect of

28               the conflict of interest that stems from his criminal prosecutorial duties and

- 9 -                                                    COMPLAINT

OHSUSA:754396943.13

1    meaningful procedural protections to ensure fairness of the certification process.

2    • The final regulations must require a state mechanism to ensure that appointed

3    counsel actually provide competent representation. For example, counsel

4    competency must be measured by actual performance, not just by experience. In

5    addition, states seeking certification must demonstrate how they actually appoint

6    counsel who meet state competency standards, do so in all state post-conviction

7    proceedings, and do not merely have standards on the books that are ignored in

8    practice.

9    • The Attorney General is required to identify what information he has relied upon

10   in making certification decisions and should give notice of all denials of

11   certification, not just grants.

12   Letter from HCRC to DOJ Regulations Docket Clerk (June 1, 2011) (attached as Ex. 2).

13   22.    FDO-AZ also submitted comments which echoed many of the same concerns as

14   HCRC. In particular, their comments focused on:

15   • The absence of any requirement that a state prove that it actually complies with the

16   terms of its identified mechanism for appointment of counsel.

17   • The inadequate procedures for contesting a state's certification application—

18   specifically, the failure to identify what type of information will be considered in

19   granting or denying a certification application.

20   Letter from Jon Sands, Federal Public Defender, to DOJ Regulations Docket Clerk (June 1, 2011)

21   (attached as Ex. 3).

22   23.    On February 13, 2012, Defendants published a supplemental notice, soliciting

23   additional comments. The supplemental notice addressed provisions relating to the competency

24   standards of counsel, the timely provision of competent counsel, the effect on certification of

25   compliance with benchmarks, and the renewal of certifications. Plaintiffs submitted comments

26   to the supplemental notice, focusing on the following issues:

27   • The proposed regulations' "catch-all" provision, section 26.22(b)(3), which allows

28   states to obtain certification if they "reasonably assure a level of proficiency

- 10 -                                                          COMPLAINT

1    appropriate for State post-conviction litigation in capital cases" should be deleted

2    or modified. This catch-all provision renders meaningless the proposed sections

3    26.22(b)(1) and 26.22(b)(2), which provided some standards for determining the

4    competence of counsel.

5    • The certification process should not allow for a certification until a state has

6    carried its burden of demonstrating the required standards are in fact implemented

7    by the state.

8    • The regulation must clarify the public's right to seek repeal of a state's

9    certification and include decertification procedures.

10   Letter from HCRC to DOJ Regulations Docket Clerk (Mar. 14, 2012) (attached as Ex. 4); Letter

11   from Jon Sands, Federal Public Defender, to DOJ Regulations Docket Clerk (Mar. 14, 2012)

12   (attached as Ex. 5).

13   **B.    The Final Rule's Deficiencies**

14       24.    Despite public comments from Plaintiffs and numerous other interested parties

15   aimed at addressing a multitude of deficiencies in Defendants' proposed regulations, the Final

16   Rule includes many defects that violate the protections of the United States Constitution and the

17   APA. Representative examples of these defects—but by no means an exclusive list—are

18   highlighted below.

19       **1.    Failure to Safeguard Against Bias**

20       25.    There is an inherent bias in the Attorney General's involvement in the crafting of

21   the Final Rule considering the Attorney General's interest in promulgating a Final Rule that will

22   favor the limitations on habeas proceedings in federal courts.

23       26.    In addition, the Final Rule fails to include protections against bias in the

24   certification process. The public comments submitted identified numerous conflicts and the

25   appearance of bias. It is well established that capital prosecutors, including the Attorney General,

26   have a direct interest in providing limitations on collateral review and their interests are

27   inconsistent with ensuring that capital defendants have access to competent defense counsel.

28   / / /

- 11 -                                    COMPLAINT

OHSUSA:754396943.13

1      27.    Indeed, as HCRC explained in its comments, the Attorney General's conflict and

2 the risk of bias is evidenced by his participation in dozens of 2254 cases before the United States

3 Supreme Court in which he has uniformly supported procedural and substantive limitations that

4 benefit state prosecutors' defense of criminal convictions and sentences. *See* Ex. 2 at 5–8.

5 Despite frequently taking affirmative steps to curtail post-conviction rights, the Attorney General

6 is charged with crafting and applying rules to assess and evaluate the adequacy of state post-

7 conviction schemes. The problem created by this conflict and the risk of bias is significantly

8 exacerbated by the Attorney General's failure to adopt clear, objective criteria and procedures to

9 guide his decision-making, as is his responsibility under Chapter 154.

10      28.    Despite the detailed comments regarding the inherent bias in the rulemaking and

11 certification process, the Final Rule still suffers from significant defects, including, but not

12 limited to, its failure to: (i) provide protection against the effects of this inherent conflict of

13 interest or the risk of bias, such as designating a more appropriate arm of the DOJ to oversee the

14 certification process; (ii) state sufficient justification for disregarding the proposed solutions;

15 (iii) address the public comments regarding bias; and (iv) adopt clear standards to make

16 certification determinations, and thus reduce the effects of potential biases. In issuing the Final

17 Rule, the Attorney General also failed to respond to comments stating that procedural regularity

18 and transparency are needed to combat the appearance of bias.

19

### 2.    Deficient Certification Procedures

20      29.    The Final Rule also provides deficient certification procedures. The Final Rule

21 does not require anything more than that a request for certification be in writing. Thus, despite

22 being tasked by Congress with drafting regulations that detail the certification process, the Final

23 Rule impermissibly gives no indication of how and on what bases the Attorney General will make

24 his certification decisions. Nor does it respond to comments discussing the inadequacy of

25 requirements for a state request and the lack of notice and fair opportunity to participate in

26 certification that flow from those inadequacies.

27      30.    As a result of the bare-bones certification requirement, a state can request

28 certification while providing little, if any, supporting evidence to justify its approval. The State

          COMPLAINT

1  need not, for example, make any showing that, in practice, it complies with the mechanism upon

2  which it relies to make the requisite certification showing. *See* Ex. 2 at 13–14. Indeed, the Final

3  Rule states that the Attorney General does not believe this inquiry is a feature of the certification

4  decision. 78 Fed. Reg. at 58, 174. Similarly, the Final Rule does not impose upon the states any

5  burden in establishing compliance and, thus, dispenses with the burden of proof that Congress

6  intended the statute to include. Instead, without ever responding to the public comments on this

7  key issue, the Final Rule impermissibly shifts the burden of demonstrating a state's deficient

8  processes to individual capital prisoners seeking habeas relief.

9      31.    Numerous interested parties including Plaintiffs submitted written comments

10  detailing the inadequacies of the guidelines for the certification process. In promulgating the

11  Final Rule, the Defendants failed to adequately respond to the public comments and also failed to

12  justify their decision to shift the burden of compliance onto the individual capital prisoners.

13      32.    Indeed, states have already sought to take advantage of the minimal certification

14  requirements by applying for certification. For example, prior to the publication of the Final

15  Rule, the State of Arizona requested certification by submitting a four-page letter that does little

16  more than cite a number of Arizona statutes and rules that touch upon some of the relevant issues.

17  Letter to United States Attorney General Eric Holder from Arizona Attorney General Thomas

18  Horne (Apr. 18, 2013) (attached as Ex. 6). This letter does not include any information

19  concerning whether competent counsel are actually appointed, such counsel are actually

20  adequately compensated, or adequate funding is actually provided for necessary defense

21  expenses. Following the submission of this request, Plaintiff FDO-AZ sent a letter to Attorney

22  General Holder asking to be informed of any communication between the DOJ and the Arizona

23  Attorney General regarding Arizona's request for certification. Letter to United States Attorney

24  General Eric Holder from Dale Baich, Capital Habeas Unit Supervisor (June 4, 2013) (attached as

25  Ex. 7). Without a Final Rule, and without notifying Plaintiff FDO-AZ, DOJ nevertheless

26  responded to Arizona Attorney General Horne that it was evaluating Arizona's request—although

27  it had no guidelines by which to evaluate Arizona's proposal—and would inform the Arizona

28  attorney general "whether there is any additional information that you can provide now." Letter

- 13 -                                                                    COMPLAINT

1  from Alexa Chappell, Intergovernmental Liaison, to Arizona Attorney General Thomas Horne,

2  Arizona Attorney General (July 16, 2013) (attached as Ex. 8).  Arizona's request and Defendants'

3  response to it highlight the inadequacy of the application process, the vague and ambiguous

4  framework under which the certification decision will be made, and the lack of notice in the

5  proposed rule that the Attorney General would informally and privately collect information for

6  the certification decision.

7    33. In publishing the Final Rule, the Attorney General for the first time stated that the

8  Rule was fashioned with an understanding that certification decisions are not subject to the

9  rulemaking provisions of the APA.  78 Fed. Reg. at 58,174 (stating that certification decisions are

10  "orders" not "rules" for purposes of the APA).  The Attorney General's failure to provide notice

11  of this unexpected and controversial view of the APA's application denied the public an

12  opportunity to comment on this important aspect of the Attorney General's interpretation of

13  certification.  Furthermore, the Attorney General's interpretation is not only in violation of federal

14  law, but also has resulted in a certification process that lacks any semblance of fairness.  The

15  Final Rule does not require the Attorney General to solicit information to make his certification

16  assessment and, if he does, he need not disclose the fact that he did so or the nature of the

17  requested information.  Ex. 2 at 19–21.

18    34. As a result of these minimal, largely meaningless application requirements, the

19  affected parties and the public are precluded from offering any meaningful comment on

20  certification.

21    35. The Final Rule also fails to ensure actual notice will be provided to those most

22  affected by the certification decision.  A state may seek and potentially obtain certification

23  without any capital defense attorneys in that state being notified that such a certification request

24  was submitted.  Likewise, though their federal habeas corpus rights will be significantly

25  hampered by certification, death-row prisoners are provided no actual notice, which is

26  particularly important given that they do not have access to the Federal Register or the internet.

27  / / /

28  / / /

  COMPLAINT

OHSUSA:754396943.13

1     36.    In addition, the Final Rule only requires publication of certification grants, not

2  denials. Accordingly, interested parties are left uninformed as to when and why states are being

3  denied certification.

### 3. Failure to Include Procedures to Review Certified States' Compliance and to Seek Decertification

37.    Once a state's mechanism is certified under the minimal certification requirements

discussed above, the Final Rule does not provide any mechanism by which Defendants will

review a state's adherence to the mechanisms certified by DOJ. Thus, nothing in the Final Rule

prevents a state from requesting certification of a mechanism and then, upon certification,

immediately abandoning those mechanisms.

38.    The Final Rule similarly lacks any procedure by which an interested party may

seek decertification of a state in the event that state fails to provide the previously-certified

mechanism. Though the Final Rule requires recertification after five years, it does not expressly

allow or provide grounds for interested parties to request reconsideration of certification

whenever a state is no longer in compliance with the mechanism.

### 4. Failure to Provide Minimum Counsel Competency Standards

39.    The certification process is also deficient because the Final Rule fails to provide

minimum standards of attorney competence. The Final Rule outlines certain attorney experience

for post-conviction proceedings and incorporates selected counsel requirements from the

Innocence Protection Act, but omits critical features of those standards and the requirements

recognized by case law. Most importantly, the Final Rule promulgates a "catch-all" provision

that provides no minimum standard of counsel competency. The catch-all clause permits the

certification of counsel if the state standards "reasonably assure a level of proficiency appropriate

for State post-conviction litigation in capital cases." By allowing such a broad exception to the

competency standards, the Final Rule provides no clear and transparent guidelines as to what

constitutes counsel competency. The vague and ambiguous guidelines in the Final Rule deprive

affected parties of the necessary guidance as to what counsel competency entails.

///

COMPLAINT

1    40.    Numerous interested parties including Plaintiffs submitted written comments
2  detailing the inadequacies of the guidelines for what constitutes counsel competency. In
3  promulgating the Final Rule, the Defendants failed to adequately respond to the public comments
4  and also failed to justify their decision to rely on undefined minimum standards regarding counsel
5  competency.

6        **C.**    **Plaintiffs' Interests in the Final Rule**

7    41.    The Final Rule determines the procedures and standards by which the Attorney
8  General certifies a state for expedited review of state death penalty convictions and sentences in
9  federal habeas corpus proceedings. Chapter 154 requires qualifying state mechanisms for the
10  appointment and adequate compensation of competent state post-conviction counsel in death
11  penalty cases, timely appointment of such counsel, and reasonable expenses for the development
12  and presentation of all potentially meritorious claims of constitutional error in state court
13  proceedings. A certification determination based on biased, incomplete, and/or inaccurate
14  information that erroneously portrays state compliance when it does not exist fundamentally
15  undermines the goals and purposes of Chapter 154 and violates existing judicial rules regarding
16  its requirements.

17    42.    Such errors during certification ultimately deprive indigent capital habeas corpus
18  petitions of their rights under the Due Process Clause of the United States Constitution, and to
19  appropriate federal judicial review of their capital convictions and death sentences.

20    43.    Plaintiffs have a substantial interest in the Final Rule and potential certification of
21  state mechanisms pursuant to Chapter 154. Plaintiffs serve as counsel to death row prisoners and
22  also serve as a resource for private counsel. They submitted comments on behalf of themselves,
23  the clients that they have been or will be appointed to represent, and on behalf of all California
24  and Arizona death-sentenced prisoners and their attorneys. Those comments have been either
25  ignored or not adequately addressed by DOJ.

26    44.    The Final Rule provides for a flawed state certification process that deprives
27  interested parties such as Plaintiffs the opportunity to object to or comment on the certification
28  submission. Additionally, the deficiencies in the Final Rule, and resulting uncertainty about how

          COMPLAINT

OHSUSA:754396943.13

1  state eligibility will be evaluated, immediately hinder Plaintiffs' ability to ascertain whether their

2  states' mechanisms would conform to Chapter 154 requirements under the Final Rule. This

3  prevents Plaintiffs and their clients from making informed decisions or recommendations on

4  critical litigation strategies in state and federal courts. Nonetheless, once a state is certified, the

5  statute of limitations for post-capital habeas proceedings in federal courts is significantly

6  shortened, the tolling provisions are substantially more restrictive, and other procedural

7  limitations are applied retroactively. Thus, Plaintiffs and their clients are significantly adversely

8  affected by the Final Rule. Accordingly, Plaintiffs require an injunction to either set aside the

9  Final Rule or postpone the effective date of the Final Rule.

10  **VI.    CAUSES OF ACTION**

11  **FIRST CAUSE OF ACTION**

12  **Violation of Administrative Procedure Act for Failure to Provide Adequate Notice**

13  45.    Plaintiffs repeat and reallege paragraphs 1–44.

14  46.    During the rulemaking process, Defendants failed to provide adequate notice to

15  interested parties of the contents of the Final Rule. Among other things, Defendants failed to

16  provide notice that the Attorney General does not consider the certification decision a rule subject

17  to the requirements of the Administrative Procedure Act. Additionally, Defendants failed to

18  provide notice that the Attorney General will privately collect information from the state attorney

19  general to use in making the certification decision.

20  47.    Defendants' failure to provide interested parties with adequate notice during the

21  rulemaking process violates the Administrative Procedure Act, 5 U.S.C. § 706(2), 5 U.S.C §§

22  553(b)(3)-(c), and constitutes arbitrary and capricious agency action.

23  **SECOND CAUSE OF ACTION**

24  **Violation of Administrative Procedure Act for Failure to Respond to Significant**
25  **Public Comments**

26  48.    Plaintiffs repeat and reallege paragraphs 1–44.

27  49.    Defendants have failed to adequately address in the Final Rule significant public

28  comments that pointed out deficiencies in the proposed regulation. In particular, Defendants

- 17 -

1    failed to respond adequately to significant public comments concerning: (i) the procedural

2    regularity and transparency needed to avoid the risk of bias; (ii) the requirement that states bear

3    the burden of demonstrating compliance; (iii) the inadequate transparency regarding the factual

4    basis upon which Defendants will assess certification requests; and (iv) the failure to publish a

5    denial of certification.

6          50.    Defendants' failure to respond adequately to significant public comments in the

7    Final Rule violates the Administrative Procedure Act, 5 U.S.C. § 553(c), 5 U.S.C. § 706(2)(A),

8    and constitutes arbitrary and capricious agency action.

9                              **THIRD CAUSE OF ACTION**

10         **Violation of Administrative Procedure Act for Procedurally Deficient Certification
                                    Process**

11

12         51.    Plaintiffs repeat and reallege paragraphs 1–44.

13         52.    Defendants' certification process claims exemption from the Administrative

14   Procedure Act's rulemaking requirements.

15         53.    Defendants' certification process fails to provide actual notice to interested parties

16   of a state's request for certification.

17         54.    Defendants' certification process fails to provide interested parties with notice and

18   the opportunity to meaningfully contest the basis for state eligibility.

19         55.    Defendants' certification process impermissibly shifts the burden of proof from the

20   state to the individual petitioners.

21         56.    Defendants' certification process is not rationally related to the certification

22   decision and fails to create a process for obtaining information relevant to the certification

23   decision.

24         57.    Defendants' certification process fails to provide notice of certification denials to

25   interested parties.

26         58.    Defendants' certification process fails to allow interested parties to petition for

27   repeal of certification.

28   ///

                                    - 18 -                              COMPLAINT

1    59.    Defendants' implementation of a deficient certification process violates the

2  Administrative Procedure Act, 5 U.S.C. §§ 553(b)(3)-(c),(e); 5 U.S.C. § 706(2)(A),(C),(D), and

3  constitutes arbitrary and capricious agency action.

## FOURTH CAUSE OF ACTION

### Violation of Administrative Procedure Act for Substantively Deficient Certification Process

7    60.    Plaintiffs repeat and reallege paragraphs 1–44.

8    61.    Defendants have implemented a certification process that fails to provide

9  substantive criteria as to how to satisfy the requirements of Chapter 154. Among other things,

10  Defendants have implemented a certification process (i) with insufficient standards for counsel

11  competency; and (ii) that fails to establish how and on what factual bases the Attorney General

12  will make his certification decisions.

13    62.    Accordingly, Defendants have violated the Administrative Procedure Act,

14  5 U.S.C. § 706(2)(A), and such action constitutes arbitrary and capricious agency action.

## FIFTH CAUSE OF ACTION

### Violation of Due Process Clause of the United States Constitution

17    63.    Plaintiffs repeat and reallege paragraphs 1–44.

18    64.    Defendants' involvement in the rulemaking and certification process violates the

19  Due Process Clause of the United States Constitution because the Attorney General, who has a

20  vested interest in limitations on collateral review, labors under an actual conflict of interest in

21  crafting regulations and making certification determinations that demand assessing the adequacy

22  of state post-conviction systems.

23    65.    Defendants have failed to provide adequate notice of rulemaking.

24    66.    Defendants have implemented a certification process that is subject to risk of bias.

25    67.    Defendants have implemented a certification process that violates the Due Process

26  Clause of the United States Constitution because it fails to provide adequate notice and a

27  meaningful opportunity to participate in and contest certification. The Final Rule permits

28  certification of a state mechanism that is not applied in practice.

1    68.    The Final Rule violates the Due Process Clause of the United States Constitution
2    because it provides no minimum standards of counsel competency.

3    **VII.    RELIEF REQUESTED**

4        Wherefore, Plaintiffs pray that this Court:

5    1.    Hold unlawful and set aside Defendants' Certification Process for State Capital
6    Counsel Systems, 78 Fed. Reg. 58,160 (Sept. 23, 2013) for failing to comply with the
7    requirements of the Administrative Procedure Act and the Due Process Clause of the United
8    States Constitution as alleged in the Causes of Action above. There exists an actual, present and
9    justiciable controversy between Plaintiffs and Defendants concerning their rights and duties with
10   respect to Defendants' actions described in those causes of action. Furthermore, this controversy
11   is ripe for judicial decision, and declaratory relief is necessary and appropriate. 18 U.S.C.
12   §§ 2201, 2202.

13   2.    In the alternative, this Court should enjoin the effective date of the Final Rule until
14   review of the lawfulness of Defendants' actions is completed, 5 U.S.C. § 705.

15   3.    Award Plaintiffs their costs and reasonable attorney's fees incurred in this action,
16   28 U.S.C. § 2412(d)(1)(A), and

17   4.    Grant such other relief as the Court may deem just and proper.

18

19   Dated: September 30, 2013        GEORGE E. GREER
                                      CATHERINE Y. LUI
20                                    DARREN S. TESHIMA
                                      SHANNON C. LEONG
21                                    Orrick, Herrington & Sutcliffe LLP

22

23                                    By: _____

24                                        CATHERINE Y. LUI
                                          Attorneys for Plaintiffs
25                                        Habeas Corpus Resource Center and the
                                          Office of the Federal Public Defender for
26                                        the District of Arizona

27

28

COMPLAINT

OHSUSA:754396943.13

# Exhibit 1

written comments on the proposal to the FAA. No comments were received.

Class E airspace designations are published in paragraph 6006, of FAA Order 7400.9X dated August 7, 2013, and effective September 15, 2013, which is incorporated by reference in 14 CFR 71.1. The Class E airspace designations listed in this document will be published subsequently in that Order.

**The Rule**

This action amends Title 14 Code of Federal Regulations (14 CFR) part 71 by establishing Class E en route domestic airspace extending upward from 1,200 feet above the surface, at the Battle Mountain VORTAC navigation aid, Battle Mountain, NV, to accommodate IFR aircraft under control of Salt Lake City, Oakland and Los Angeles ARTCCs by vectoring aircraft from en route airspace to terminal areas. This action is necessary for the safety and management of IFR operations.

The FAA has determined this regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. Therefore, this regulation: (1) Is not a "significant regulatory action" under Executive Order 12866; (2) is not a "significant rule" under DOT Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a regulatory evaluation as the anticipated impact is so minimal. Since this is a routine matter that only affects air traffic procedures and air navigation, it is certified this rule, when promulgated, does not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act. The FAA's authority to issue rules regarding aviation safety is found in Title 49 of the U.S. Code. Subtitle 1, Section 106 discusses the authority of the FAA Administrator. Subtitle VII, Aviation Programs, describes in more detail the scope of the agency's authority. This rulemaking is promulgated under the authority described in Subtitle VII, Part A, Subpart I, Section 40103. Under that section, the FAA is charged with prescribing regulations to assign the use of airspace necessary to ensure the safety of aircraft and the efficient use of airspace. This regulation is within the scope of that authority as it establishes controlled airspace at the Battle Mountain VORTAC, Battle Mountain, NV.

**Environmental Review**

The FAA has determined that this action qualifies for categorical exclusion

under the National Environmental Policy Act in accordance with FAA Order 1050.1E, "Environmental Impacts: Policies and Procedures," paragraph 311a. This airspace action is not expected to cause any potentially significant environmental impacts, and no extraordinary circumstances exist that warrant preparation of an environmental assessment.

**List of Subjects in 14 CFR Part 71**

Airspace, Incorporation by reference, Navigation (air).

**Adoption of the Amendment**

In consideration of the foregoing, the Federal Aviation Administration amends 14 CFR Part 71 as follows:

**PART 71—DESIGNATION OF CLASS A, B, C, D AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS**

■ 1. The authority citation for 14 CFR part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

**§71.1 [Amended]**

■ 2. The incorporation by reference in 14 CFR 71.1 of the Federal Aviation Administration Order 7400.9X, Airspace Designations and Reporting Points, dated August 7, 2013, and effective September 15, 2013 is amended as follows:

*Paragraph 6006 En Route Domestic Airspace Areas.*

\* \* \* \* \*

**ANM NV E6 Battle Mountain, NV [New]**

Battle Mountain VORTAC, NV
    (Lat. 40°34′09″ N., long. 116°55′20″ W.)

That airspace extending upward from 1,200 feet above the surface within an area bounded by Lat. 41°08′22″ N., long. 114°57′44″ W.; to Lat. 40°40′40″ N., long. 114°28′45″ W.; to Lat. 40°06′57″ N., long. 114°37′44″ W.; to Lat. 39°38′25″ N., long. 114°42′19″ W.; to Lat. 38°28′04″ N., long. 114°21′28″ W.; to Lat. 38°19′56″ N., long. 114°09′07″ W.; to Lat. 38°23′43″ N., long. 113°12′48″ W.; to Lat. 37°48′00″ N., long. 113°30′00″ W.; to Lat. 37°49′25″ N., long. 113°42′01″ W.; to Lat. 37°53′44″ N., long. 113°42′03″ W.; to Lat. 38°01′00″ N., long. 114°12′03″ W.; to Lat. 38°01′00″ N., long. 114°30′03″ W.; to Lat. 37°59′59″ N., long. 114°42′06″ W.; to Lat. 37°53′00″ N., long. 116°11′03″ W.; to Lat. 37°53′00″ N., long. 116°26′03″ W.; to Lat. 37°53′00″ N., long. 116°50′00″ W.; to Lat. 38°13′30″ N., long. 117°00′00″ W.; to Lat. 38°13′30″ N., long. 117°16′30″ W.; to Lat. 37°55′11″ N., long. 117°53′37″ W.; to Lat. 39°39′28″ N., long. 117°59′55″ W.; to Lat. 40°04′38″ N., long. 118°49′42″ W., thence to the point of beginning.

Issued in Seattle, Washington, on September 11, 2013.

**Christopher Ramirez,**

*Acting Manager, Operations Support Group, Western Service Center.*

[FR Doc. 2013–22846 Filed 9–20–13; 8:45 am]

**BILLING CODE 4910–13–P**

**DEPARTMENT OF JUSTICE**

**28 CFR Part 26**

**[Docket No. 1540; AG Order No. 3399–2013]**

**RIN 1121–AA77**

**Certification Process for State Capital Counsel System**

**AGENCY:** Office of the Attorney General, Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** Chapter 154 of title 28, United States Code, provides special procedures for Federal habeas corpus review of cases brought by indigent prisoners in State custody who are subject to a capital sentence. These special procedures are available to States that the Attorney General has certified as having established mechanisms for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by such prisoners, and as providing standards of competency for the appointment of counsel in these proceedings. This rule sets forth the regulations for the certification procedure.

**DATES:** *Effective Date:* This rule is effective October 23, 2013.

**FOR FURTHER INFORMATION CONTACT:** Robert Hinchman, U.S. Department of Justice, Office of Legal Policy, 950 Pennsylvania Avenue NW., Washington, DC 20530, at (202) 514–8059 or *Robert.Hinchman@usdoj.gov.*

**SUPPLEMENTARY INFORMATION:** Chapter 154 of title 28, United States Code, makes special procedures applicable in Federal habeas corpus review of State capital judgments if the Attorney General has certified "that [the] State has established a mechanism for providing counsel in postconviction proceedings as provided in section 2265" and "counsel was appointed pursuant to that mechanism, petitioner validly waived counsel, petitioner retained counsel, or petitioner was found not to be indigent." 28 U.S.C. 2261(b). Section 2265(a)(1) provides that, if requested by an appropriate State official, the Attorney General must

determine "whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State [capital] postconviction proceedings brought by indigent prisoners" and "whether the State provides standards of competency for the appointment of counsel in [such] proceedings."

Chapter 154 was enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Public Law 104–132, section 107, 110 Stat. 1214, 1221–26 (1996), and was amended by the USA PATRIOT Improvement and Reauthorization Act of 2005, Public Law 109–177, section 507, 120 Stat. 192, 250–51 (2006). Before the 2006 amendments, the regional Federal courts in their review of State capital cases determined States' eligibility for the chapter 154 habeas corpus review procedures. The 2006 amendments reassigned responsibility for chapter 154 certifications to the Attorney General of the United States, subject to de novo review by the Court of Appeals for the District of Columbia Circuit, and added a provision stating that there are no requirements for certification or for application of chapter 154 other than those expressly stated in the chapter, 28 U.S.C. 2265(a)(3). The effects of the 2006 amendments are explained in an opinion of the Department's Office of Legal Counsel and, where relevant to a specific provision in the rule, elsewhere in this preamble. *See The Attorney General's Authority in Certifying Whether a State Has Satisfied the Requirements for Appointment of Competent Counsel for Purposes of Capital Conviction Review Proceedings,* 33 Op. O.L.C. ____, at *12 (Dec. 16, 2009) ("OLC Opinion"), *available at http://www.justice.gov/olc/opinions.htm.*

Section 2265(b) directs the Attorney General to promulgate regulations to implement the certification procedure under chapter 154. The Attorney General accordingly published a proposed rule in the **Federal Register** on June 6, 2007, to add a new subpart entitled "Certification Process for State Capital Counsel Systems" to 28 CFR part 26. 72 FR 31217. The comment period ended on August 6, 2007. The Department published a notice on August 9, 2007, reopening the comment period, 72 FR 44816, and the reopened comment period ended on September 24, 2007. A final rule establishing the chapter 154 certification procedure was published on December 11, 2008, 73 FR 75327 (the "2008 regulations"), with an effective date of January 12, 2009.

In January 2009, the United States District Court for the Northern District of California enjoined the Department "from putting into effect the rule . . . without first providing an additional comment period of at least thirty days and publishing a response to any comments received during such period." *Habeas Corpus Resource Ctr.* v. *U.S. Dep't of Justice,* No. 08–2649, 2009 WL 185423, at *10 (N.D. Cal. Jan. 20, 2009) (preliminary injunction); *Habeas Corpus Resource Ctr.* v. *U.S. Dep't of Justice,* No. 08–2649, slip op. at 1 (Jan. 8, 2009) (temporary restraining order). On February 5, 2009, the Department solicited further public comment, with the comment period closing on April 6, 2009. 74 FR 6131.

As the Department reviewed the submitted comments, it considered further the statutory requirements governing the regulatory implementation of the chapter 154 certification procedures. The Attorney General determined that chapter 154 gave him greater discretion in making certification determinations than the 2008 regulations would have allowed. Therefore, the Department published a notice in the **Federal Register** on May 25, 2010, proposing to remove the 2008 regulations pending the completion of a new rulemaking process, during which the Department would further consider what procedures were appropriate. 75 FR 29217. The comment period closed on June 24, 2010. On November 23, 2010, the Department published a final rule removing the 2008 regulations. 75 FR 71353.

The Department published a new proposed rule on March 3, 2011. 76 FR 11705. The comment period closed on June 1, 2011. The Department published a supplemental notice of proposed rulemaking on February 13, 2012, which identified a number of possible changes the Department was considering based on comments received in response to the publication of the proposed rule. 77 FR 7559. The comment period closed on March 14, 2012.

## Summary of Comments

About 60 comments were received on the proposed rule, including both comments received on the initial notice of proposed rulemaking and comments received on the supplemental notice of proposed rulemaking.

Some commenters urged the Department to publish, in effect, a third notice of proposed rulemaking so as to disclose the exact text of the final rule—particularly the language regarding the effect of compliance with benchmarks on certification—before its publication. However, the Department published the full text of the proposed rule in the original notice of proposed rulemaking. 76 FR 11705. It also published a supplemental notice of proposed rulemaking to provide a further opportunity for public input on changes to the rule under consideration following initial comment. 77 FR 7559. The text of this final rule is the same as that published in the original notice of proposed rulemaking, except for five changes to that text that were precisely described in the supplemental notice, further clarifying amendments (affecting §§ 26.20, 26. 21, 26.22(b), (c), and (d), and 26.23(c)), and minor technical changes. All of the changes made to the text directly pertain to subjects and issues identified as under consideration by the terms of the original notice and supplemental notice and are responsive to the public comments received on those notices. The extensive comments received in response to the two publications confirm that interested members of the public were able to comment intelligently on the issues affecting the formulation of the final rule and in fact did so.

In the ensuing summary, comments that concern the general approach of the rule or that affect a number of provisions in the rule are discussed initially, followed by discussion of comments that pertain more specifically to particular provisions in the rule.

## General Comments

### *The Basic Approach of the Rule*

Two commenters argued that the Attorney General lacks authority to articulate substantive standards for chapter 154 certification, contending instead that chapter 154 limits the Attorney General to performing ministerial tasks when exercising his or her certification responsibilities. These comments are not well-founded. Chapter 154 is reasonably construed to allow the Attorney General to define within reasonable bounds the chapter's requirements for certification, and to evaluate whether a State's mechanism is adequate for purposes of ensuring that it will result in the appointment of competent counsel. The reasons for this conclusion are summarized in the OLC Opinion and elsewhere in this preamble.

Many commenters agreed that the Attorney General may appropriately specify and apply a substantive Federal standard that State mechanisms must meet to satisfy chapter 154's requirements for certification, and this rule specifies that standard, within the limits of the statutory scheme it implements: (i) *Appointment*—Chapter

154 requires the Attorney General to certify "whether the State has established a mechanism for the appointment . . . of . . . counsel" in State capital collateral proceedings. This rule provides further specification regarding the statutory appointment procedures and discusses the express statutory provisions that require such appointments to occur in a reasonably timely fashion. (ii) *Competent Counsel*—Chapter 154 provides that the Attorney General must determine whether the State has established a mechanism for the appointment of "competent counsel" in State capital collateral proceedings, and "whether the State provides standards of competency for the appointment of counsel" in such proceedings. This rule provides two "benchmark" competency standards that are presumptively sufficient to warrant certification while still leaving States some leeway to adopt other standards so long as they reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases. (iii) *Compensation and payment of reasonable litigation expenses*—Chapter 154 additionally requires the Attorney General to determine whether the State has established a mechanism for the "compensation" and "payment of reasonable litigation expenses" of competent counsel in State capital collateral proceedings. This rule provides four benchmark compensation standards that are presumptively adequate while again leaving States some significant discretion to formulate alternative compensation schemes, if reasonably designed to ensure the availability and timely appointment of competent counsel. And as to all of these matters, this rule provides that the Attorney General will consider a State's submission requesting certification and any input through a public comment procedure before determining whether certification is warranted.

Several commenters, however, argued that the certification standards and procedures promulgated in this rule (and described in the prior notice and supplemental notice of proposed rulemaking) do not go far enough in dictating the standards States must meet, or in providing for sufficient review and oversight by the Attorney General of State compliance with mechanisms for which certification is sought. For the reasons discussed generally below, and elsewhere in this preamble in the context of specific provisions of the rule, the Department

has not adopted the changes proposed by these commenters.

Some of these commenters urged that the rule incorporate counsel competency provisions that would have the effect of eliminating or largely displacing State discretion to develop, within appropriate bounds, mechanisms for ensuring that competent counsel are appointed. One commenter, for instance, proposed that the rule should prescribe uniform national competency standards that must be adopted by any and all States seeking certification. Other commenters contended that the rule should incorporate measures as to prior experience in capital and postconviction capital proceedings, specialized training, demonstrated competence according to performance standards, and removal of attorneys who fail to provide effective representation— and find deficient, without exception, any State system that does not incorporate *all* of these features. The Department did not accept these comments, believing that they risk conflict with the statutory scheme, which leaves room for States to formulate their own standards so long as they reasonably assure the availability and appointment of competent counsel. *See* OLC Opinion at \*12–13; *see also* 135 Cong. Rec. 24696 (1989) (report of the Judicial Conference's Ad Hoc Committee on Federal Habeas Corpus in Capital Cases ("the Powell Committee report") from which many of the relevant features of Chapter 154 derive, explaining that giving States "wide latitude to establish a mechanism that complies with [the statutory requirements]" is "more consistent with the federal-state balance").

Raising another issue, several comments proposed that the rule require a showing of State compliance with its own established mechanism as a condition of certification. As envisioned by these comments, the Attorney General, when presented with a request for certification, would review a State's record of appointments in individual cases to verify that the appointments were made in conformity with the State's established mechanism. These comments were not adopted because the statutory scheme does not call for such case-specific oversight by the Attorney General of State compliance with a mechanism it has established.

Chapter 154 in its current formulation states two preconditions for the chapter's applicability in a particular case: (1) As provided in section 2261(b)(1), "the Attorney General of the United States certifies that a State has established a mechanism for providing

counsel in postconviction proceedings as provided in section 2265"; and (2) as provided in section 2261(b)(2), "counsel was appointed pursuant to that mechanism, petitioner validly waived counsel, petitioner retained counsel, or petitioner was found not to be indigent." Of these two functions, only the general certification function is assigned to "the Attorney General of the United States." The case-specific function of ascertaining whether counsel was appointed pursuant to the certified mechanism is reserved to Federal habeas courts, which can address individual irregularities and decide whether the Federal habeas corpus review procedures of chapter 154 will apply in particular cases. If the commenters were correct in asserting that the Attorney General should withhold certification unless he or she finds that the State has complied with its established mechanism in every case, there would have been little need for Congress to have included section 2261(b)(2). *Cf. Ashmus* v. *Woodford,* 202 F.3d 1160, 1168 & n.13 (9th Cir. 2000) (chapter 154 designed to avoid case-by-case analysis of counsel's competence by requiring binding appointment standards). Moreover, if a State establishes a new mechanism for appointment of competent counsel (in response to this rule and its articulation of benchmark standards) and requests at the outset that the Attorney General determine its adequacy, chapter 154 should not be read to foreclose certification simply because the Attorney General would not yet have a basis to examine the State's compliance with the newly established system.

Though the Department rejects the suggestion that the Attorney General's certification determination should depend on whether a State complies with its own mechanism in isolated cases, the question of whether a State has "established" a mechanism is a conceptually distinct matter that the statutory framework *does* charge the Attorney General with determining, *see* 28 U.S.C. 2265(a)(1)(A)–(B). The requirement of having "established" a mechanism consistent with chapter 154 presupposes that the State has adopted and implemented standards consistent with the chapter's requirements concerning counsel appointment, competency, compensation, and expenses. Thus, the rule allows for the possibility that the Attorney General will need to address situations in which there has been a wholesale failure to implement one or more material elements of a mechanism described in a State's certification submission, such as

when a State's submission relying on § 26.22(b)(1)(ii) in the rule points to a statute that authorizes a State agency to create and fund a statewide attorney monitoring program, but the agency never actually expends any funds, or expends funds to provide for monitoring of attorneys in only a few of its cities. Addressing any such situations would require careful consideration of the specific features of a mechanism presented for certification, and is therefore best left to individual certification decisions. Other than in these situations, should they arise, questions of compliance by a State with the standards of its capital counsel mechanism will be a matter for the Federal habeas courts.

Finally, a few of the comments could be read to suggest that chapter 154 requires the Attorney General to certify a State mechanism only if he or she examines and is satisfied by the actual performance of postconviction counsel following appointment. On such an understanding, an assessment by the Attorney General of the performance of attorneys in State habeas proceedings (e.g., what investigation was done or not done, or what arguments were made or not made in a habeas petition) would inform a decision as to whether the State's mechanism adequately provides for appointment of competent postconviction counsel and, accordingly, whether chapter 154 certification is warranted. To the extent that the comments urged such an interpretation, it was rejected in formulating the rule.

The actual requirements under chapter 154 relating to counsel competency are establishment by a State of "a mechanism for the appointment . . . of competent counsel" in State capital collateral proceedings, and provision by the State of "standards of competency for the appointment of counsel" in such proceedings. Neither of these provisions suggests that the Attorney General is required to inquire into the facts of how counsel performed following appointment in all or some subset of cases. Rather, both frame their requirements regarding counsel competency as matters relating to appointment, and are naturally understood as contemplating an inquiry into whether a State has put in place adequate qualification standards that counsel must meet to be eligible for appointment. This understanding is supported by the Powell Committee report. The report explained that Federal review would examine whether a State's mechanism for appointing capital postconviction counsel comports with the statutory requirements "as

opposed to the competency of particular counsel." 135 Cong. Rec. 24696 (1989). It further explained that, in contrast to the focus on "the performance of a capital defendant's trial and appellate counsel," "[t]he effectiveness of state and federal postconviction counsel is a matter that can and must be dealt with in the appointment process." *Id.*

*The Role of the Attorney General*

Some commenters asserted that the Attorney General has an inherent conflict of interest that should disqualify him from making certification determinations under chapter 154. These commenters claimed that the Attorney General's prosecutorial functions and responsibilities would render him unable to objectively evaluate State capital counsel systems. The remediation proposed by these commenters included the suggestion that the Attorney General delegate his functions under chapter 154 to some other official or division within the Department of Justice that the commenters believed would be free of the supposed conflict of interest. Commenters also proposed that the Attorney General only exercise his certification responsibilities on the basis of very specific, inflexible criteria that would leave no room for judgment or discretion by the Attorney General in evaluating a given State system under chapter 154.

As an initial matter, the Attorney General cannot refrain from carrying out the functions assigned to him by chapter 154: The law requires him to discharge those functions. Congress assigned the certification function to the Attorney General after having heard arguments concerning a purported conflict of interest similar to those now advanced by the commenters. *See* 28 U.S.C. 2265(a)(1); *Habeas Reform: The Streamlined Procedures Act: Hearing Before the S. Comm. on the Judiciary,* 109th Cong. 26–27 (2005); *see also id.* at 54 (written statement of Professor Eric M. Freedman on behalf of the American Bar Association) ("The Attorney General is the nation's chief *prosecutor* and thus is hardly an appropriate officer to decide whether a state has kept its part of the 'opt in' bargain."). Moreover, the enactment of chapter 154 is not the first time that Congress has assigned to the Attorney General the task of evaluating State efforts to provide attorney representation to petitioners convicted of a capital crime. For example, the Innocence Protection Act of 2004, Public Law 108–405, Title IV, Subtitle B, 118 Stat. 2260, 2286–92 (2004) ("IPA"), contemplates the administration by the Attorney General

of a program to improve the quality of legal representation provided to indigent petitioners in State capital cases, including the making of grants to States willing to implement federally prescribed capital counsel standards, continuing oversight of the capital defense systems of States that accept funding, and negotiation or direction by the Attorney General of corrective actions needed to secure compliance by those States with the federally prescribed capital counsel requirements. *See* 42 U.S.C. 14163, 14163c–14163d; 151 Cong. Rec. E2640 (daily ed. Dec. 22, 2005) (extension of remarks of Rep. Flake) (noting as precedent for chapter 154 responsibilities of the Attorney General that "[j]ust last year . . . Congress assigned the Attorney General to evaluate State . . . capital counsel systems" under the IPA).

More fundamentally, there is no sound basis for the claim that the Attorney General has a conflict of interest that would preclude him from fairly carrying out the functions assigned to him by Congress. The criteria the Attorney General will apply in deciding whether a State has satisfied the chapter 154 requirements do not control what will be deemed constitutionally effective or ineffective assistance of counsel in the criminal cases for which the Attorney General is responsible. Addressing questions concerning what constitutes constitutionally effective assistance calls for an assessment of an attorney's performance in a given case, and as already noted, the Attorney General will not make such independent assessments in the context of making certification decisions under chapter 154, which call instead for an evaluation of general competency standards put in place by a State mechanism. Hence, there is no basis to conclude that the determinations that the Attorney General must make when presented with a request for certification of a State mechanism would conflict with the conduct of the Attorney General's prosecutorial functions.

Moreover, the functions performed by the Attorney General in his criminal law enforcement and prosecutorial oversight capacities are only part of the broader, diverse range of duties he regularly performs. The Department, under the Attorney General's supervision, administers and carries out programs for the improvement of indigent criminal defense systems, both generally and with respect to capital cases in particular. *See, e.g.,* Bureau of Justice Assistance, U.S. Dep't of Justice, *Answering Gideon's Call: Improving Indigent Defense Delivery Systems, FY*

*2012 Competitive Grant Announcement* (April 4, 2012); Bureau of Justice Assistance, U.S. Dep't of Justice, *Capital Case Litigation Initiative, FY 2011 Competitive Grant Announcement* (Jan. 11, 2011); Bureau of Justice Assistance, U.S. Dep't of Justice, *Capital Case Litigation Initiative, http://www.bja.gov/ ProgramDetails.aspx?Program_ID=52* (last visited July 23, 2013) (further information on capital case litigation initiative); U.S. Dep't of Justice, *The Access to Justice Initiative, http:// www.justice.gov/atj* (last visited July 23, 2013) (home page for the Department's Access to Justice Initiative, which seeks to "increase access to counsel and legal assistance," including by advancing "new statutory, policy, and practice changes that support development of quality indigent defense"). The Attorney General leads and convenes the Federal Interagency Reentry Council, a government-wide effort to improve employment, housing, treatment, and educational opportunities for individuals who were previously incarcerated. The Department of Justice also handles much of the Federal government's civil litigation under the Attorney General's authority, in some cases serving as or representing the plaintiff and in others serving as or representing the defendant. In addition, the Attorney General oversees the Department's Community Relations Service, which provides violence prevention and conflict resolution services to State and local governments, private organizations, and community groups. These examples demonstrate that the Attorney General is accustomed to appropriately balancing varied and occasionally competing interests in the exercise of his duties. Thus, even if carrying out the certification function assigned to him by law did affect the Department's criminal law enforcement efforts (though it does not), the commenters have made no persuasive showing that the Attorney General would be unable to fairly evaluate a State's certification request.

In addition, discharge of the required chapter 154 functions by the Attorney General is consistent with Rule 1.7(a)(2) of the American Bar Association ("ABA") Model Rules of Professional Conduct and comparable rules adopted by most State supreme courts), which provides in relevant part that "a lawyer shall not represent a client if . . . there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."

The Attorney General has no responsibilities to a client that would materially limit the discharge of the chapter 154 certification function, because the Attorney General's only relevant client is the United States, which through Congress has expressly directed the discharge of that function by law. There is also no reason to believe that the Attorney General has any responsibility to a "former client" or "third person," or any "personal interest," that would materially impair his representation of the United States in the discharge of that function. The Attorney General has a professional obligation to abide by the "client's decisions concerning the objectives of representation," ABA Model Rule 1.2(a), making it difficult to conceive how the Attorney General could have such a disqualifying conflict in representing the United States when it is the United States that has mandated through its laws that the Attorney General carry out the chapter 154 certification function.

Against this background, there is no force to the claim of some commenters that the Attorney General has an inherent conflict of interest in carrying out his legal duties under chapter 154—which potentially affects defense and judicial review functions in criminal cases for which the Attorney General is not responsible—because the Attorney General oversees the conduct of prosecutions in Federal criminal cases, among other duties. Modification of the rule to incorporate the remedial measures proposed by these commenters is accordingly not necessary because the underlying assumption of a conflict of interest is not well-founded. Indeed, the specific remedy suggested by many of these commenters, that the Attorney General address the purported conflict of interest by delegating the certification function to the Department's Inspector General, would itself pose problems. Among others, the task of certifying State capital counsel mechanisms falls outside the current duties, responsibilities, and expertise of the Inspector General and his staff, which focus on fraud, waste, and abuse in the Department of Justice, *see* 5 U.S.C. App. 3 sections 4, 8E.

*Relationship to Prior Judicial Interpretation*

Some commenters criticized the rule as inconsistent with the judicial construction of chapter 154. However, prior judicial interpretation of chapter 154, much of which remains generally informative, supports many features of this rule, as this preamble documents. To the extent the rule approaches

certain matters differently from some past judicial decisions, there are reasons for the differences.

One reason judicial decisions could not consistently be followed on some matters in this rule is that the decisions were not in accord with each other on these matters. For example, as discussed below in connection with § 26.22(b) of the rule, some district court decisions regarded prior capital litigation experience as necessary to qualify for appointment under chapter 154, but appellate precedent and other authority permit a more flexible approach that would understand capital litigation experience to be relevant and often helpful, but not indispensable.

Textual changes that Congress has made in chapter 154 are another reason for differences from prior judicial decisions under chapter 154. For example, as explained below in the analysis statement accompanying § 26.21 in this rule, chapter 154 originally had separate provisions for State systems bifurcating direct and collateral review (28 U.S.C. 2261 (2000) (amended 2006)) and State "unitary review" systems in which collateral claims may be raised in the course of direct review (28 U.S.C. 2265 (2000) (amended 2006)). Both sets of provisions included language specifying the form that State standards establishing the required capital counsel mechanism must take. The general provisions in former section 2261(b) required that a State establish the mechanism "by statute, rule of its court of last resort, or by another agency authorized by State law." The provisions in section 2265(a) for unitary review procedures required that a State establish the mechanism "by rule of its court of last resort or by statute." Both sections said that "[t]he rule of court or statute must provide standards of competency for the appointment of . . . counsel."

In *Ashmus* v. *Calderon*, the court concluded that the State unitary review procedure under review in that case did not satisfy chapter 154, in part because the State's qualification standards for appointment of capital counsel were not set out in a "rule of court" in the relevant sense. 123 F.3d 1199, 1207–08 (9th Cir. 1997). This particular ground for denying chapter 154 certification no longer exists under the current formulation of chapter 154. The amendments to chapter 154 enacted in 2006 replaced the separate provisions for bifurcated and unitary review procedures with uniform requirements that apply to all State systems and eliminated the former language specifying that the relevant standards

were to be provided by rule of court or statute.

This rule accordingly does not include a requirement that relevant State standards must be adopted by any particular means, notwithstanding the judicial application of such a requirement when the statutory language was different. While States still must establish capital counsel mechanisms that satisfy the chapter 154 requirements to be certified, there is no requirement that they do so in any particular form, such as only through standards set out in rules of court. So long as there has been an authoritative adoption or articulation by a State of binding standards, and those standards are not otherwise negated or overridden by State policy, the standards are "established" for the purposes of chapter 154.

Other differences reflect the change in responsibility for chapter 154 certification under the 2006 amendments. Prior to those amendments, requests to invoke the chapter 154 procedures were presented to Federal habeas courts in the context of particular State capital cases they were reviewing. Courts in that posture considered both whether the State had established a mechanism satisfying chapter 154, and if so, whether counsel for the petitioner in the particular case before them had been provided in full compliance with that mechanism. Hence, if counsel had not been appointed on collateral review in a particular case, or if the attorney provided did not satisfy the State's competency standards for such appointments, for example, the courts could find chapter 154 inapplicable on that basis, regardless of whether the State had established a capital counsel mechanism that otherwise satisfied the requirements of chapter 154. *See, e.g., Tucker v. Catoe,* 221 F.3d 600, 604–05 (4th Cir. 2000) ("We accordingly conclude that a state must not only enact a 'mechanism' and standards for postconviction review counsel, but those mechanisms and standards must in fact be complied with before the state may invoke the time limitations of 28 U.S.C. 2263.").

The result in such a case is not necessarily different under the current formulation of chapter 154, but the route to that result is not the same. In entertaining a State's request for chapter 154 certification, the Attorney General has no individual case before him and is not responsible for determining whether a State has complied with its mechanism in any particular case. Rather, as discussed above, 28 U.S.C. 2261(b)(1) assigns to the Attorney

General the general certification function under chapter 154, which makes him responsible for determining whether a mechanism has been established by the State and whether the State provides standards of competency. If the State mechanism is certified, appointment of counsel pursuant to the certified mechanism (absent waiver or retention of counsel or a finding of non-indigence) continues to be a further condition for the applicability of chapter 154. But whether that has occurred in any individual case is, under 28 U.S.C. 2261(b)(2), a matter within the province of the Federal habeas court to which the case is presented, not the Attorney General.

### Section 26.20—Purpose

A comment on this section as drafted in the proposed rule objected that it did not mention the condition for chapter 154's applicability appearing in 28 U.S.C. 2261(b)(2). While the section 2261(b)(2) requirement was noted in the preamble to the proposed rule, *see* 76 FR at 11706, 11710–11, the objection is well-taken. The final text of § 26.20 reflects explicitly that the applicability of the Federal habeas corpus review procedures of 28 U.S.C. 2262, 2263, 2264, and 2266 in a capital case depends on both certification of the State's postconviction capital counsel mechanism, as provided in 28 U.S.C. 2261(b)(1), and appointment of counsel pursuant to the certified mechanism (absent waiver or retention of counsel or a finding of non-indigency) as provided in 28 U.S.C. 2261(b)(2).

### Section 26.21—Definitions

*Appointment*

Many comments raised the concern that the proposed rule did not address the timing of counsel appointment. The concern reflected the general importance of the timely availability of counsel in the context of a complex and difficult type of litigation and specific issues arising from chapter 154's special time limit for Federal habeas filing. *Compare* 28 U.S.C. 2263 (general 180-day time limit under chapter 154) *with* 28 U.S.C. 2244(d) (one-year time limit otherwise applicable).

The Department believes that the concern reflected in these comments is well-founded. Chapter 154 involves a *quid pro quo* arrangement under which appointment of counsel for indigents is extended to postconviction proceedings in capital cases, and in return, subsequent Federal habeas review is carried out with generally more limited time frames and scope. *See, e.g.,* H.R. Rep. No. 104–23, at 10 (1995) (noting

the chapter's "quid pro quo arrangement under which states are accorded stronger finality rules on Federal habeas review in return for strengthening the right to counsel for indigent capital defendants"). The Powell Committee report, from which this essential feature of chapter 154 derives, explained that "[c]apital cases should be subject to one complete and fair course of collateral review in the state and federal system . . . with the assistance of competent counsel for the defendant" and that "[t]he belated entry of a lawyer, under severe time pressure, does not do enough to ensure fairness." 135 Cong. Rec. 24695 (1989).

The quid pro quo arrangement of chapter 154 requires provision of counsel to capital petitioners in State postconviction proceedings in return for Federal habeas review carried out with generally more limited time frames and scope. Against this background, not every conceivable provision for making postconviction counsel available, however belatedly—e.g., only after the deadline for pursuing State postconviction proceedings had passed; or only after the expiration of section 2263's time limit for Federal habeas filing; or only after such delay that the time available for preparing for and pursuing either State or Federal postconviction review had been seriously eroded—can logically be regarded as providing for appointment of counsel within the meaning of chapter 154. Consistent with such considerations, judicial decisions under chapter 154 that addressed the matter concluded that the State mechanism must provide for timely appointment of counsel. *See, e.g., Brown v. Puckett,* No. 3:01CV197–D, 2003 WL 21018627, at *3 (N.D. Miss. Mar. 12, 2003) ("The timely appointment of counsel at the conclusion of direct review is an essential requirement in the opt-in structure. Because the abbreviated 180-day statute of limitations begins to run immediately upon the conclusion of direct review, time is of the essence. Without a requirement for the timely appointment of counsel, the system is not in compliance."); *Ashmus v. Calderon,* 31 F. Supp. 2d 1175, 1187 (N.D. Cal. 1998) ("The quid pro quo would be hollow indeed if compliance by the state was satisfied by merely offering and promising to appoint competent counsel with no element of timeliness."); *Hill v. Butterworth,* 941 F. Supp. 1129, 1147 (N.D. Fla. 1996) ("[T]he Court holds that any offer of counsel pursuant to Section 2261 must be a *meaningful offer.* That is, counsel must be immediately appointed after a

capital defendant accepts the state's offer of postconviction counsel."), *rev'd on other grounds*, 147 F.3d 1333 (11th Cir. 1998).

The supplemental notice of proposed rulemaking accordingly proposed specifying more clearly that an adequately functioning mechanism, as described in chapter 154, will necessarily incorporate a policy for the timely appointment of competent counsel. *See* 77 FR at 7560–61. Section 26.21 of the final rule does so by adding a definition of appointment that clarifies that it entails "provision of counsel in a manner that is reasonably timely in light of the time limitations for seeking State and Federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings." *See* American Bar Association, *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, at 127 (rev. ed. Feb. 2003), *available at http:// www.americanbar.org/content/dam/ aba/migrated/legalservices/downloads/ sclaid/deathpenaltyguidelines2003. authcheckdam.pdf* ("ABA Guidelines") (increasingly intertwined nature of State and Federal habeas proceedings means that "although the AEDPA deals strictly with cases being litigated in federal court, its statute of limitations provision creates a de facto statute of limitations for filing a collateral review petition in state court").

Nevertheless, two comments responding to the supplemental notice objected to this change from the proposed rule as inconsistent with the current version of chapter 154, which provides that "[t]here are no requirements for certification or for application of this chapter other than those expressly stated in this chapter." 28 U.S.C. 2265(a)(3). However, the definition of appointment in § 26.21 does not add to the express requirements for certification. Rather, as explained above, it reflects a contextual understanding of chapter 154's express requirement of a mechanism for appointment of competent postconviction capital counsel, *see* 28 U.S.C. 2265(a)(1), to encompass some standard for affording postconviction representation in a manner that is reasonably timely in light of the relevant postconviction review time limitations and the time required for developing and presenting claims. *See* OLC Opinion at \*8 ("In reasonably construing an ambiguous term in a statute that he is charged with administering, the Attorney General would not be adding to the requirements for certification . . . [but]

merely would be implementing an express statutory provision . . . just as agency officials regularly do in other contexts" under *Chevron, U.S.A., Inc.* v. *Natural Res. Defense Council, Inc.,* 467 U.S. 837, 844 (1984).).

Other features of chapter 154 provide additional textual support for the final rule's definition of "appointment" and confirm it is consistent with the express statutory scheme, including section 2265(a)(3). Section 2262(a), for instance, provides for an automatic stay of execution, by application to a Federal habeas court, upon entry of an order appointing counsel. If chapter 154 permitted a State to delay appointment of counsel, an execution that is scheduled for a date shortly after the denial of a prisoner's direct appeal could occur before the prisoner receives the State postconviction counsel and the automatic stay that chapter 154 promises. Likewise, chapter 154 expressly contemplates that States will establish, and the Attorney General will review, standards expected to produce *competent* representation by appointed counsel. 28 U.S.C. 2265(a)(1)(A), (C). Judgments concerning what competency standards are needed may well vary based on expectations about the amount of time an attorney will have to perform requisite tasks. The need for counsel to be appointed in a reasonably timely fashion, especially in light of the relevant statutory deadlines for seeking habeas relief, sets such expectations and enables the judgments that the statutory framework requires.

The two concerned commenters also cite legislative history evidence, specifically two floor statements criticizing the Ninth Circuit's decision in *Spears* v. *Stewart,* 283 F.3d 992 (9th Cir. 2001), in support of their objection to the articulation in this rule of chapter 154's requirement that appointments be made in a reasonably timely fashion. *See, e.g.,* 152 Cong. Rec. S1625 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl, the sponsor of the amendment, including that it "forbids creation of additional requirements not expressly stated in the chapter, as was done in the Spears case"); 151 Cong. Rec. E2639 (daily ed. Dec. 22, 2005) (extension of remarks of Rep. Flake). However, the legislators' criticism of the *Spears* decision does not support the commenters' objection to the rule's articulation of chapter 154's timeliness requirement. *Spears* addressed an issue concerning the timing of appointment of capital collateral counsel in two contexts, finding first that a rule adopted by the Arizona Supreme Court did adequately provide for timely appointment of counsel, but then

declining to apply the chapter 154 Federal habeas review procedures in that particular case on the ground that counsel was not appointed within the time frame called for by the mechanism. *Compare Spears,* 283 F.3d at 1017 ("We conclude that the Arizona statutory mechanism for the appointment of postconviction counsel [requiring appointment within 15 days of notice that the conviction had become final] . . . offered counsel to all indigent capital defendants . . . in a timely fashion."), *with id.* at 1018–19 (holding that chapter 154 did not apply "in Petitioner's case" because his attorney was appointed over a year after the mechanism's deadline). The object of the dissatisfaction expressed in the floor statements upon which the two commenters rely was neither the positive determination in *Spears* regarding the need for a timing component in a State's mechanism nor the adequacy of Arizona's timing provision for purposes of chapter 154, but rather the denial to the State of the benefits of chapter 154 in that individual case. *See* 152 Cong. Rec. S1625 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl); 151 Cong. Rec. E2639–40 (daily ed. Dec. 22, 2005) (extension of remarks of Rep. Flake).

The Attorney General's current role under chapter 154 parallels that of the *Spears* court in making the first of these two determinations—whether the mechanism in force in the State adequately provides for the reasonably timely appointment of counsel. Nothing in the present rule would bar the Attorney General from approving, as the *Spears* court did, a State mechanism that provides for timely provision of counsel. Whether and in what circumstances a delay in appointment of counsel would affect chapter 154's applicability in an *individual* case may be constrained by Federal habeas courts in the exercise of their function under 28 U.S.C. 2261(b)(2), and is not a question that the statute assigns to the Attorney General.

In any event, courts ordinarily give floor statements, even statements made by the sponsor of a bill or amendment, relatively limited weight in analyzing Congress's intent. *See, e.g., Garcia* v. *United States,* 469 U.S. 70, 76 (1984). This is appropriate in the case of the legislation that added section 2265(a)(3) to chapter 154 because the commenters principally rely on views expressed by a Senator that were not included in the bill's conference report, *compare* H.R. Rep. No. 109–333, at 109–10 (2005) (Conf. Rep.) (making no reference to the timing of appointments, and identifying not *Spears,* but a different case that

involved a different issue as being "overruled" by the bill's provisions), *with* 152 Cong. Rec. S1625 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl). *See Ctr. for Sci. in the Pub. Interest* v. *Regan,* 802 F.2d 518, 523 (D.C. Cir. 1986) (noting that "the contemporaneous remarks of a single legislator, even a sponsor, are not controlling in legislative history analysis; rather, those remarks must be considered along with other statements and published committee reports"). Thus, even if the commenters' reading of the floor statements' criticism of *Spears* were correct, the statements should not be treated as controlling or as indicative of congressional intent contrary to the rule's clarification of a requirement for reasonably timely appointment of counsel.

With respect to a separate but related issue, one commenter suggested that § 26.21's definition of "appointment" to encompass a timeliness element is unnecessary because courts may alternatively address problems under chapter 154 resulting from delay in providing postconviction counsel by adjusting the operation of the relevant time limits for filing. The commenter cited *Rhines* v. *Weber,* 544 U.S. 269 (2005), and *In re Morgan,* 50 Cal. 4th 932, 237 P.3d 993 (2010), for support.

As an initial matter, it is unclear to what extent these cited cases apply to the issue at hand. *Rhines,* for example, involved stay-and-abey procedures that may not be available to petitioners under chapter 154, *see* 28 U.S.C. 2264(b), and *Morgan* focused on the viability of pro se "shell" State habeas petitions—a practice that, even if it were firmly established and accepted by both State and Federal courts, raises significant concerns in the chapter 154 context. As a practical matter, for example, not every State petitioner will be in a position to understand the necessity for filing such a petition and able to file a petition successfully. Moreover, chapter 154 contemplates that in exchange for substantial benefits on Federal habeas review, States will provide not the opportunity for petitioners to file *pro se* State habeas petitions, but the opportunity for petitioners to file *counseled* State habeas petitions. *See Mills* v. *Anderson,* 961 F. Supp. 198, 201 n.4 (S.D. Ohio 1997) (questioning whether State mechanism that provides for appointment of counsel only after filing of *pro se* petition is inadequate under chapter 154). Thus, the relevance of the procedures discussed in *Rhines* and *Morgan* is uncertain. Even if available in this context, they would at most affect what might be thought necessary to

reasonably assure the timely appointment of counsel. The possible existence of such procedures would not undermine the conclusion that the "appointment" required under chapter 154 must be made in a reasonably timely manner, as reflected in the definition in § 26.21.

Some commenters approved of the rule's specification of the requirement for timely appointment but stated that it should provide a more definite period of time (e.g., a specific number of days or weeks) within which State mechanisms must appoint counsel. The Department believes, however, that States must have significant latitude in designing mechanisms for ensuring that competent counsel are appointed, *see* OLC Opinion at *12–13, and this rule therefore does not define timeliness in terms of a specific number of days or weeks within which counsel is to be provided. Instead, a State need only demonstrate that it has established a mechanism for affording counsel in a manner that is reasonably timely, in light of the time limits for seeking State and Federal collateral review and the effort involved in the investigation, research, and filing of effective habeas petitions, which protect a petitioner's right to meaningful habeas review.

Additionally, some commenters urged that the rule should require that appointment of postconviction capital counsel be timely in relation to the petitioner's conviction, not just in relation to the time limits for seeking State and Federal postconviction review and the time required for preparing postconviction claims. The rationale offered for this proposal was that direct review of the judgment in capital cases, occurring between the end of the trial proceedings and the commencement of postconviction proceedings, may take a long time, and that evidence and records that would be useful to the defense in postconviction proceedings may be lost in the meantime. While the Department does not question the value of efforts to avoid spoliation of evidence, consideration can be given only within the statutory framework; to the extent these commenters contemplated requiring that postconviction counsel be appointed even before the conclusion of direct review, such a mandate would appear to go beyond chapter 154's requirements for appointment of counsel "in State postconviction proceedings." 28 U.S.C. 2265(a)(1); *see id.* 2261(b)(1).

*Appropriate State Official*

Section 26.21 of the rule, in part, defines an "appropriate State official" who may request chapter 154

certification under 28 U.S.C. 2265(a)(1) to mean the State attorney general or the State chief executive if the State attorney general does not have responsibility for Federal habeas corpus litigation. Some commenters objected to the rule's designation of the State attorney general as the appropriate official to request chapter 154 certification on grounds of conflict of interest, lack of relevant knowledge, interference with State discretion, and exceeding statutory authority.

The comments received provided no persuasive reasons for changing the definition of "appropriate State official" in § 26.21. First, the objection that the State attorney general's litigation interests may lead him to make unsound judgments whether his State has satisfied chapter 154's requirements conflates the role of applicant and that of decision-maker. Under this rule, the State attorney general is authorized to request certification, but it will be the U.S. Attorney General who makes a wholly independent determination of whether certification is warranted. In making this determination, the U.S. Attorney General will consider any supporting or contrary information or views that any interested entity may choose to submit through the public comment procedure set out in § 26.23 of the rule, in addition to whatever the State attorney general may offer on the question.

Second, designation of the State attorney general as the "appropriate State official" is consistent with both the original language of chapter 154 and the 2006 amendments. Prior to the 2006 amendments, Federal habeas courts determined whether chapter 154's requirements were satisfied, so State attorneys general responsible for Federal habeas corpus litigation in capital cases were able to seek determinations that the State capital counsel mechanism satisfied the chapter 154 requirements as part of their litigation functions. The court, not the State attorney general, was the decision-maker on that question, and the court's decision was informed by hearing the views of others with opposed interests, in addition to those of the State attorney general. The transfer of the chapter 154 certification function from the Federal courts to the U.S. Attorney General does not materially change this framework. The State attorney general is authorized to seek certification; the U.S. Attorney General, not the State attorney general, is the decision-maker; and the U.S. Attorney General will consider any views proffered by others as discussed above.

Third, the Attorney General's decisions regarding chapter 154 certification are subject to de novo review by the D.C. Circuit Court of Appeals, as provided in 28 U.S.C. 2265(c), and seeking such review would commonly be within the litigation authority of the State attorney general, regardless of which official had sought the initial determination from the U.S. Attorney General. It would be odd to deem the State attorney general an inappropriate official to seek chapter 154 certification from the U.S. Attorney General in the first instance, where the statutes interpose no obstacle to State attorneys general seeking the same determination from the D.C. Circuit at a later stage.

Fourth, the objection regarding lack of relevant knowledge by the State attorney general is also unpersuasive. This objection in the comments appears to be premised largely on the belief that States seeking certification will normally submit with their request a set of comprehensive data that demonstrate the operation of the State's collateral review system in capital cases, including such matters as the amount of awards to defense counsel for litigation expenses in particular cases, of which the State attorney general might in some cases be unaware. The proposition that the Attorney General must conduct such a case-by-case review under chapter 154 is not well-founded, for reasons discussed earlier in this preamble. Additionally, the Department thinks it significant that none of the commenters identified a person in a State likely to have better knowledge than the State attorney general or chief executive concerning matters relevant to certification. Thus, even if it is accepted that a State attorney general may not have perfectly complete information in every instance, there is no basis to believe that there is an alternative official or individual better suited to the task. Moreover, if at times there is information relevant to the U.S. Attorney General's determination that the State attorney general may not have, any interested person is free to provide such information through the public comment procedure for certification requests set out in § 26.23(b)–(c) in this rule.

Finally, the objection in the present comments regarding potential conflict with State law reflects a misunderstanding of the rule, which does not preempt State law. If State law were to prohibit a State attorney general from requesting chapter 154 certification, then the State attorney general would be barred by State law from making such a request. That has no

bearing on the formulation of § 26.21, which only defines the class of State officials whose request for chapter 154 certification triggers the requirement under 28 U.S.C. 2265(a)(1) that the U.S. Attorney General make a chapter 154 certification decision. Moreover, any concern about potential conflict with State law is purely speculative. No State submitted comments on this rule stating that it has prohibited, wishes to prohibit, or may prohibit the State attorney general from requesting chapter 154 certification on behalf of the State.

### Section 26.22(a)—Statutory Requirements Concerning Appointments

Section 26.22(a) tracks chapter 154's provisions concerning the procedures for appointment of counsel, appearing in 28 U.S.C. 2261(c)–(d). Some commenters stated that the rule should be modified to provide additional definition concerning these procedures, such as specifying in greater detail what constitutes a sufficient offer of counsel, or what exactly will or will not be deemed a valid waiver of counsel, under these provisions.

The comments received did not provide persuasive reasons for addressing additional interpretive issues in this rule. Chapter 154's legal directive to the Attorney General regarding rulemaking is that the Attorney General "shall promulgate regulations to implement the certification procedure under [section 2265(a)]," 28 U.S.C. 2265(b). Some of the specific matters raised in the comments have been addressed by courts in prior decisions relating to chapter 154, but there is no requirement that the present rule attempt to provide a comprehensive restatement or synthesis of all past judicial decisions under the chapter. Though the Attorney General has provided further definition of the chapter 154 requirements in § 26.22 of this rule, in the interest of affording additional guidance regarding what must be done to qualify for certification under chapter 154 and what criteria will be applied in making certification decisions, that does not oblige the Attorney General to go further and attempt to resolve in this rule (even if it were possible) all possible questions that might arise in the interpretation and application of chapter 154's requirements.

It is uncertain whether particular interpretive questions raised by the commenters will prove to be significant issues in the context of the capital counsel systems of States that actually apply for certification hereafter. If they do not, then little will have been gained

by the Attorney General's attempt to resolve them in advance. If they do prove to be significant issues, considering them in the concrete setting of State systems whose certification is requested is likely to be more conducive to sound resolutions than trying to address them in the abstract.

### Section 26.22(b)–(c)—General Issues

Paragraphs (b) and (c) in § 26.22 articulate the requirements relating to counsel competency and compensation. Each paragraph consists of "benchmark" provisions identifying standards that presumptively will be considered adequate (§ 26.22(b)(1) for competency and § 26.22(c)(1) for compensation), followed by general provisions for assessing State standards that take other approaches (§ 26.22(b)(2) for competency and § 26.22(c)(2) for compensation).

The text of the rule published in the notice of proposed rulemaking stated without qualification that the Attorney General *will* approve State standards satisfying the benchmark provisions. Many commenters expressed the concern that, under the proposed rule, the Attorney General could have been required to certify a State's mechanism meeting the competence and compensation benchmarks, even if it could be shown that the mechanism is not adequate in the context of the State system in which it operates.

The Department continues to believe that State mechanisms that incorporate the benchmark standards for competency and compensation should be adequate. However, the comments were persuasive that it is not possible to predict with certainty that these benchmarks will be adequate in the context of every possible State system. For example, it is conceivable that a State standard authorizing what normally should be sufficient compensation may not in fact make competent lawyers available for appointment in postconviction proceedings, considering the context of a particular State system and its distinctive market conditions for legal services. *Cf. Baker* v. *Corcoran,* 220 F.3d 276, 285–86 (4th Cir. 2000) (considering per-attorney overhead costs and effective compensation rates among other factors in finding compensation scheme inadequate under chapter 154). The final rule has accordingly been modified, as discussed in the supplemental notice of proposed rulemaking, to provide that State standards satisfying the benchmarks for competency and compensation are *presumptively* adequate, thereby affording latitude to consider State-

specific circumstances that may establish the contrary—i.e., that standards generally expected to be sufficient in most instances are for some reason not reasonably likely to lead to the timely provision and adequate compensation of competent counsel to habeas petitioners in a particular State. 77 FR at 7561.

Importantly, however, the Department found unpersuasive commenters' separate criticism that the proposed rule fails to provide for oversight of a State's compliance with a chapter 154 mechanism that it has established. As explained earlier in this preamble, the Department remains of the view that chapter 154 is correctly read to assign to the Federal habeas courts—not to the Attorney General—questions concerning whether a State has fully complied in a given case with the requirements of its own established mechanism.

### Section 26.22(b)(1)(i)—Counsel Competency Standards Based on 18 U.S.C. 3599

Section 26.22(b)(1)(i) in the final rule sets forth competency standards requiring at least five years of bar admission and three years of postconviction litigation experience, or if a State mechanism so provides, allowing appointment for good cause in a given case of other counsel whose background, knowledge, or experience would otherwise enable him or her to properly represent the petitioner. Section 26.22(b)(1)(i) is based on the qualification standards Congress has adopted in 18 U.S.C. 3599 for appointment of counsel in Federal court proceedings in capital cases. The formulation of this provision in the final rule to require three years of postconviction litigation experience differs from the corresponding provision in the proposed rule, which required three years of felony litigation experience, without specification of the stage or stages of litigation at which the experience was obtained. The reasons for this change are explained below.

In response to the proposed rule, many commenters suggested that postconviction litigation experience would be a better measure of competency for State postconviction proceedings than general felony litigation experience because of the difficult and unique demands that postconviction law and procedure place on attorneys who litigate those cases. These comments were persuasive.

In construing chapter 154, some courts have concluded that, given the complexity of postconviction law and procedure, a qualifying mechanism for the appointment of competent counsel

should provide for counsel with specialized postconviction litigation experience. *See, e.g., Colvin-El v. Nuth,* No. Civ.A. AW 97–2520, 1998 WL 386403, at *6 (D. Md. July 6, 1998) ("Given the extraordinarily complex body of law and procedure unique to postconviction review, an attorney must, at minimum, have some experience in that area before he or she is deemed 'competent.' "); *see also* Jon B. Gould & Lisa Greenman, *Report to the Committee on Defender Services, Judicial Conference of the United States: Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases* 88 (Sep. 2010) (noting the view of postconviction specialists that there is "little time available for inexperienced counsel to 'learn the ropes,' and no safety net if they fail"). Several States have also incorporated this guidance into their appointment standards. *See, e.g.,* La. Admin. Code tit. 22, 915(D)(1)(e)(i) (requiring that qualified postconviction lead counsel shall "have at least five years of criminal postconviction litigation experience."); Miss. R. App. P. 22(d)(5) (generally requiring experience in at least one postconviction proceeding for appointment); Mo. Ann. Stat. § 547.370(2)(3) (requiring at least one of two appointed counsel to have "participated as counsel or co-counsel to final judgment in at least five postconviction motions involving class A felonies in either state or federal trial courts"). The adaptation of the section 3599 standard in the final rule accordingly specifies three years of postconviction litigation experience, rather than three years of any sort of felony litigation experience as in the proposed rule.

The formulation of this benchmark in the final rule to require postconviction experience does not take issue, as some commenters claimed, with Congress's judgments regarding counsel competency standards that are likely to be adequate. Rather, both the proposed and final versions reflect necessary adaptation of the standards of 18 U.S.C. 3599 for use in chapter 154 certification decisions. In defining relevant prior litigation experience, 18 U.S.C. 3599(b) and (c) deem prior trial experience relevant for trial appointments, and prior appellate experience relevant for appointments "after judgment." The statute does not provide an experience requirement tailored specifically to postconviction proceedings, having no separate specification about the experience required for appointments to provide representation "after judgment"

in postconviction proceedings as opposed to representation "after judgment" on appeal. If section 3599's standards were transcribed as literally as possible in § 26.22(b)(1)(i), the rule would state that a State competency standard is presumptively adequate if it normally requires three years of appellate experience as a precondition for appointment in postconviction proceedings. But chapter 154 differs from section 3599 in that chapter 154 deals exclusively with postconviction proceedings. Prior postconviction litigation experience (as opposed to prior appellate experience) is more similar in character to the postconviction litigation for which an attorney would be appointed pursuant to chapter 154, and more likely on the whole to enable the attorney to provide effective representation in postconviction proceedings. The rule accordingly follows the sensible approach of referring to prior postconviction litigation experience in defining an experience standard that will presumptively be considered adequate for appointments in the postconviction proceedings addressed by chapter 154.

The Criminal Justice Act (CJA) guidelines promulgated by the Judicial Conference of the United States counsel courts to consider postconviction experience when making appointments under 18 U.S.C. 3599. *See* 7A Guide to [Federal] Judiciary Policy 620.50 (last rev. 2011) ("CJA Guidelines"), *available at http://www.uscourts.gov. FederalCourts/AppointmentOfCounsel/ CJAGuidelinesForms/GuideToJudiciary PolicyVolume7.aspx.* To be sure, the CJA Guidelines are not absolute requirements even in Federal habeas matters; the guidelines are phrased in permissive terms and elaborate in part on 18 U.S.C. 3005, *see* CJA Guidelines 620.10.10(a), 620.30, which concern appointment of counsel for trial representation in Federal capital cases and does not apply to appointments for collateral proceedings in State capital cases. *Compare* 18 U.S.C. 3005 *with* 18 U.S.C. 3599. However, the Department does agree that the CJA Guidelines may at times help to inform determinations as to appropriate standards for appointment of counsel, and so understood, the Department is ultimately convinced that the guidelines' advice to consider postconviction experience is sound. The final rule therefore avoids the anomaly that would result from an overly formalistic adaptation of 18 U.S.C. 3599 and instead carries out the adaptation in a manner in which the prior litigation

experience requirement is more finely attuned to the nature of the proceedings—i.e., postconviction proceedings—in which appointments are to be made.

The Department was not convinced, however, by commenters who asserted that this benchmark is deficient (or the other counsel competency provisions of the rule are deficient) because it does not require appointed counsel to have prior experience in *capital* postconviction proceedings, or at a minimum, some prior capital litigation experience generally. While prior capital litigation experience is frequently a relevant and valuable asset for an attorney assigned to handle postconviction matters, *see Wright* v. *Angelone*, 944 F. Supp. 460, 467 (E.D. Va. 1996), and is also a factor that the CJA Guidelines say courts should consider in Federal capital cases, the Department was ultimately unpersuaded that prior capital litigation experience must be required categorically as a precondition of competence under chapter 154. When setting competency requirements for appointed counsel in the IPA, see *infra*, Congress has not mandated that appointed attorneys invariably have such experience. 42 U.S.C. 14163(e). Similarly, courts and others have recognized that prior capital case experience should not be regarded as a sine qua non of an appropriate competency standard for postconviction counsel. *See, e.g., Spears*, 283 F.3d at 1013 ("Nothing in [chapter 154] or in logic requires that a lawyer must have capital experience to be competent."); ABA Guidelines, at 37 & n. 109 (noting that "[s]uperior postconviction death penalty defense representation has often been provided by members of the private bar who did not have prior experience in the field" and stating that such counsel should be appointed if the client will receive high quality legal representation).

Next, and more broadly, some commenters contended that any competency measure based solely on prior experience will necessarily be insufficient under chapter 154 and criticized the Section 26.22(b)(1)(i) benchmark (and § 26.22(b)(2)) on that basis. Many of these comments urged the view that a State system that relies on prior experience must also incorporate procedures for monitoring counsel performance following appointment and for removal of poorly performing attorneys. The rule remains unchanged in response to these comments. 18 U.S.C. 3599 reflects a Congressional judgment that sufficiently robust experience requirements alone

can be sufficient. Further, when Congress amended chapter 154 in 2006, it could have required all State mechanisms to adopt monitoring and removal provisions similar to those it required in the IPA in 2004, *see* 42 U.S.C. 14163(e)(2)(E), if it viewed such provisions as indispensable, but Congress did not do so. Thus, monitoring or removal requirements are not included in the rule's benchmark based on 18 U.S.C. 3599. *But see* § 26.22(b)(1)(ii) and discussion *infra*. However, their omission should not displace or affect the existence and operation of more generally applicable monitoring or removal procedures (e.g., disbarment) that a State may have in place, nor should it in any way discourage States from choosing to adopt monitoring and removal provisions as a discretionary matter.

One of the comments argued that the standards applicable under section 3599 to Federal habeas counsel should be considered inadequate for appointment of counsel in State collateral proceedings, on the ground that Federal habeas counsel has the benefit of the antecedent work of State collateral counsel in developing and presenting claims, and accordingly need lesser skills. However, the standards of section 3599 apply to Federal habeas counsel regardless of what prior representation or process has or has not been provided in State proceedings. Also, the same standards apply under section 3599 to counsel in Federal court collateral proceedings in Federal capital cases which, like State court collateral proceedings in State capital cases, are normally preceded only by trial and appeal.

Some commenters also objected to the exception language in the section 3599-based benchmark that allows appointment of counsel not meeting its specific litigation experience requirement in some circumstances. This exception appropriates the standard of 18 U.S.C. 3599(d), which allows courts, for good cause, to appoint other counsel whose background, knowledge, or experience would otherwise enable them to properly represent the petitioner, with due consideration of the seriousness of the penalty (i.e., capital punishment) and the nature of the litigation. We expect that allowing this type of departure will not unduly negate or undermine the specific experience requirement of this aspect of the rule, since its formulation limits its applicability to exceptional cases. It requires good cause for the court to appoint counsel other than those satisfying the specific experience requirement, and requires the court to

verify that such counsel have other characteristics qualifying them to meet the demands of postconviction capital punishment litigation. In the rule, as in section 3599, the exception recognizes that insisting on a rigid application of a defined experience requirement could debar attorneys who are well-qualified on other grounds to represent capital petitioners. The comments provided no persuasive reason to deny this latitude in State court collateral proceedings in capital cases, which Congress has deemed appropriate for Federal court collateral proceedings (and other Federal court proceedings) in capital cases. *See* 18 U.S.C. 3599(d); *cf. Ashmus*, 123 F.3d at 1208 (recognizing that "habeas corpus law is complex and has many procedural pitfalls" but concluding that it is not necessary under chapter 154 that every lawyer have postconviction experience), *rev'd on other grounds*, 523 U.S. 740 (1998).

Though the Department therefore believes there is good reason to retain the availability of the exception to § 26.22(b)(1)(i)'s years of experience requirement that is drawn from 18 U.S.C. 3599(d), the rule is permissive, not mandatory, on this point. If a State decides to omit the exception in its mechanism, such that appointed attorneys will invariably need to have been admitted to the bar for five years and have three years of postconviction litigation experience, that omission will not result in a determination that it has failed to satisfy the § 26.22(b)(1)(i) benchmark.

Finally, some commenters objected to this revision of the benchmark as unduly limiting State discretion regarding the formulation of their counsel competency standards. However, use of this particular standard as a benchmark does not convey or depend on a judgment that other approaches States may choose to adopt are necessarily illegitimate or inadequate for purposes of chapter 154. Rather, other standards may be presented for the Attorney General's consideration under § 26.22(b)(2), and they will be approved if they otherwise reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases.

### Section 26.22(b)(1)(ii)—Counsel Competency Standards Based on the Innocence Protection Act

Section 26.22(b)(1)(ii) identifies the establishment of qualification standards for appointment in conformity with the procedures of the IPA as another potential means of satisfying chapter 154.

The text of the rule published in the notice of proposed rulemaking framed the benchmark in terms of "meeting qualification standards established in conformity with 42 U.S.C. 14163(e)(1) [and] (2)(A)." These provisions concern the nature and composition of capital counsel appointment or selection entities, 42 U.S.C. 14163(e)(1), and provide that the appointing authority or an appropriate designated entity must "establish qualifications for attorneys who may be appointed to represent indigents in capital cases," 42 U.S.C. 14163(e)(2)(A).

Numerous comments on the proposed rule related to how many of the IPA provisions should be imported into the rule's benchmark. Commenters noted that the benchmark as formulated in the proposed rule did not capture the full range of IPA provisions bearing on the qualifications counsel must meet to be eligible for appointment. In particular, subparagraphs (e)(2)(B), (D), and (E) in 42 U.S.C. 14163 require maintenance of a roster of qualified attorneys, specialized training programs for attorneys providing capital case representation, monitoring the performance of attorneys who are appointed and their attendance at training programs, and removal from the roster of attorneys who fail to deliver effective representation, engage in unethical conduct, or do not participate in required training. These provisions are integral elements of the IPA qualification standards for appointments, because counsel who fail to measure up under these requirements become ineligible for subsequent appointments.

These comments were persuasive that the IPA-based provision in the proposed rule did not fully reflect the IPA system relating to qualifications for appointment because of the omission of reference to subparagraphs (e)(2)(B), (D), and (E) in the statute. The omission has been corrected in § 26.22(b)(1)(ii) in the final rule.

The supplemental notice of proposed rulemaking included this change in the IPA-based benchmark. *See* 77 FR at 7560. Some of the commenters responding to the supplemental notice questioned the continued omission of certain other IPA provisions, particularly the IPA requirements relating to appointment of two counsel, and the IPA requirements concerning compensation of counsel. *See* 42 U.S.C. 14163(e)(2)(C), (F). Counsel compensation is addressed in a different part of this rule, which includes benchmarks similar to the IPA provisions. See § 26.22(c)(1)(ii) and (iv)

in the final rule and the related discussion below.

Regarding the number of counsel, chapter 154 does not require States to appoint more than one attorney (as part of a defense team) for postconviction representation. Rather, the applicable statute frames the potential appointment of multiple postconviction counsel as a discretionary matter. *See* 28 U.S.C. 2261(c)(1) (State capital counsel mechanism must provide for court order "appointing one or more counsels to represent the prisoner"). The Department believes there is no sound basis to eliminate the discretion chapter 154 contemplates by its own terms through a rule that forecloses certification of State mechanisms that provide for the appointment of only one attorney.

Furthermore, the IPA itself requires appointment of two counsel, with some exception, in the context of counsel standards that do not differentiate between different stages in the litigation of capital cases and that are principally concerned with the trial stage. *See* 42 U.S.C. 14163(c)–(d) (providing that IPA funding is to be used for effective systems for providing competent legal representation at all stages, with general requirement that at least 75% be used in relation to trial representation and at most 25% in relation to appellate and postconviction representation). In adapting the IPA standards to the context of chapter 154, which concerns only representation in postconviction proceedings, some flexibility on the question whether multiple counsel should be required is appropriate and accords with relevant congressional judgments in related contexts. As noted, chapter 154 itself frames the appointment of multiple postconviction counsel as a discretionary matter. 28 U.S.C. 2261(c)(1). Likewise, in relation to Federal capital cases and Federal habeas corpus review of State capital cases, Congress has required appointment of two counsel at trial but has made appointment of more than one counsel at later stages a discretionary matter. *Compare* 18 U.S.C. 3005 (court to "assign 2 . . . counsel" for trial representation) *with* 18 U.S.C. 3599(a) (requiring in provisions applicable at later stages "appointment of one or more attorneys"). The rule takes a similar approach when adapting the IPA standards in the chapter 154 context by permitting, but not requiring, State mechanisms to provide for appointment of two attorneys to represent a capital petitioner on collateral review.

Additionally, § 26.22(b) in the rule articulates the statutory requirement that a State provide for the appointment

of competent counsel in State postconviction proceedings and provide standards of competency for the appointment of such counsel. 28 U.S.C. 2265(a)(1)(A), (C). As discussed above, this means that States must have qualification standards that counsel must meet to be eligible for appointment and that the Attorney General finds adequate. The IPA provisions included in § 26.22(b)(1)(ii) in the final rule fit within this framework because they are integral to the IPA's specification of qualifications that counsel must meet to be eligible for initial or subsequent appointments. The same would not be true of specifications concerning the number of counsel to be appointed.

As to a separate issue, another comment criticized this benchmark on the ground that it does not prescribe definite qualification standards for appointment of counsel, but rather endorses any standards adopted in conformity with the IPA procedures. However, chapter 154 directs the Attorney General to determine whether the State provides standards of competency for appointment of competent counsel in State capital collateral proceedings, and whether the State's mechanism incorporating such standards will reasonably assure the appointment of competent counsel. It does not require the Attorney General to specify directly the required content of such standards. The corresponding provisions of the IPA reflect a judgment by Congress that qualification standards adopted in conformity with the IPA procedures will be adequate. This judgment is appropriately adopted in defining one of the means by which States may seek to satisfy the requirements of chapter 154.

### Section 26.22(b)(2)—Other Counsel Competency Standards

Section 26.22(b)(2) in the rule provides that the Attorney General may find other competency standards for the appointment of counsel adequate if they reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases. Some commenters criticized this provision as overly indefinite and urged that the rule should provide for assessment of State capital counsel competency standards only under clearly defined criteria.

Many of these critical comments are premised at least partly on the view that the Attorney General has a conflict of interest under chapter 154. The commenters viewed this alleged conflict as exacerbated by § 26.22(b)(2) and urged that the rule eliminate or drastically limit any opportunity for the Attorney General to exercise judgment

or discretion in evaluating the adequacy of a State capital counsel mechanism. The Department rejects the premise that the Attorney General has a conflict, for reasons discussed above, and therefore finds the comments predicated on that view unpersuasive.

Also, as explained earlier, the Department believes States should retain some significant discretion to formulate and apply counsel competency standards, and § 26.22(b)(2) as drafted appropriately preserves that discretion. There are any number of ways in which a State might adopt measures of experience, knowledge, skills, training, education, or combinations of those considerations in devising a standard that would reasonably assure the appointment of counsel who are competent to conduct postconviction litigation in capital proceedings. Revising § 26.22(b)(2) to provide only very specific, one-size-fits-all criteria is accordingly impractical and would risk foreclosing innovative efforts by States to devise robust standards, even standards that would unquestionably result in the timely appointment of competent counsel.

Furthermore, before Congress reassigned the certification function from the Federal courts to the Attorney General by the 2006 amendments to chapter 154, courts did not assess the adequacy of State counsel competency standards constrained by rigid, pre-announced criteria; they were guided instead by the terms of chapter 154 itself and the facts in a particular case. *See, e.g., Spears*, 283 F.3d at 1012–15; *Ashmus*, 123 F.3d at 1208; *Hill*, 941 F. Supp. at 1142–43. The 2006 amendments changed the decision-maker for purposes of making judgments about the overall adequacy of State systems under chapter 154, but the amendments do not suggest that the Attorney General's discretion to evaluate the adequacy of State competency standards must be constrained by a one-size-fits-all approach. Had Congress questioned the Attorney General's ability to exercise discretion soundly or believed that more specific guidance was necessary, it could have amended the statutory scheme to specify more detailed requirements that State mechanisms must meet when it transferred the certification function to the Attorney General—but Congress did not do so.

This is not to say, as some comments contend, that § 26.22(b)(2) affords a State unbounded discretion to establish any sort of competency standards and still obtain certification of its mechanism under chapter 154. The notice and supplemental notice of proposed rulemaking described the two approaches now reflected in paragraph (b)(1) of the rule as benchmarks, and they function precisely in that manner. That is, the criteria in paragraph (b)(1) do not simply identify two competency standards that will entitle a State that adopts them to a presumption of adequacy; they also serve as a point of reference in judging the adequacy of other counsel qualification standards that States may establish and offer for certification by the Attorney General. A State mechanism that does not incorporate the benchmark standards will naturally require closer examination by the Attorney General to ensure that it satisfies the statutory standards, and while it is possible to conceive of a variety of alternative competency measures that would satisfy chapter 154's requirements, State competency standards that appear likely to result in significantly lower levels of proficiency compared to the benchmark levels risk being found inadequate under chapter 154. For clarity, the text of the proposed rule has been revised to reflect this understanding, namely, that the paragraph (b)(1) standards function as benchmarks and are relevant to the Attorney General's assessment of alternative competency standards for which certification would be predicated on § 26.22(b)(2).

This explanation also responds to another comment, which complains that the provision appearing in the final rule as § 26.22(b)(2) is overly restrictive, on the ground that it limits the possibility of approval of State competency standards to situations in which they are ''functionally identical to or more stringent than'' the particular benchmark standards described in § 26.22(b)(1). This comment reflects a misunderstanding of the rule. The analysis statement in the proposed rule noted in relation to the benchmarks that States' adoption of competency requirements that are similar or that are likely to result in even higher levels of proficiency will weigh in favor of a finding of adequacy for purposes of chapter 154, *see* 76 FR at 11709, and a statement to the same effect appears in the section-by-section analysis for this final rule. However, it is not similarity in form to the presumptively adequate standards that section (b)(2) contemplates, and the standards need not function in an identical matter. Rather, § 26.22(b)(2) contemplates a close equivalence in terms of the expectation that a proffered mechanism will reasonably assure an appropriate level of proficiency in appointed counsel. As the analysis statement

explained and this preamble repeats, Congress intended the States to have significant discretion regarding competency standards, within reasonable bounds, and the particular benchmarks identified in the rule do not exhaust the means by which States may satisfy chapter 154's requirements.

### Section 26.22(c)—Compensation of Counsel

Section 26.22(c)(1)(i) refers to the compensation of counsel pursuant to 18 U.S.C. 3599 in Federal habeas corpus proceedings reviewing State capital cases. The Department received no comments that were specifically critical of this standard, which remains unchanged in the final rule.

The compensation standards for appointed capital counsel in State collateral proceedings described in § 26.22(c)(1)(ii) and (iv) in the rule involve compensation comparable to that of retained counsel meeting sufficient competency standards or attorneys representing the State in such collateral proceedings. Some comments were critical of these benchmarks as setting an inadequate level of compensation. However, as explained in the accompanying analysis statement for the rule, these parts of the rule are similar to legislative judgments in the IPA endorsing compensation of capital defense counsel at market rates or at a level commensurate with that of prosecutors. 42 U.S.C. 14163(e)(2)(F)(ii)(I); *see also* ABA Guidelines § 9.1(B)(2), at 49 (same). The comments provided no persuasive reason to reject this legislative judgment in the context of chapter 154, or to believe that compensating appointed capital defense counsel at higher levels than competent retained counsel or counsel representing the State in the same proceedings will generally be necessary to induce a sufficient number of competent attorneys to provide representation.

Section 26.22(c)(1)(iii) in the rule refers to compensation comparable to the compensation of appointed counsel in State appellate or trial proceedings in capital cases. The accompanying explanation in the analysis statement for this rule explains that the compensation afforded for trial and appellate representation is likely to be sufficient to secure the availability of an adequate pool of competent attorneys to provide postconviction representation, because that level of compensation is necessarily sufficient to ensure an adequate number of attorneys are available to provide representation in trials and appeals, where representation by counsel is constitutionally required.

Some commenters criticized this provision as overly permissive on the ground that trial and appellate counsel may be underpaid and that such counsel are sometimes found to have provided constitutionally ineffective assistance. However, that is not an occurrence that can be infallibly guarded against by any level of compensation at any stage of criminal proceedings. Moreover, the proposed rule has been modified to afford the Attorney General latitude to consider any unusual circumstances presented by a particular State system that indicate that the level of compensation called for in this benchmark is unlikely to function as expected. It is conceivable in the context of a particular State and its distinctive market conditions for legal services, for example, that what normally should be sufficient compensation may not in fact be reasonably likely to make competent lawyers available for timely provision to capital petitioners in State postconviction proceedings. *Cf. Baker,* 220 F.3d at 285–86 (considering per-attorney overhead costs and effective compensation rates among other factors in finding compensation scheme inadequate under chapter 154).

Nevertheless, the Attorney General does not exercise limitless discretion to pass judgment on whether State compensation authorizations are sufficiently generous under chapter 154, which provides in relevant part simply that the Attorney General is to determine "whether the State has established a mechanism for the appointment [and] compensation . . . of competent counsel." 28 U.S.C. 2265(a)(1)(A). The formulation of the rule on this point reads the statutory scheme to allow the Attorney General to review the adequacy of State compensation provisions in the interest of promoting sufficient financial incentives to secure the appointment of competent counsel in sufficient numbers to timely provide representation to capital petitioners in State collateral proceedings. The Attorney General will consider any available relevant information, including the effective hourly rate for appointed attorneys, in evaluating a mechanism's compensation standards. But the comments critical of the § 26.22(c)(1)(iii) benchmark, which raised concerns with funding for appointment of counsel in particular cases or in particular States, were not sufficiently persuasive that compensation that adequately motivates counsel to accept appointments for the trial and appeal of capital cases (in

which they are held to provision of constitutionally effective assistance) will generally be unlikely to provide sufficient incentives for competent counsel to provide representation in State collateral proceedings satisfying the standards of chapter 154.

Section 26.22(c)(2) in the rule allows approval of other approaches to compensation, but "only if the State mechanism is otherwise reasonably designed to ensure the availability for appointment of [competent] counsel." Some commenters criticized this provision as vague and urged that the rule be modified so that chapter 154 certification could be granted only if a State's counsel compensation provisions satisfy definite criteria stated in the rule.

As with the corresponding comments on § 26.22(b)(2), these comments in part reflected an assumption that the Attorney General has a conflict of interest in carrying out his legal duties under chapter 154, and the response is much the same. The underlying assumption of a conflict of interest is not well-founded, for reasons discussed above. Additionally, § 26.22(c)(2) is consistent with the Department's recognition that a State should have significant latitude in designing a capital counsel mechanism that (among other things) are tailored to the State's unique characteristics and market conditions. As already noted, the provision affords States appropriate discretion to set alternative levels of compensation that will reasonably assure the timely appointment of competent counsel but that might otherwise be foreclosed by an overly specific ex ante requirement. At the same time, as explained above in connection with § 26.22(b)(2), a State's latitude to consider alternative compensation standards, and the Attorney General's assessment of any such standards, is not unbounded. The rule identifies four benchmarks that will continue to guide the Attorney General's evaluation of other proposed standards—as the text of the proposed rule has similarly been revised to clarify.

## Section 26.22(d)—Reasonable Litigation Expenses

Section 26.22(d) in the rule reflects the requirement to provide for payment of reasonable litigation expenses. Some commenters criticized this provision as not sufficiently specific regarding the types of expenses that must be defrayed and the means of evaluating what expenditures are reasonable. They accordingly urged more definite specification concerning these matters in the rule, such as explicitly requiring

payment for investigators, mitigation specialists, mental health and forensic science experts, and support personnel, and providing standards for evaluating the reasonableness of compensation for persons in each category.

The comments raise an important issue for consideration. The Department recognizes that investigators, mental health and forensic experts, and other support personnel often contribute critical services in capital postconviction cases. The Department agrees that payment of such individuals, among other expenses that may arise in the context of a particular case, are litigation expenses that should merit reimbursement if reasonable, and the text of § 26.22(d) has been modified in the final rule to clarify this point. *See* ABA Guidelines, at 128 ("[C]ollateral counsel cannot rely on the previously compiled record but must conduct a thorough, independent investigation in accordance with Guideline 10.7 . . . [including] discover[ing] mitigation that was not presented previously, [and] identify[ing] mental-health claims which potentially reach beyond sentencing issues to fundamental questions of competency and mental-state defenses."); *Rompilla* v. *Beard,* 545 U.S. 374, 387 (2005) ("'[W]e long have referred [to ABA Standards] as guides to determining what is reasonable.'" (quoting *Wiggins* v. *Smith,* 539 U.S. 510, 524 (2003) (internal quotation marks omitted)).

However, the language of section 2265 does not suggest that the Attorney General must enumerate the universe of litigation expenses that merit reimbursement. Rather, the relevant statutory directive to the Attorney General is to determine whether the State has established a mechanism for the "payment of reasonable litigation expenses." 28 U.S.C. 2265(a)(1)(A). The comments on this issue did not persuasively establish that a State should be denied chapter 154 certification if its mechanism requires the payment of reasonable litigation expenses in terms similar to chapter 154 itself, or at some other level of generality less specific than that urged by the commenters. *See Spears,* 283 F.3d at 1016 ("[Chapter 154] requires only that the state mechanism provide for the payment of reasonable litigation expenses. The federal statute thus assumes that a state can assess reasonableness as part of its process."); *see also* Gould & Greenman, *supra,* at 31–32, 78, 122 (2010) (provision for Federal court proceedings in capital cases, which refers generally to fees and expenses for investigative, expert, and other reasonably necessary services,

states that payment for these purposes shall not exceed $7,500 unless approved for a higher amount by the circuit chief judge or delegee—but the median reimbursable cost that Federal courts approved in capital cases between 1998 and 2004 was $83,000).

Importantly, though, as with other requirements under chapter 154, satisfaction of the requirement regarding payment of reasonable litigation expenses requires that States have standards in force that so provide. The Attorney General will consider all relevant aspects of State standards in ascertaining whether the statutory requirements have been satisfied. Thus, as § 26.22(d) states, a general provision requiring payment of reasonable litigation expenses would not be sufficient if negated by rigid payment caps with no authorized means for payment of necessary expenses above such limits, and the Attorney General would similarly consider whether such a provision is negated by State policy that precludes payment for certain categories of expenses that may be reasonably necessary. Moreover, as with other requirements, the Attorney General is not dependent on the State's representations, and any interested person or entity believing that State standards overall do not provide for payment of reasonable litigation expenses is free to bring relevant information to the Attorney General's attention through the comment procedure set out in § 26.23 in the rule.

Comments responding to the supplemental notice of proposed rulemaking suggested that satisfaction of § 26.22(d) should only be considered presumptively adequate for purposes of chapter 154, paralleling the "presumptively" qualifier applicable to the benchmark provisions relating to counsel competency and compensation, which appear in § 26.22(b)(1) and (c)(1) in the final rule. The "presumptively" qualifier is neither necessary nor appropriate here because § 26.22(d) incorporates no benchmark provisions. It articulates the requirement relating to payment of litigation expenses under chapter 154, and States that have established mechanisms that meet this requirement have done what chapter 154 requires in this connection. Its proper counterpart is not the benchmark provisions in § 26.22(b)(1) and (c)(1), but the general articulations of the chapter's requirements relating to counsel competency and compensation in § 26.22(b)(2) and (c)(2), which similarly do not need or have a "presumptively" qualifier.

**Section 26.23(a)–(c)—Certification Procedure**

These provisions in the rule specify the procedure for the Attorney General to receive requests for chapter 154 certification, obtain public comment on the requests through Internet posting and **Federal Register** publication, and make and announce the certification decision.

Some commenters objected that the public notice and comment procedure of the rule is inadequate and that the Attorney General must engage in additional fact-finding processes. These objections are premised on an incorrect understanding of the nature and scope of the Attorney General's certification determination, as explained earlier in this preamble. The Attorney General's decision to certify an established State mechanism under chapter 154 need not be supported by a data-intensive examination of the State's record of compliance with the established mechanism in all or some significant subset of postconviction cases; for instance, certification should not be foreclosed for a State that cannot submit the information the commenters identify because it has established new standards that satisfy the statutory requirements but for which there is no pre-existing record of compliance. The comments provided no persuasive reason to believe that the rule's procedure, under which the Attorney General will publish a State's request for certification and invite interested parties and the State seeking certification to be heard via written submissions during one or more public comment periods, will be inadequate to provide the information needed for the determinations that the Attorney General actually must make under chapter 154. Moreover, the Attorney General's certifications under chapter 154 are orders rather than rules for purposes of the Administrative Procedure Act (APA). They are accordingly not subject to the APA's rulemaking provisions, *see* 5 U.S.C. 553, much less to the APA's requirements for rulemaking or adjudication required to be made or determined on the record after opportunity for an agency hearing, *see* 5 U.S.C. 553(c), 554, 556, 557.

The Department does not believe, as some commenters urged, that it is necessary to specify detailed information concerning State capital collateral review systems that States must include in their requests for chapter 154 certification. For the reasons already given, these comments were similarly based on an incorrect understanding of the nature and scope

of the Attorney General's certification determination. Chapter 154 itself and this rule explain what States must do to qualify for chapter 154 certification. Under the procedures of § 26.23, States will be free to present any and all information they consider relevant or useful to explain how the mechanism for which they seek certification satisfies these requirements. Likewise, through the public comment procedure of the rule, any other interested person or entity will be free to submit any information it may wish in support of, or in opposition to, the State's request—including information that the mechanism submitted for certification has not been established because its standards are actually negated or overridden by contrary State policy. Further, the proposed rule has been revised to make clear that the Attorney General may permit more than one period for comment to allow the requesting State or any interested parties further opportunity for submission of views or information. The comments provided no persuasive reason for an across-the-board imposition of more definite informational requirements beyond that.

Comments also proposed that the rule require the Attorney General to give personal notice to certain entities concerning a State's submission of a request for chapter 154 certification, such as capital defense entities in the requesting State. In any particular State, there may be a large number of organizations and individuals who are involved in capital defense work or who would be interested in a State's request for chapter 154 certification for other reasons. It is not feasible for the Attorney General to attempt to identify and personally notify all of them. Nor should the Attorney General be in the position of having to pick and choose, identifying certain persons or organizations as sufficiently interested or important to receive personal notice, when others will not receive such notice. Such personal notice requirements, in any event, are unnecessary, because the State's request will be made publicly available on the Internet and in the **Federal Register** as provided in § 26.23(b).

Section 26.23(c) states that if certification is granted, the certification will be published in the **Federal Register**. Some commenters urged that denials of certification also be published in the **Federal Register**. However, the granting of chapter 154 certification by the Attorney General changes the Federal habeas corpus review procedures applicable in relation to capital cases in the State, so there is a

clear interest in making it indisputable and publicly known that certification has been granted, for which Federal Register publication is a convenient and sufficient means. The reasons for publicizing a denial of certification through official publication are less compelling because its legal effect is just to perpetuate the status quo. Publication of a denial of certification might alternatively serve the purpose of providing the predicate for an appeal of the Attorney General's decision to the D.C. Circuit Court of Appeals. However, review by the D.C. Circuit would be pursuant to chapter 158 of title 28, *see* 28 U.S.C. 2265(c), which provides that "[o]n the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules." 28 U.S.C. 2344. So the Attorney General has the option of giving notice by service to the State official who requested certification regarding the denial of the certification, and is not legally required to publish the denial. Considering the foregoing, the comments do not persuasively establish that the rule should be changed to require uniformly that the Attorney General publish denials of certification in the Federal Register.

### Section 26.23(d)—Post-Certification Occurrences

Section 26.23(d) in the rule addresses the effect of changes or alleged changes in a State capital counsel mechanism following certification by the Attorney General.

One commenter urged that more of the accompanying explanation regarding this provision in the analysis statement for the proposed rule be contained in the rule itself. The relevant portion of the analysis statement, 76 FR at 11710–11, in part noted that if a State abolishes its capital counsel mechanism following certification by the Attorney General, then 28 U.S.C. 2261(b)(2)'s requirement of appointment of counsel pursuant to the certified mechanism as a condition of chapter 154's applicability cannot thereafter be satisfied, reflecting the obvious point that counsel cannot be appointed pursuant to something that no longer exists. The analysis statement further noted that capital habeas petitioners may present claims to Federal habeas courts that subsequent changes or alleged changes in the certified mechanism effectively converted it into a new and uncertified mechanism, and hence section 2261(b)(2)'s requirement of appointment of counsel pursuant to the certified mechanism was not satisfied in their cases. This observation

reflects no judgment by the Attorney General as to whether certain changes in a certified mechanism would affect the applicability of chapter 154, and, if so, under what circumstances or to what extent. That is a matter that Federal habeas courts may consider if capital petitioners raise claims of this nature under section 2262(b)(2). The rule says no more on this question because resolving it is not any part of the Attorney General's certification functions under chapter 154.

The analysis went on to note that in such circumstances, or in other circumstances in which there has been some change or alleged change in the State mechanism, the State could request a new certification by the Attorney General of its present capital counsel mechanism. That could avoid litigation in Federal habeas courts under 28 U.S.C. 2261(b)(2) over the present status of the State mechanism and ensure that determinations regarding satisfaction of chapter 154's requirements are made by the Attorney General, subject to review by the D.C. Circuit Court of Appeals, as contemplated by 28 U.S.C. 2261(b)(1) and 2265(c)(2). The rule does not need to be changed to make this point because § 26.23(d) in the rule already says that "[a] State may request a new certification by the Attorney General to ensure the continued applicability of chapter 154 to cases in which State postconviction proceedings occur after a change or alleged change in the State's certified capital counsel mechanism."

Some comments urged that the rule should be changed to provide a means for decertification of State capital counsel mechanisms that the Attorney General has previously approved. One of the comments pointed in this connection to 5 U.S.C. 553(e), which in part requires agencies to give interested persons the right to petition for the repeal of a rule. However, that provision is inapplicable to chapter 154 certifications, which are orders rather than rules, as noted above.

Decertification could conceivably be effected in one of two ways: (i) through some procedure for examination or oversight of State capital counsel mechanisms following their certification to ascertain whether they continue to measure up under chapter 154's standards, or (ii) through modification of the rule to provide that a certification automatically lapses based on subsequent changes in the capital counsel mechanism or other changed circumstances.

The argument for incorporating some provision for continual oversight and potential decertification of State capital

counsel mechanisms is not persuasive for a number of reasons. First, the proposal conflates the functions assigned to the Attorney General and those reserved to Federal habeas courts under the current formulation of chapter 154, which limits the Attorney General's function to making general certification determinations upon request of an appropriate State official, *see* 28 U.S.C. 2261(b)(1), 2265(a)(1), and reserves case-specific inquiries affecting chapter 154's applicability to Federal habeas courts under 28 U.S.C. 2261(b)(2). Second, the chapter includes provisions that establish when a certification takes effect and direct the Attorney General to promulgate regulations to implement a certification procedure, *see* 28 U.S.C. 2265(a)(2), 2265(b), but no direction to the Attorney General to implement a decertification procedure. These considerations lead to the conclusion that day-to-day oversight and potential decertification of State capital counsel mechanisms are not among the Attorney General's authorized functions under chapter 154.

Regarding the idea that a certification would automatically lapse based on subsequent events, such an approach would pose difficulties in operation, most prominently that certification should not cease to apply merely because the change *might* affect satisfaction of the chapter 154 requirements, and that it is unclear *who* would determine whether a change in the capital counsel system might affect satisfaction of the chapter 154 requirements.

This rule accordingly responds to these difficulties by not including any provision for decertification, but providing in § 26.23(d) that a State may seek a new certification from the Attorney General to resolve uncertainties concerning chapter 154's continued applicability in light of subsequent changes or alleged changes in the State's certified capital counsel mechanism. This approach (i) avoids any question of legal consistency with chapter 154's definition of the Attorney General's authority and functions, and (ii) avoids the difficulties inherent in attempting to define ex ante and in the absence of any factual context for assessing whether and what changes to a State system should prompt a decertification review, but (iii) affords a means for resolution by the responsible authority under chapter 154 of questions that may arise in practice regarding the continued effectiveness of chapter 154 certifications.

Just as importantly, § 26.23(e), discussed below, provides that

certifications are effective for a period of five years, thereby ensuring that a State capital counsel mechanism's current satisfaction of the chapter 154 requirements will be revisited at reasonable intervals. This addresses concerns about the possibility of subsequent changes in a State's system that could put it out of compliance with chapter 154, further reducing the force of any argument that a decertification procedure is needed.

### Section 26.23(e)—Renewal of Certifications

Section 26.23(e) provides that certifications remain effective for a period of five years. The addition of this provision, which was not in the proposed rule but was described in the supplemental notice of proposed rulemaking, *see* 77 FR at 7562, is responsive to many comments that pointed out that changed circumstances may affect whether a once-certified mechanism continues to be adequate for purposes of chapter 154. For example, inflation or changed economic circumstances may mean that provisions authorizing compensation of counsel at a specified hourly rate, which were sufficient at the time of an initial certification decision, are no longer adequate after the passage of years. Or changes may occur in the standards constituting a State's postconviction capital counsel mechanism that affect their consistency with chapter 154.

Some commenters on the supplemental notice approved of this change but urged that the rule include more detail concerning the operation of the recertification process and the standards that would be applied in making recertification decisions. This is unnecessary because the process and standards for subsequent certification decisions are the same as those for initial certification decisions under the rule. The standards of § 26.22 will be applied in deciding whether a State's capital counsel mechanism for which recertification is requested satisfies the chapter 154 requirements, and the procedure set forth in § 26.23 will apply in entertaining, obtaining public input concerning, and deciding recertification requests.

Two commenters objected to limiting the duration of certifications on the grounds that chapter 154 does not provide for the termination of certifications and that the sponsor of the 2006 amendments to chapter 154 explained that they were intended to create a system of "one-time certification." *See* 152 Cong. Rec. S1625 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl). Regarding the statutory

question, the statutory framework is unquestionably premised on the continuing sufficiency of a mechanism once certified by the Attorney General. The quid pro quo that is the core and the animating purpose of chapter 154, procedural "benefits" for States if and only if they meet the statutory criteria, would cease to make sense if a certification were indefinitely and irrevocably effective even if—by virtue of changed circumstances, *see infra* (analysis statement)—the standards first put in place by a State no longer satisfied the statutory requirements. Providing for periodic review of certifications is fully consistent with the statutory text and avoids such an absurd result. If a statute requires an assessment of mutable conditions against legal standards, a reasonable time limit may be imposed on the effectiveness of a certification to ensure its continuing validity, even if the authorizing statute does not explicitly provide for a time limit. *See Durable Mfg. Co.* v. *U.S. Dep't of Labor,* 578 F.3d 497, 501–02 (7th Cir. 2009) (upholding time limitation of validity of labor certificates in light of possible subsequent changes in economic circumstances affecting consistency with statutory requirements and objectives).

Regarding the statement by the sponsor of the amendment, it reflects a rejection of the idea of a continuing "compliance review" process or "decertification" procedure under chapter 154 in light of (i) "the substantial litigation burdens" that would likely result for States that have been certified, including "the cost of creating opportunities to force the State to continually litigate its chapter 154 eligibility," (ii) the concern that "if such a means of post-opt-in review were created, it inevitably would be overused and abused," and (iii) the judgment that States "are entitled to a presumption that once they have been certified as chapter-154 compliant, they will substantially maintain their counsel mechanisms." 152 Cong. Rec. S1625 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl). The statement further viewed a decertification procedure as enabling adverse parties to embroil States in challenges to the continued validity of their capital counsel mechanisms under chapter 154 based on case-specific deficits in their operation, such as delay in the appointment of counsel in particular cases for reasons beyond the State's control. *See id.*

Considered as a whole, the sponsor's statement reflects concerns that would be implicated by the creation of a continuing oversight or decertification

procedure for chapter 154. The Department, as discussed above, has not attempted to create such a procedure in the present rule.

The provision adopted in § 26.22(e) in the final rule does not implicate these concerns. It authorizes no person or entity to initiate challenges to the continuing validity of a certification, much less to involve a State in the uncertainty of perpetual litigation about the validity of a certification. Moreover, § 26.22(e) provides that certifications remain effective for an uninterrupted period of five years after the completion of the certification process by the Attorney General and any related judicial review. If recertification is requested at or before the end of that period, the rule provides that the prior certification will remain in effect until the completion of the recertification process by the Attorney General and any related judicial review.

Section 26.22(e) also does not implicate the concern about challenges based on case-specific non-compliance with State capital counsel mechanisms. Recertification decisions by the Attorney General will involve the same standards and procedures as initial certification decisions.

Finally, the inclusion of § 26.22(e) in the rule does not reflect an assumption that States are likely to abolish or materially weaken their chapter 154-compliant capital counsel mechanisms once they have been established. If no changes have occurred that take a State capital counsel mechanism out of compliance with chapter 154, then it will be recertified, and the recertification process will provide a definitive means of establishing continued satisfaction of the chapter's requirements.

### Section-by-Section Analysis

#### Section 26.20

Section 26.20 explains the rule's purpose of implementing the certification procedure for chapter 154. It is modified from the corresponding provision in the 2008 regulations to describe more fully the conditions for the applicability of chapter 154 under 28 U.S.C. 2261(b).

#### Section 26.21

Section 26.21 defines the terms "appropriate state official" and "state postconviction proceedings" in the same manner as the 2008 regulations, and adds a definition of "appointment" and "indigent prisoners."

Chapter 154 involves a quid pro quo arrangement under which States provide for the appointment of counsel

for indigent petitioners in State postconviction proceedings in capital cases, and in return Federal habeas review is carried out with generally more limited time frames and scope following the State postconviction proceedings in which counsel has been made available. *See* 28 U.S.C. 2261–2266. In this context, not every provision for making counsel available in State postconviction proceedings, however belatedly, can logically be regarded as providing for the appointment of counsel in the sense relevant under the chapter. In particular, that would not be the case if the State capital counsel mechanism provided for the availability of counsel to represent indigent capital petitioners only after the deadline for pursuing State postconviction proceedings had passed; or only after the expiration of the time limit in 28 U.S.C. 2263 for Federal habeas filing; or only after such delay that the time available to prepare for and pursue State or Federal postconviction review had been seriously eroded. Section 26.21 accordingly defines "appointment" to mean "provision of counsel in a manner that is reasonably timely in light of the time limitations for seeking State and Federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings."

Under 28 U.S.C. 2265(a), a certification request must be made by "an appropriate State official." Prior to the 2006 amendments to chapter 154, Federal courts entertaining habeas corpus applications by State prisoners under sentence of death would decide which set of habeas corpus procedures applied—chapter 153 or chapter 154 of title 28—and State attorneys general responsible for such litigation could request determinations that their States had satisfied the requirements for the applicability of chapter 154. The 2006 amendments to chapter 154 were not intended to disable the State attorneys general from their pre-existing role in this area, and State attorneys general continue in most instances to be the officials with the capacity and motivation to seek chapter 154 certification for their States. *See* 73 FR at 75329–30. Section 26.21 of the rule accordingly provides that the appropriate official to seek chapter 154 certification is normally the State attorney general. In those few States, however, where the State attorney general does not have responsibilities relating to Federal habeas corpus litigation, the chief executive of the State will be considered the appropriate

State official to make a submission on behalf of the State.

Section 26.21 defines "State postconviction proceedings" as "collateral proceedings in State court, regardless of whether the State conducts such proceedings after or concurrently with direct State review." Collateral review normally takes place following the completion of direct review of the judgment, but some States have special procedures for capital cases in which collateral proceedings and direct review may take place concurrently. Provisions that separately addressed the application of chapter 154 to these systems were replaced by the 2006 amendments with provisions that permit chapter 154 certification for all States under uniform standards, regardless of their timing of collateral review vis-à-vis direct review. *Compare* 28 U.S.C. 2261(b), 2265 (2006) (as amended by the USA PATRIOT Improvement and Reauthorization Act of 2005), *with* 28 U.S.C. 2261(b), 2265 (2000) (as enacted by AEDPA). *See generally* 152 Cong. Rec. S1620 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl) (explaining that the current provisions simplify the chapter 154 qualification standards, "which obviates the need for separate standards for those States that make direct and collateral review into separate vehicles and those States with unitary procedures").

The definition of "State postconviction proceedings" in the rule reflects the underlying objective of chapter 154 to provide expedited Federal habeas corpus review in capital cases arising in States that have gone beyond the constitutional requirement of providing counsel for indigents at trial and on appeal by extending the provision of counsel to indigent capital petitioners in State collateral proceedings. *See* 73 FR at 75332–33, 75337 (reviewing relevant legislative and regulatory history). The provisions of chapter 154, as well as its legislative history, reflect the understanding of "postconviction proceedings" as specifically referring to collateral proceedings rather than to other proceedings that occur after conviction (e.g., sentencing proceedings, direct review). *See* 28 U.S.C. 2261(e) (providing that ineffectiveness or incompetence of counsel during postconviction proceedings in a capital case cannot be a ground for relief in a Federal habeas corpus proceeding); 28 U.S.C. 2263(a), (b)(2) (180-day time limit for Federal habeas filing under chapter 154 starts to run "after final State court affirmance of the conviction and sentence on direct review or the expiration of the time for seeking such

review" subject to tolling "from the date on which the first petition for postconviction review or other collateral relief is filed until the final State court disposition of such petition"); 152 Cong. Rec. S1620, 1624–25 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl) (explaining that chapter 154 provides incentives for States to provide counsel in State postconviction proceedings, referring to collateral proceedings); 151 Cong. Rec. E2639–40 (daily ed. Dec. 22, 2005) (extension of remarks of Rep. Flake) (displaying the same understanding); *see also, e.g., Murray* v. *Giarratano,* 492 U.S. 1 (1989) (using the terms postconviction and collateral proceedings interchangeably).

### Section 26.22

Section 26.22 sets out the requirements for certification that a State must meet to qualify for the application of chapter 154. These are the requirements in 28 U.S.C. 2261(c)–(d) and 2265(a)(1).

### Paragraph (a) of § 26.22—Appointment of Counsel

Paragraph (a) of § 26.22 sets out the requirements of chapter 154 concerning appointment of counsel that appear in 28 U.S.C. 2261(c)–(d).

### Paragraph (b) of § 26.22—Competent Counsel

Paragraph (b) of § 26.22 explains how States may satisfy the requirement to provide for appointment of "competent counsel" and to provide "standards of competency" for such appointments. 28 U.S.C. 2265(a)(1)(A), (C).

The corresponding portion of the 2008 regulations construed the reference to appointment of "competent counsel" in section 2265(a)(1)(A) as a cross-reference to counsel meeting the competency standards provided by the State pursuant to section 2265(a)(1)(C). It accordingly treated the definition of such standards as a matter of State discretion, not subject to further review by the Attorney General. *See* 73 FR at 75331. However, these provisions may also reasonably be construed as permitting the Attorney General to require a threshold of minimum counsel competency, while recognizing substantial State discretion in setting counsel competency standards. *See generally* OLC Opinion. The latter understanding is supported by cases interpreting chapter 154, *see, e.g., Spears,* 283 F.3d at 1013 (recognizing that "Congress . . . intended the states to have substantial discretion to determine the substance of the competency standards" under chapter 154 while still reviewing the adequacy

of such standards), and by the original Powell Committee proposal from which many features of chapter 154 ultimately derive, *see* 135 Cong. Rec. 24696 (1989). This understanding is adopted in § 26.22(b) of the final rule.

The specific standards set forth in paragraph (b) are based on judgments by Congress in Federal laws concerning adequate capital counsel competency standards and on judicial interpretation of the counsel competency requirements of chapter 154. Section 26.22(b)(1) sets out two approaches that will presumptively be considered adequate to satisfy chapter 154—an option involving an experience requirement derived from the standard for appointment of counsel in Federal court proceedings in capital cases (paragraph (b)(1)(i)), and an option involving qualification standards set in a manner consistent with relevant portions of the IPA (paragraph (b)(1)(ii)). Section 26.22(b)(2) provides that States can satisfy chapter 154's requirements by reasonably assuring an appropriate level of proficiency in other ways, such as by requiring some combination of experience and training.

As indicated in the introductory language in subsection (b)(1) of § 26.22, State capital counsel mechanisms will be regarded as presumptively adequate in relation to counsel competency if they meet or exceed the benchmark standards identified in the subsection. States will not be penalized for going beyond the minimum required by the rule. Thus, for example, in relation to paragraph (b)(1)(i), State competency standards will be considered presumptively sufficient if they require five years of postconviction experience, rather than three; uniform satisfaction of the five-year/three-year experience requirement rather than allowing some exception as in 18 U.S.C. 3599(d); or training requirements for appointment in addition to the specified experience requirement.

The rule does not require that all counsel in a State qualify under the same standard. Alternative standards may be used so long as the State mechanism requires that all counsel satisfy some standard qualifying under paragraph (b). *Cf.* 18 U.S.C. 3599(d) (allowing exceptions to categorical experience requirement); *Spears*, 283 F.3d at 1013 (finding that alternative standards are allowed under chapter 154). Hence, for example, a State system may pass muster by requiring that appointed counsel either satisfy an experience standard sufficient under paragraph (b)(1)(i) or satisfy an alternative standard sufficient under paragraph (b)(2) involving more limited

experience but an additional training requirement.

Option 1: § 26.22(b)(1)(i)—The Competency Standards for Federal Court Proceedings

As provided in paragraph (b)(1)(i) of § 26.22, a State may satisfy chapter 154's requirement relating to counsel competency by requiring appointment of counsel "who have been admitted to the bar for at least five years and have at least three years of postconviction litigation experience." This is based on the standard for appointed counsel in capital case proceedings in Federal court. *See* 18 U.S.C. 3599(a)–(e). Because Congress has determined that a counsel competency standard of this nature is adequate for capital cases in Federal court proceedings, including postconviction proceedings, *see* 18 U.S.C. 3599(a)(2), it will also presumptively be considered adequate for chapter 154 purposes when such cases are at the stage of State postconviction review.

The counsel competency standards for Federal court proceedings in capital cases under 18 U.S.C. 3599 do not require adherence to a five-year/three-year experience requirement in all cases, but provide that the court, "for good cause, may appoint another attorney whose background, knowledge, or experience would otherwise enable him or her to properly represent the defendant," with due consideration of the seriousness of the penalty (i.e., capital punishment) and the nature of the litigation. 18 U.S.C. 3599(d). For example, a court might consider it appropriate to appoint an attorney who is a law professor with expertise in capital punishment law and training in capital postconviction litigation to represent a prisoner under sentence of death, even if the attorney has less than three years of relevant litigation experience. The rule in paragraph (b)(1)(i) accordingly does not require the imposition of a five-year/three-year minimum experience requirement in all cases, but allows States that generally impose such a requirement to permit the appointment of other counsel who would qualify for appointment under the exception allowed in 18 U.S.C. 3599, i.e., appointment by a court, for good cause, of attorneys whose background, knowledge, or experience would otherwise enable them to properly represent prisoners under sentence of death considering the seriousness of the penalty and the nature of the litigation. This recognizes, as in section 3599, that courts may properly be allowed, for good cause, to depart from the specified experience

requirement, which the Department expects would occur only in exceptional cases.

Option 2: § 26.22(b)(1)(ii)—The Innocence Protection Act Standards

Paragraph (b)(1)(ii) in § 26.22 sets forth a second approach that presumptively satisfies the counsel competency requirements of chapter 154, specifically, by setting qualification standards for appointment of postconviction capital counsel in a manner consistent with the IPA. The IPA directs the Attorney General to provide grants to States to create or improve "effective system[s] for providing competent legal representation" in capital cases, 42 U.S.C. 14163(c)(1), and provides a definition of "effective system" in 42 U.S.C. 14163(e) that is largely based on elements of the ABA Guidelines. *Compare* 42 U.S.C. 14163(e), *with* ABA Guidelines § 3.1, at 22–23. The IPA specifies that such effective systems are to include appointment of capital counsel (i) by a public defender program, (ii) by an entity composed of individuals with demonstrated knowledge and expertise in capital cases (other than current prosecutors) that is established by statute or by the highest State court with criminal case jurisdiction, or (iii) by the court appointing qualified attorneys from a roster maintained by a State or regional selection committee or similar entity pursuant to a pre-existing statutory procedure. 42 U.S.C. 14163(e)(1).

Under the IPA requirements, the appointing authority or an appropriate designated entity must "establish qualifications for attorneys who may be appointed to represent indigents in capital cases," "maintain a roster of qualified attorneys," "conduct, sponsor, or approve specialized training programs," and monitor and disqualify from subsequent appointment attorneys whose performance is ineffective or unethical or who fail to participate in required training. 42 U.S.C. 14163(e)(2)(A), (B), (D), (E). The IPA does not prescribe the content of the required counsel qualification standards, but assumes that the specifications regarding the nature of the appointment or selection authority—and the associated requirements for post-appointment monitoring and potential disqualification—can be relied on to provide appropriate competency standards.

Paragraph (b)(1)(ii) in § 26.22 follows this legislative judgment in relation to a State's satisfaction of the counsel competency requirements of chapter

Case4:13-cv-04517-CW Document1 Filed09/30/13 Page41 of 135

154. Thus, a State's capital counsel
mechanism will presumptively be
deemed adequate for purposes of
chapter 154's counsel competency
requirements if it provides for the
appointment and qualification (or
disqualification) of counsel in State
postconviction proceedings in capital
cases in a manner consistent with 42
U.S.C. 14163(e)(1) and 14163(e)(2)(A),
(B), (D), (E).

Option 3: § 26.22(b)(2)—Other
Standards Reasonably Assuring
Proficiency

In enacting chapter 154, "Congress
did not envision any specific
competency standards but, rather,
intended the states to have substantial
discretion to determine the substance of
the competency standards." *Spears,* 283
F.3d at 1013. The options described in
paragraphs (b)(1)(i) and (ii) in § 26.22
accordingly do not exhaust the means
by which States may satisfy chapter
154's requirements concerning counsel
competency. Indeed, Congress in
formulating chapter 154 rejected a
recommendation that States uniformly
be required to satisfy standards similar
to those for Federal court proceedings in
capital cases that currently appear in 18
U.S.C. 3599, *see* 73 FR at 75331, and in
amending chapter 154 in 2006 Congress
did not modify chapter 154 to require
adherence by States to the IPA
standards that had been enacted in 2004
but rather continued to use the more
general language of chapter 154 relating
to counsel competency.

Consequently, as provided in
paragraph (b)(2) in § 26.22, the Attorney
General will consider whether a State's
counsel competency standards
reasonably assure appointment of
counsel with a level of proficiency
appropriate for State postconviction
litigation in capital cases, even if they
do not meet the particular criteria set
forth in paragraph (b)(1)(i) or (b)(1)(ii).
As in the courts' consideration of the
adequacy of State competency standards
prior to the 2006 amendments to
chapter 154, no definite formula can be
prescribed for this review, and the
Attorney General will assess such State
mechanisms individually. Measures that
will be deemed relevant include
standards of experience, knowledge,
skills, training, education, or
combinations of these considerations
that a State requires attorneys to meet in
order to be eligible for appointment in
State capital postconviction
proceedings. *Cf.* 18 U.S.C. 3599(d)
(allowing appointment of counsel
whose background, knowledge, or
experience would otherwise enable
such counsel to properly represent the

petitioner); *Spears,* 283 F.3d at 1012–13
(finding that competency standards
involving combination of experience,
proficiency, and education were
adequate under chapter 154); ABA
Guidelines § 5.1(B)(2), at 35, § 8.1(B), at
46 (recommending skill and training
requirements for counsel).

Also, the rule in subparagraphs
(b)(1)(i) and (ii) of § 26.22 identifies
particular approaches that will be
considered presumptively adequate,
namely, those of the Federal capital
counsel statute, 18 U.S.C. 3599, or the
IPA, 42 U.S.C. 14163(e)(1), (2)(A) (B),
(D), (E). These approaches accordingly
serve as benchmarks, and a State's
adoption of competency requirements
that are likely to result in similar or
even higher levels of proficiency will
weigh in favor of a finding of adequacy
for purposes of chapter 154. Conversely,
State competency standards that appear
likely to result in significantly lower
levels of proficiency compared to the
benchmark levels risk being found
inadequate under chapter 154.

Paragraph (c) of § 26.22—Compensation
of Counsel

Paragraph (c) of § 26.22 explains how
a State may satisfy the requirement that
it have established a mechanism for the
compensation of appointed counsel. 28
U.S.C. 2265(a)(1)(A). The corresponding
portion of the 2008 regulations assumed
that levels of compensation for purposes
of chapter 154 were a matter of State
discretion, not subject to review by the
Attorney General, because the statute
refers simply to "compensation" and
imposes no further requirement that the
authorized compensation be "adequate"
or "reasonable." *See* 73 FR at 75331–32.
However, the broader statutory context
is the requirement that the State
establish a mechanism "for the
appointment [and] compensation . . . of
competent counsel." 28 U.S.C.
2265(a)(1)(A). This requirement reflects
a determination by Congress that
reliance on unpaid volunteers to
represent indigent prisoners under
sentence of death is insufficient, and a
State mechanism affording inadequate
compensation could similarly fall short
in ensuring the availability of competent
counsel for appointment. Hence, when
a State relies on a compensation
incentive to secure competent counsel,
chapter 154 is reasonably construed to
permit the Attorney General to review
the adequacy of authorized
compensation. This understanding is
adopted in § 26.22(c) of the proposed
rule.

Paragraph (c)(1) in § 26.22 describes a
number of possible compensation
standards that will presumptively be

considered adequate for purposes of
chapter 154, generally using as
benchmarks the authorizations for
compensation of capital counsel that
have been deemed adequate in other
acts of Congress.

The first option, appearing in
paragraph (c)(1)(i), is compensation
comparable to that authorized by
Congress for representation in Federal
habeas corpus proceedings reviewing
State capital cases in 18 U.S.C.
3599(g)(1). This level of compensation
should similarly be adequate to ensure
the availability of competent counsel for
appointment in such cases at the stage
of State postconviction review.

The second option, appearing in
paragraph (c)(1)(ii), is compensation
comparable to that of retained counsel
who meet competency standards
sufficient under paragraph (b). The IPA
and the ABA Guidelines similarly
endorse reliance on market rates for
legal representation to provide adequate
compensation for appointed capital
counsel. *See* 42 U.S.C.
14163(e)(2)(F)(ii)(II); ABA Guidelines
§ 9.1(B)(3), at 49. Compensation
sufficient to induce competent attorneys
to carry out such representation for hire
should likewise be sufficient to attract
competent attorneys to accept
appointments for such representation.

The third option, appearing in
paragraph (c)(1)(iii), is compensation
comparable to that of appointed counsel
in State appellate or trial proceedings in
capital cases. *Cf.* 18 U.S.C. 3599(g)(1)
(authorization for compensation of
capital counsel not differentiating
between compensation at different
stages of representation). The
compensation afforded at the stages of
trial and appeal must be sufficient to
secure competent attorneys to provide
representation because effective legal
representation is constitutionally
required at those stages. Comparable
compensation should accordingly be
sufficient for that purpose at the
postconviction stage.

The fourth option, appearing in
paragraph (c)(1)(iv), is compensation
comparable to that of attorneys
representing the State in State
postconviction proceedings in capital
cases. This option also follows the IPA
and the ABA Guidelines, which provide
that capital counsel employed by
defender organizations should be
compensated on a salary scale
commensurate with the salary scale of
prosecutors in the jurisdiction. 42
U.S.C. 14163(e)(2)(F)(ii)(IV); ABA
Guidelines § 9.1(B)(2), at 49. The rule
allows this approach for compensation
of both public defenders and private
counsel, but recognizes that private

defense counsel may have to pay from their own pockets overhead expenses that publicly employed prosecutors do not bear. The rule accordingly specifies that, if paragraph (c)(1)(iv) is relied on to justify the level of compensation authorized for private counsel, the compensation standard should take account of overhead costs (if any) that are not otherwise payable as reasonable litigation expenses. *Cf. Baker,* 220 F.3d at 285–86 (finding that compensation resulting in substantial losses to appointed counsel was inadequate under chapter 154).

In comparing a State's compensation standards to the benchmarks identified in paragraph (c)(1), both hourly rates and overall limits on compensation will be taken into account. For example, under paragraph (c)(1)(iii), suppose that State law authorizes the same hourly rate for compensation of appointed capital counsel at the appellate stage and in postconviction proceedings, but it specially imposes a low overall limit on compensable hours at the postconviction stage. The compensation authorized at the respective stages may then not be comparable in any realistic sense, and the objective of ensuring the availability of competent counsel for postconviction representation may not be realized, because counsel who accepted such representation would effectively be required to function as uncompensated volunteers to the extent they needed to work beyond the maximum number of compensable hours. This does not mean that State compensation provisions will be deemed inadequate if they specially prescribe presumptive limits on overall compensation at the postconviction stage, but comparability to the paragraph (c)(1) benchmarks may then depend on whether the State provides means for authorizing compensation beyond the presumptive maximum where necessary. *Cf. Spears,* 283 F.3d at 1015 (approving a presumptive 200-hour limit under chapter 154 where compensation was available for work beyond that limit if reasonable); *Mata* v. *Johnson,* 99 F.3d 1261, 1266 (5th Cir. 1996) (overall $7500 limit on compensation was not facially inadequate under chapter 154 and was not shown inadequate in the particular case), *vacated in part on other grounds,* 105 F.3d 209 (5th Cir. 1997).

As with the counsel competency benchmarks of paragraph (b)(1), the counsel compensation standards of paragraph (c)(1) provide only a floor that States are free to exceed, and not all counsel must be compensated in conformity with a single standard. A State may adopt alternative standards,

each comparable to or exceeding some benchmark identified in paragraph (c)(1), and provide for compensation of different counsel or classes of counsel in conformity with different standards. For example, a State might provide for representation of some indigent capital petitioners in postconviction proceedings by appointed private counsel and some by public defender personnel, compensate the private counsel in conformity with paragraph (c)(1)(iii), and compensate the public defender counsel in conformity with paragraph (c)(1)(iv).

The rule recognizes that the options set out in paragraph (c)(1) of § 26.22 are not necessarily the only means by which a State may provide compensation for competent counsel. State compensation provisions for capital counsel have been deemed adequate for purposes of chapter 154 and other Federal laws independent of any comparison to the benchmarks in paragraph (c)(1). *See* 42 U.S.C. 14163(e)(2)(F)(i) (under the IPA, State may compensate under qualifying statutory procedure predating that Act); *Spears,* 283 F.3d at 1015 (State could compensate at "a rate of up to $100 an hour, a rate that neither Petitioner nor amici argue was unreasonable"). Also, a State may secure representation for indigent capital petitioners in postconviction proceedings by means not dependent on any special financial incentive for accepting appointments, such as by providing sufficient salaried public defender personnel to competently carry out such assignments as part of their duties. Accordingly, under paragraph (c)(2) in § 26.22, capital counsel mechanisms involving compensation provisions that do not satisfy paragraph (c)(1) may be found to satisfy the statutory requirement if they are otherwise reasonably designed to ensure the availability of competent counsel. As with § 26.22(b)(2) of the rule, mechanisms seeking to qualify under paragraph (c)(2) that appear likely to provide for significantly lesser compensation compared to the benchmark levels risk being found inadequate under chapter 154.

## Paragraph (d) of § 26.22—Payment of Reasonable Litigation Expenses

Paragraph (d) of § 26.22 incorporates the requirement in 28 U.S.C. 2265(a)(1)(A) to provide for the payment of reasonable litigation expenses. An inflexible cap on reimbursable litigation expenses in capital postconviction proceedings could contravene this requirement by foreclosing the payment of costs incurred by counsel, even if determined by the court to be

reasonably necessary. However, the requirement does not foreclose a presumptive limit if the State provides means for authorizing payment of litigation expenses beyond the limit where necessary. *Cf.* 18 U.S.C. 3599(f), (g)(2) (establishing presumptive $7500 limit on payment for litigation expenses in Federal court proceedings in capital cases, with authority for chief judge or delegee to approve higher amounts); *Mata,* 99 F.3d at 1266 (concluding that overall $2500 limit on payment of litigation expenses was not facially inadequate under chapter 154 and was not shown to be inadequate in the particular case).

### Section 26.23

Section 26.23 in the rule sets out the mechanics of the certification process for States seeking to opt in to chapter 154.

Paragraph (a) provides that an appropriate State official may request in writing that the Attorney General determine whether the State meets the requirements for chapter 154 certification. Paragraph (b) provides that the Attorney General will make the request available on the Internet and solicit public comment on the request by publishing a notice in the **Federal Register.** It requires Internet availability because State requests for certification may include supporting materials not readily reproducible or viewable in the **Federal Register,** such as copies of State statutes, rules, and judicial decisions bearing on the State's satisfaction of chapter 154's requirements for certification.

As provided in paragraph (c), the Attorney General will review the State's request, including consideration of timely public comments received in response to a **Federal Register** notice. The Attorney General will decide whether the State has satisfied the requirements for chapter 154 certification and will publish the certification in the **Federal Register** if certification is granted. The certification will include a determination of the date the capital counsel mechanism qualifying the State for certification was established, as that date is the effective date of the certification. 28 U.S.C. 2265(a)(2).

Paragraph (d) addresses the effect of changes or alleged changes in a State's capital counsel mechanism after that mechanism has been certified by the Attorney General. The paragraph first addresses situations involving changes or alleged changes in a State's capital counsel mechanism prior to State postconviction proceedings in a capital case. Chapter 154's special Federal

habeas corpus review procedures apply in cases in which two conditions are met: (i) the State's capital counsel mechanism has been certified by the Attorney General, 28 U.S.C. 2261(b)(1), and (ii) "counsel was appointed pursuant to that mechanism"—i.e., the mechanism certified by the Attorney General—unless the petitioner "validly waived counsel . . . [or] retained counsel . . . or . . . was found not to be indigent," 28 U.S.C. 2261(b)(2). The first sentence of paragraph (d) therefore notes that certification by the Attorney General under chapter 154 reflects the Attorney General's determination that the State capital counsel mechanism examined in the Attorney General's review satisfies chapter 154's requirements. If a State later discontinues that mechanism before counsel is appointed in a given State postconviction proceeding, then counsel in that case will not have been "appointed pursuant to" the mechanism that was approved by the Attorney General and chapter 154 would accordingly be inapplicable in that case. Similarly, if a State later changes or is alleged to have changed the certified mechanism, litigation before Federal habeas courts may result under 28 U.S.C. 2261(b)(2) as to whether the State has in fact materially changed its mechanism and, if so, whether the change means that counsel (even if appointed) was appointed pursuant to what is effectively a new and uncertified mechanism, rather than the mechanism certified by the Attorney General.

The second sentence of paragraph (d) accordingly provides that a State may seek a new certification by the Attorney General if there is a change or alleged change in a previously certified capital counsel mechanism. If a State wishes to improve on a certified capital counsel mechanism, then certification by the Attorney General of the new or revised mechanism will allow the State to avoid Federal habeas court litigation over whether chapter 154 is applicable to cases involving appointments made pursuant to that mechanism. Similarly, if legal questions are raised about the continued applicability of chapter 154 based on changes or alleged changes in a certified capital counsel mechanism, a State may seek a new certification by the Attorney General that its current mechanism satisfies chapter 154's requirements, ensuring the continued applicability of chapter 154's special Federal habeas corpus procedures. By seeking a new certification of a new or revised capital counsel mechanism, a State may ensure that it is the Attorney

General, subject to review by the DC Circuit Court of Appeals, who determines whether its capital counsel mechanism is in present compliance with chapter 154's requirements, *see* 28 U.S.C. 2261(b)(1), 2265(c)(2), and avoid litigation over that matter in the Federal habeas courts.

The final sentence in paragraph (d) states that subsequent changes in a State's capital counsel mechanism do not affect the applicability of chapter 154 in cases in which a mechanism certified by the Attorney General existed throughout State postconviction proceedings in the case. For example, suppose that the Attorney General certifies a State's capital counsel mechanism in 2013, the State postconviction proceedings in a capital case are carried out in 2014 and 2015 with counsel in those proceedings appointed pursuant to the certified mechanism, and Federal habeas corpus proceedings in the case commence in 2016. Suppose further that the State makes some change in 2016 to its counsel competency or compensation standards. Because a certified capital counsel mechanism would have been in place throughout State postconviction review, the prerequisites for expedited Federal habeas corpus review under chapter 154 would be satisfied. *See* 28 U.S.C. 2261(b). That result would not be affected by later changes in the State's postconviction capital counsel mechanism.

Section 26.23(e) provides in part that a chapter 154 certification remains effective for a period of five years. This takes account of the possibility of changes over time in a State's standards constituting its postconviction capital counsel mechanism, and the possibility of other changes in a State that may affect the continuing sufficiency over time of standards initially adopted by a State and certified under chapter 154. For example, a State provision authorizing compensation of counsel at a specified hourly rate may initially be reasonably designed to ensure the availability for appointment of competent counsel, but that may no longer be the case after the passage of years in light of inflation or other changed economic circumstances. *Cf. Durable Mfg. Co.*, 578 F.3d at 501–02 (upholding time limitation of validity of labor certificates in light of possible subsequent changes in economic circumstances affecting consistency with statutory requirements and objectives). Providing for some limitation on the lifespan of certifications and requiring renewal allows questions concerning the continued adequacy of the mechanism's

standards, including whether they continue to apply, to be reexamined at regular intervals, each time with increased information about a State's actual experience with its mechanism, rather than assuming that a once-compliant State system is compliant indefinitely. At the same time, overly stringent limits on the duration of certifications could unduly burden States and undermine the incentive States have under chapter 154 to undertake the effort to establish compliant mechanisms and seek their certification.

Balancing these considerations, § 26.23(e) in the rule provides a basic period of five years during which a certification remains valid, with further provisions regarding the beginning and end of the period to promote the uninterrupted availability of the benefits of chapter 154 to a certified State when seeking recertification. As provided in 28 U.S.C. 2265(a)(2), the effectiveness of a certification is backdated to the date the certified capital counsel mechanism was established, but under the rule the five-year limit on its duration does not begin to run until the completion of the certification process by the Attorney General and any related judicial review. Moreover, the rule provides that a certification remains effective for an additional period extending until the conclusion of the Attorney General's disposition of the State's recertification request and any judicial review thereof, if the State requests recertification at or before the end of the five-year period.

## Regulatory Certifications

### Executive Order 13563 and 12866

As described in Executive Order 13563, Improving Regulation and Regulatory Review (Jan. 18, 2011), agencies must, to the extent permitted by law, propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs; tailor the regulation to impose the least burden on society, consistent with obtaining the regulatory objectives; and, in choosing among alternative regulatory approaches, select those approaches that maximize net benefits. Executive Order 13563 recognizes that some benefits and costs are difficult to quantify and provides that, where appropriate and permitted by law, agencies may consider and discuss qualitatively values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts.

The Department of Justice has determined that this rule is a "significant regulatory action" under

Executive Order 12866, section 3(f), and, accordingly, this rule has been reviewed by the Office of Management and Budget. The determination that this is a significant regulatory action, however, does not reflect a conclusion that it is "likely to result in a rule that may . . . [h]ave an annual effect on the economy of $100 million or more" or other effects as described in section 3(f)(1) of the Executive Order.

This rule has no effect on States unless they decide that they wish to qualify for chapter 154 certification. If States do decide to apply for chapter 154 certification, the resulting costs will mainly depend on (i) the number of capital cases these States litigate in State postconviction proceedings, and (ii) the incremental difference (if any) between their current per-case capital litigation costs and the corresponding costs under a system that complies with this rule.

These costs cannot be exactly quantified because (i) we do not know how many States will try to seek certification based on their own analysis of whether it is beneficial on balance to do so; (ii) the rule provides States wide latitude to design their own appointment mechanism; (iii) the rule affords the Attorney General discretion in making certification decisions; and (iv) there are non-quantifiable benefits to providing an opt-in system that may outweigh the costs such as improved fairness and equity in capital counsel systems. Absent a State's application and public comment, the Department cannot determine whether the Attorney General would decide, in his discretion, to certify that the State's capital counsel mechanism satisfies this rule.

Moreover, even if the Department could determine at this time that a State's mechanism fails to meet this rule's standards, the Department does not have the data necessary to calculate the costs of making the State mechanism compliant and the rule gives States substantial discretion to correct any perceived shortfall in a myriad of ways. Thus, any cost projections would need to be specific to each State and would depend on unknown variables such as how a State will design compensation and competency standards and whether and how the Attorney General will exercise discretion. Against this background, the Department cannot quantify the costs and benefits of this rule.

Despite the impracticability of exact quantification, the Department can confidently project that the annual cost will not exceed $100 million. At the end of 2010, 36 States held 3,100 prisoners under sentence of death. *See* Bureau of Justice Statistics, Office of Justice

Programs, U.S. Department of Justice, *Capital Punishment, 2010—Statistical Tables* at 8, table 4 (Dec. 2011), *available at http://www.bjs.gov/content/pub/pdf/cp10st.pdf*. Regarding the costs of satisfying the requirements of this rule, 35 of the 36 States accounting for the capital cases in the United States already provide for appointment of counsel in State postconviction proceedings. These States may still fall short of satisfying this rule's standards, in relation to such matters as payment of litigation expenses or compensation of counsel, but this rule affords States a variety of options that may minimize any resulting increase in costs.

Assuming that all 36 States that currently have the death penalty will upgrade their postconviction capital counsel mechanisms to the extent necessary to satisfy this rule, and that the number of capital cases pending in State postconviction proceedings in a year is 2,000, the total cost for the States to comply with this rule could not reach $100 million unless the average increase in litigation costs were $50,000 for each case. While for the reasons explained above we have not estimated the costs for States to satisfy this rule, we have no reason to believe that costs would increase to that degree.

States that obtain certification by the Attorney General under this rule could realize costs savings resulting from chapter 154's expedited procedures in subsequent Federal habeas corpus review. *See* 28 U.S.C. 2262, 2264, 2266. Chapter 154's expedited procedures offer States the benefits of: (i) Definite rules regarding the commencement and expiration of stays of execution, *see* 28 U.S.C. 2262; (ii) clearer and more circumscribed rules regarding the claims cognizable on federal habeas corpus review, *see* 28 U.S.C. 2264; (iii) general times frames of 450 days and 120 days respectively for decision of capital habeas petitions by federal district courts and courts of appeals, *see* 28 U.S.C. 2266(b)(1); and (iv) limited allowances for the amendment of such petitions, *see* 28 U.S.C. 2266(b)(3). In addition, because the States would more fully defray the costs of representing indigent capital petitioners in State postconviction proceedings, there would be less need for representation by private counsel on a pro bono basis, often arranged through postconviction capital defense projects. Thus, State costs also would be offset by reduced costs for private entities and individuals who otherwise would provide representation, reducing the overall economic effect.

Along with the cost savings States could obtain, this rule also affords

indigent capital petitioners non-quantifiable benefits. If a State chooses to "opt-in" to Chapter 154, an indigent capital petitioner is more likely to be represented by competent counsel in state postconviction proceedings—proceedings in which there is no constitutional right to counsel. The timely appointment of qualified counsel also provides indigent capital petitioners the opportunity to properly and promptly present their challenges in postconviction proceedings without the severe time pressure created by the belated entry of a lawyer. Above all, the rule's requirement of timely appointment of competent counsel seeks to provide an indigent capital petitioner the benefit of a collateral review that will be fair, thorough, and the product of capable and committed advocacy.

*Executive Order 13132—Federalism*

This regulation will not have substantial direct effects on the States, on the relationship between the national government and the States, or on distribution of power and responsibilities among the various levels of government. It provides only a framework for those States that wish to qualify for the benefits of the expedited habeas procedures of chapter 154 of title 28 of the United States Code. Therefore, in accordance with Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism assessment.

*Executive Order 12988—Civil Justice Reform*

This regulation meets the applicable standards set forth in section 3(a) and (b)(2) of Executive Order 12988.

*Regulatory Flexibility Act*

The Attorney General, in accordance with the Regulatory Flexibility Act, 5 U.S.C. 605(b), has reviewed this regulation and by approving it certifies that this regulation will not have a significant economic impact on a substantial number of small entities. This rule provides only a framework for those States that wish to qualify for the benefits of the expedited habeas procedures of chapter 154 of title 28 of the United States Code.

*Unfunded Mandates Reform Act of 1995*

This rule will not result in aggregate expenditures by State, local and tribal governments or by the private sector of $100,000,000 or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under

the provisions of the Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1532.

*Small Business Regulatory Enforcement Fairness Act of 1996*

This rule is not a major rule as defined by section 251 of the Small Business Regulatory Enforcement Fairness Act of 1996, 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

## List of Subjects in 28 CFR Part 26

Law enforcement officers, Prisoners.

Accordingly, for the reasons set forth in the preamble, part 26 of chapter I of title 28 of the Code of Federal Regulations is amended as follows:

## PART 26—DEATH SENTENCES PROCEDURES

■ 1. The authority citation for part 26 continues to read as follows:

**Authority:** 5 U.S.C. 301; 18 U.S.C. 4001(b), 4002; 28 U.S.C. 509, 510, 2261, 2265.

■ 2. A new Subpart B is added to part 26 to read as follows:

**Subpart B—Certification Process for State Capital Counsel Systems**

Sec.
26.20 Purpose.
26.21 Definitions.
26.22 Requirements.
26.23 Certification process.

**Subpart B—Certification Process for State Capital Counsel Systems**

### § 26.20 Purpose.

Sections 2261(b)(1) and 2265(a) of title 28 of the United States Code require the Attorney General to certify whether a State has a mechanism for providing legal representation to indigent prisoners in State postconviction proceedings in capital cases that satisfies the requirements of chapter 154 of title 28. If the Attorney General certifies that a State has established such a mechanism, sections 2262, 2263, 2264, and 2266 of chapter 154 of title 28 apply in relation to Federal habeas corpus review of State capital cases in which counsel was appointed pursuant to that mechanism. These sections will also apply in Federal habeas corpus review of capital cases from a State with a mechanism certified by the Attorney General in which petitioner validly waived

counsel, petitioner retained counsel, or petitioner was found not to be indigent, as provided in section 2261(b) of title 28. Subsection (b) of 28 U.S.C. 2265 directs the Attorney General to promulgate regulations to implement the certification procedure under subsection (a) of that section.

### § 26.21 Definitions.

For purposes of this part, the term—

*Appointment* means provision of counsel in a manner that is reasonably timely in light of the time limitations for seeking State and Federal postconviction review and the time required for developing and presenting claims in the postconviction proceedings.

*Appropriate State official* means the State attorney general, except that, in a State in which the State attorney general does not have responsibility for Federal habeas corpus litigation, it means the chief executive of the State.

*Indigent prisoners* means persons whose net financial resources and income are insufficient to obtain qualified counsel.

*State postconviction proceedings* means collateral proceedings in State court, regardless of whether the State conducts such proceedings after or concurrently with direct State review.

### § 26.22 Requirements.

The Attorney General will certify that a State meets the requirements for certification under 28 U.S.C. 2261 and 2265 if the Attorney General determines that the State has established a mechanism for the appointment of counsel for indigent prisoners under sentence of death in State postconviction proceedings that satisfies the following standards:

(a) As provided in 28 U.S.C. 2261(c) and (d), the mechanism must offer to all such prisoners postconviction counsel, who may not be counsel who previously represented the prisoner at trial unless the prisoner and counsel expressly requested continued representation, and the mechanism must provide for the entry of an order by a court of record—

(1) Appointing one or more attorneys as counsel to represent the prisoner upon a finding that the prisoner is indigent and accepted the offer or is unable competently to decide whether to accept or reject the offer;

(2) Finding, after a hearing if necessary, that the prisoner rejected the offer of counsel and made the decision with an understanding of its legal consequences; or

(3) Denying the appointment of counsel, upon a finding that the prisoner is not indigent.

(b) The mechanism must provide for appointment of competent counsel as defined in State standards of competency for such appointments.

(1) A State's standards of competency are presumptively adequate if they meet or exceed either of the following criteria:

(i) Appointment of counsel who have been admitted to the bar for at least five years and have at least three years of postconviction litigation experience. But a court, for good cause, may appoint other counsel whose background, knowledge, or experience would otherwise enable them to properly represent the petitioner, with due consideration of the seriousness of the penalty and the unique and complex nature of the litigation; or

(ii) Appointment of counsel meeting qualification standards established in conformity with 42 U.S.C. 14163(e)(1) and (2)(A), if the requirements of 42 U.S.C. 14163(e)(2)(B), (D), and (E) are also satisfied.

(2) Competency standards not satisfying the benchmark criteria in paragraph (b)(1) of this section will be deemed adequate only if they otherwise reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases.

(c) The mechanism must provide for compensation of appointed counsel.

(1) A State's provision for compensation is presumptively adequate if the authorized compensation is comparable to or exceeds—

(i) The compensation of counsel appointed pursuant to 18 U.S.C. 3599 in Federal habeas corpus proceedings reviewing capital cases from the State;

(ii) The compensation of retained counsel in State postconviction proceedings in capital cases who meet State standards of competency sufficient under paragraph (b);

(iii) The compensation of appointed counsel in State appellate or trial proceedings in capital cases; or

(iv) The compensation of attorneys representing the State in State postconviction proceedings in capital cases, subject to adjustment for private counsel to take account of overhead costs not otherwise payable as reasonable litigation expenses.

(2) Provisions for compensation not satisfying the benchmark criteria in paragraph (c)(1) of this section will be deemed adequate only if the State mechanism is otherwise reasonably designed to ensure the availability for appointment of counsel who meet State standards of competency sufficient under paragraph (b) of this section.

(d) The mechanism must provide for payment of reasonable litigation expenses of appointed counsel. Such expenses may include, but are not limited to, payment for investigators, mitigation specialists, mental health and forensic science experts, and support personnel. Provision for reasonable litigation expenses may incorporate presumptive limits on payment only if means are authorized for payment of necessary expenses above such limits.

**§ 26.23 Certification process.**

(a) An appropriate State official may request in writing that the Attorney General determine whether the State meets the requirements for certification under § 26.22 of this subpart.

(b) Upon receipt of a State's request for certification, the Attorney General will make the request publicly available on the Internet (including any supporting materials included in the request) and publish a notice in the **Federal Register**—

(1) Indicating that the State has requested certification;

(2) Identifying the Internet address at which the public may view the State's request for certification; and

(3) Soliciting public comment on the request.

(c) The State's request will be reviewed by the Attorney General. The review will include consideration of timely public comments received in response to the **Federal Register** notice under paragraph (b) of this section, or any subsequent notice the Attorney General may publish providing a further opportunity for comment. The certification will be published in the **Federal Register** if certification is granted. The certification will include a determination of the date the capital counsel mechanism qualifying the State for certification was established.

(d) A certification by the Attorney General reflects the Attorney General's determination that the State capital counsel mechanism reviewed under paragraph (c) of this section satisfies chapter 154's requirements. A State may request a new certification by the Attorney General to ensure the continued applicability of chapter 154 to cases in which State postconviction proceedings occur after a change or alleged change in the State's certified capital counsel mechanism. Changes in a State's capital counsel mechanism do not affect the applicability of chapter 154 in any case in which a mechanism certified by the Attorney General existed throughout State postconviction proceedings in the case.

(e) A certification remains effective for a period of five years after the completion of the certification process by the Attorney General and any related judicial review. If a State requests re-certification at or before the end of that five-year period, the certification remains effective for an additional period extending until the completion of the re-certification process by the Attorney General and any related judicial review.

Dated: September 11, 2013.

**Eric H. Holder, Jr.,**

*Attorney General.*

[FR Doc. 2013–22768 Filed 9–20–13; 8:45 am]

**BILLING CODE P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R04–OAR–2009–0140; FRL–9901–10-Region 4]**

**Approval and Promulgation of Implementation Plans; North Carolina; Removal of Stage II Gasoline Vapor Recovery Program**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** EPA is taking final action to approve changes to the North Carolina State Implementation Plan (SIP) submitted by the State of North Carolina Department of Environment and Natural Resources (NC DENR), Division of Air Quality on September 18, 2009, for the purpose of removing Stage II vapor control requirement contingency measures for new and upgraded gasoline dispensing facilities in the State. The September 18, 2009, SIP revision also addresses several non-Stage II related rule changes. However, action on the other portions for the September 18, 2009, SIP revision is being addressed in a separate rulemaking action. EPA has determined that North Carolina's September 18, 2009, SIP revision regarding the Stage II vapor control requirements is approvable because it is consistent with the Clean Air Act (CAA or Act).

**DATES:** *Effective Date:* This rule will be effective October 23, 2013.

**ADDRESSES:** EPA has established a docket for this action under Docket Identification No. EPA–R04–OAR–2009–0140. All documents in the docket are listed on the *www.regulations.gov* Web site. Although listed in the index, some information is not publicly available, i.e., Confidential Business Information or other information whose disclosure is restricted by statute.

Certain other material, such as copyrighted material, is not placed on the Internet and will be publicly available only in hard copy form. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Regulatory Development Section, Air Planning Branch, Air, Pesticides and Toxics Management Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW., Atlanta, Georgia 30303–8960. EPA requests that if at all possible, you contact the person listed in the **FOR FURTHER INFORMATION CONTACT** section to schedule your inspection. The Regional Office's official hours of business are Monday through Friday, 8:30 to 4:30 excluding Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** For information regarding this action, contact Ms. Kelly Sheckler, Regulatory Development Section, Air Planning Branch, Air, Pesticides and Toxics Management Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW., Atlanta, Georgia 30303–8960. Ms. Sheckler's telephone number is (404) 562–9222; email address: *sheckler.kelly@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Background
II. Final Action
III. Statutory and Executive Order Reviews

**I. Background**

EPA, under the CAA Amendments of 1990, designated (pursuant to section 107(d)(1)) and classified certain counties in North Carolina, either in their entirety or portions thereof, as "moderate" ozone nonattainment areas for the 1-hour ozone national ambient air quality standards (NAAQS). Specifically, the Charlotte-Gastonia Area (comprised of Gaston and Mecklenburg Counties); the Greensboro-Winston-Salem-High Point Area (comprised of Davidson, Davis (partial), Forsyth and Guilford Counties); and the Raleigh-Durham Area (comprised of Durham, Granville (partial), and Wake Counties) were all designated as "moderate" ozone nonattainment areas for the 1-hour ozone NAAQS. The designations were based on the Areas' 1-hour ozone design values for the 1987–1989 three-year period. The "moderate" classification triggered various statutory requirements for these Areas including the Stage II vapor recovery requirements pursuant to section 182(b)(3) of the CAA.

Exhibit 2



# HABEAS CORPUS RESOURCE CENTER

303 Second Street, Suite 400 South
San Francisco, CA 94107
Tel 415-348-3800 • Fax 415-348-3873
www.hcrc.ca.gov

*Board of Directors*
*MR. CHARLES A. BIRD, Chair*
*DEAN DRUCILLA STENDER RAMEY*
*HON. ARLEIGH WOODS*
*MR. JOSEPH SCHLESINGER*
*PROF. MARGARET RUSSELL*

*MICHAEL LAURENCE, Executive Director*

*JEAN FIELD, Assistant Director*
*JEANNIE STERNBERG, Deputy Director*

June 1, 2011

Regulations Docket Clerk
Office of Legal Policy
Department of Justice
950 Pennsylvania Ave. NW, Room 4232
Washington, DC 20530

       Re: Certification Process for State Capital Counsel Systems, OAG Docket No. 1540

To Whom It May Concern:

The Habeas Corpus Resource Center (HCRC) is an entity of the Judicial Branch of the State of California. The HCRC provides legal representation for indigent petitioners in death penalty habeas corpus proceedings before the California Supreme Court and the federal courts, assists the California Supreme Court by identifying and recruiting private counsel qualified to accept appointments in capital habeas corpus proceedings, and provides training and serves as a resource to those attorneys. *See* Cal. Gov't Code § 68661 (West 2011). The HCRC has been appointed to represent death row prisoners in ninety-eight state and federal habeas corpus proceedings.

The HCRC has a substantial interest in the proposed regulations and the potential certification of state mechanisms pursuant to 28 U.S.C. sections 2261 and 2265, both in its capacity as appointed counsel to death row inmates and in its more expansive role as a resource for private counsel. We submit these comments on behalf of the HCRC, the clients for whom the agency has been, or will be, appointed to represent, and all of the California death-sentenced inmates and their attorneys who are served by the HCRC's resource mandate.[1]

---

[1]       In addition, we join the comments submitted by the Federal Public Defenders, the National Association of Criminal Defense Lawyers, the Judicial Conference of the United States, Legal Ethics Professors and Professional Responsibility Experts, the American Bar Association, the Innocence Project, the Cornell Death Penalty Project and Death Penalty Resource & Defense Center in Columbia, South Carolina, Mr. Albert M. Pearson, the American Civil Liberties Union, and the Constitution Project.

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 2

### HISTORY AND PURPOSE OF CHAPTER 154

In June 1988, Chief Justice William Rehnquist formed the Ad Hoc Committee of the Judicial Conference on Federal Habeas Corpus in Capital Cases, chaired by retired Associate Justice Lewis Powell, for the purposes of studying and recommending amendments to federal habeas corpus procedures governing review of state capital judgments. 135 Cong. Rec. S13471-04, at S13481 (daily ed. Oct. 16, 1989) (Judicial Conference of the United States Ad Hoc Committee on Federal Habeas Corpus in Capital Cases, Committee Report, Aug. 23, 1989 (Oct. 16, 1989)) ("Powell Committee Report").

The Powell Committee concluded that the primary cause of unnecessary delay in final adjudication of constitutional claims and the high incidence of successor petitions in state capital post-conviction cases was the lack of qualified counsel representing death-sentenced individuals in state post-conviction proceedings. *Id.* at S13482. To address this situation, the Powell Committee recommended providing incentives of expedited and limited federal review to encourage states to guarantee adequate representation to death-row inmates in state habeas corpus proceedings. The Powell Committee explained that

> Every capital defendant is now entitled to competent counsel at state trial and appeal and, under recent congressional enactment, in federal habeas corpus proceedings. The Committee's proposal seeks to fill a gap that now exists by encouraging the appointment of competent counsel also in state habeas or collateral proceedings. *Id.* at S13483.

The Powell Committee recommended that states be required to "establish a system for the appointment and compensation of competent counsel throughout all stages of state post conviction review" and explained that "[t]he purpose of this mechanism is to assure that collateral review will be fair, thorough, and the product of capable and committed advocacy." *Id.* As the Powell Committee recognized, competent representation is "crucial to ensuring fairness and protecting the constitutional rights of capital litigants." *Id.* at S13482.

When Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), it included the recommendations of the Powell Committee as Chapter 154 of Title 28 of the United States Code. *See* Effective Death Penalty Act of 1995, Antiterrorism and Effective Death Penalty Act of 1996, Committee on the Judiciary Report, H.R. Rep. No. 104-23 (1995), 1995 WL 56412, *8. The United States Supreme Court reiterated the quid pro quo design of Chapter 154, observing that it is available only when a state already has "done its part to promote sound resolution of prisoners' petitions in just the way Congress sought to encourage." *Lindh v. Murphy*, 521 U.S. 320, 331 (1997).

Following the AEDPA's enactment, several states sought to apply Chapter 154 in federal habeas corpus proceedings.[2] Pursuant to the original provisions of Chapter 154, the federal judiciary

---

[2]    These states included Arizona, *Ortiz v. Stewart*, 149 F.3d 923 (9th Cir. 1998), *cert. denied*, 526 U.S. 1123 (1999); Arkansas, *Noel v. Norris*, 194 F. Supp. 2d 893 (E.D. Ark. 2002), *aff'd*, 322 F.3d 500

was charged with the responsibility of evaluating state mechanisms for compliance and uniformly concluded that proffered state mechanisms failed to ensure the appointment of competent counsel. For example, state attorneys general claimed that state mechanisms provided competent counsel by requiring merely the appointment of "'a competent attorney licensed in this state,'" *Austin v. Bell*, 927 F. Supp. 1058, 1062 (M.D. Tenn. 1996) (quoting Tenn. Code Ann. § 40-14-202), or promising that counsel "be competent and ... provide effective counsel," Memorandum and Order, *Ryan v. Hopkins*, No. 4:CV95-3391 (D. Neb. July 31, 1996), 1996 WL 539220, *3. Another state attorney general believed that competent counsel was assured by a requirement that capital post-conviction counsel have participated in ten serious criminal matters, while acknowledging that this could include no more than the negotiation of ten plea agreements in robbery cases. Memorandum Opinion, *Colvin-El v. Nuth*, No. Civ. A AW 97-2520 (D. Md. July 6, 1998), 1998 WL 386403, *6.

State attorneys general made similar efforts to avoid the clear purpose of Chapter 154 in asserting compliance with the "compensation" and "reasonable litigation expenses" required by Chapter 154. For example, the attorney general's office of Maryland argued that it provided adequate compensation to appointed capital post-conviction attorneys, even though the level of compensation resulted in a *loss* of between eighteen and forty-one dollars per hour for attorneys who accepted appointments. *Baker v. Corcoran*, 220 F.3d 276, 285 (4th Cir. 2000). The Ohio Attorney General argued that a system that guaranteed counsel no litigation expenses and placed a maximum limit on such expenses complied with Chapter 154. *Mills v. Anderson*, 961 F. Supp. 198, 202 (S.D. Ohio 1997). In California, the attorney general's office claimed it was entitled to Chapter 154 procedures although the state provided no funding to investigate claims except those discovered in the course of preparing the direct appeal. *Ashmus v. Calderon*, 31 F. Supp. 2d

(8th Cir.), *cert. denied*, 539 U.S. 972 (2003); California, *Ashmus v. Woodford* ("*Ashmus II*"), 202 F.3d 1160 (9th Cir.), *cert. denied*, 531 U.S. 916 (2000); Florida; *Hill v. Butterworth*, 941 F. Supp. 1129 (N.D. Fla. 1996), *rev'd for lack of a case or controversy*, 147 F.3d 1333 (11th Cir. 1998); Georgia, *High v. Head*, 209 F.3d 1257 (11th Cir. 2000), *cert. denied*, 532 U.S. 909 (2001); Idaho, *Leavitt v. Arave*, 927 F. Supp. 394 (D. Idaho 1996); Indiana, *Burris v. Parke*, 95 F.3d 465 (7th Cir. 1996) (en banc); Illinois, *Thomas v. Gramley*, 951 F. Supp. 1338 (N.D. Ill. 1996), *aff'd*, 144 F.3d 513 (7th Cir. 1998), *cert. denied*, 525 U.S. 1123 (1999); Louisiana, *Williams v. Cain*, 942 F. Supp. 1088 (W.D. La. 1996), *rev'd on other grounds*, 125 F.3d 269 (5th Cir. 1997), *cert. denied*, 525 U.S. 859 (1998); Maryland, *Baker v. Corcoran*, 220 F.3d 276 (4th Cir. 2000), *cert. denied*, 531 U.S. 1193 (2001); Mississippi, *Lockett v. Puckett*, 980 F. Supp. 201 (S.D. Miss. 1997), *amended*, 988 F. Supp. 1019 (S.D. Miss. 1997), *rev'd in part on other grounds*, 230 F.3d 695 (5th Cir. 2000); Missouri, *Kreutzer v. Bowersox*, 231 F.3d 460 (8th Cir. 2000), *cert. denied*, 534 U.S. 863 (2001); Montana, *Langford v. Day*, 110 F.3d 1380 (9th Cir. 1996), *cert. denied*, 522 U.S. 881 (1997); North Carolina, *Sexton v. French*, 163 F.3d 874 (4th Cir. 1998), *cert. denied*, 528 U.S. 855 (1999); Ohio, *Scott v. Anderson*, 958 F. Supp. 330 (N.D. Ohio 1997); Oklahoma, *Moore v. Gibson*, 195 F.3d 1152 (10th Cir. 1999), *cert. denied*, 530 U.S. 1208 (2000); Pennsylvania, *Death Row Prisoners of Pennsylvania v. Ridge*, 106 F.3d 35 (3rd Cir. 1997); South Carolina; *Tucker v. Catoe*, 221 F.3d 600 (4th Cir.), *cert. denied*, 531 U.S. 1054 (2000); Tennessee, *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997), *cert. denied*, 523 U.S. 1079 (1998); Texas, *Perillo v. Johnson*, 205 F.3d 775 (5th Cir. 2000); Utah, *Tillman v. Cook*, 25 F. Supp. 2d 1245 (D. Utah 1998), *aff'd*, 215 F.3d 1116 (10th Cir.), *cert. denied*, 531 U.S. 1055 (2000); and Virginia, *Wright v. Angelone*, 944 F. Supp. 460 (E.D. Va. 1996).

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 4

1175, 1188 (N.D. Cal. 1998) (rejecting California's argument that it provided adequate funding when no funding was available to investigate potentially meritorious claims not apparent in the appellate record). The most common among the errors made by state attorneys general in their efforts to obtain the benefits Chapter 154 was their belief that the promises of a state mechanism for counsel competency, compensation, and expenses need not be employed in practice; in their view, theoretical compliance with Chapter 154 was sufficient to require its application.[3]

Federal enforcement of the requirements of Chapter 154 thus proved to be a critical aspect of the statute, and the federal judiciary provided this role by interpreting the provision's express terms and requirements to ensure minimum standards of reasonableness. *See, e.g., Austin*, 927 F. Supp. at 1062 (interpreting the term "standards of competency"); *Baker*, 220 F.3d at 285 (interpreting the term "compensation"); *Ashmus*, 31 F. Supp. 2d at 1188 (interpreting the phrase "compensation and reasonable litigation expenses").

In March 2006, Congress amended Chapter 154 in the USA PATRIOT Improvement and Reauthorization Act of 2005 (Patriot Act amendments), authorizing the Attorney General to determine whether a state has established the necessary qualifying mechanism for Chapter 154's application. Under the Patriot Act amendments, the Attorney General is required to determine the following upon request:

(A)     whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent prisoners who have been sentenced to death;

(B)     the date on which the mechanism described in subparagraph (A) was established; and

(C)     whether the State provides standards of competency for the appointment of counsel in proceedings described in subparagraph (A).

28 U.S.C. § 2265(a) (West 2011).

---

[3]     *See, e.g., Tucker v. Catoe*, 221 F.3d 600, 604 (4th Cir. 2000) (rejecting the South Carolina Attorney General's argument that it was entitled to invoke Chapter 154 procedures even though it was undisputed that the capital post-conviction lawyers appointed to represent Mr. Tucker did not meet the state's own requirements); *Baker*, 220 F.3d at 286 (rejecting the attorney general's argument that Maryland was entitled to invoke Chapter 154 procedures although the state did not apply its own competency standards in appointing counsel); *Grayson v. Epps*, 338 F. Supp. 2d 699, 703 (S.D. Miss. 2004) (rejecting the Mississippi Attorney General's argument that it was entitled to invoke Chapter 154 procedures without evidence that it complied with its mechanism for appointment and funding); *Roll v. Bowersox*, 16 F. Supp. 2d 1066, 1071 (W.D. Mo. 1998) (rejecting the Missouri Attorney General's argument that it was entitled to invoke Chapter 154 procedures although the petitioner had not received the benefit of the state mechanism); Respondent-Appellee's Opposition to Application for Certificate of Probable Cause at 9, *Mata v. Johnson*, No. 96-20218 (5th Cir. Aug. 12, 1996) (arguing that petitioner need not have received counsel pursuant to the state's mechanism to be eligible for Chapter 154).

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 5

In evaluating and implementing this amended version of the statute, "it is significant that these provisions did not alter the terms of the substantive requirements that States had to meet in order to qualify for those procedures." Barron, David J., Memorandum Opinion for the Attorney General, *The Attorney General's Authority in Certifying Whether a State Has Satisfied the Requirements for Appointment of Competent Counsel for Purposes of Capital Conviction Review Proceedings* (Dec. 16, 2009) (Attorney General Memo) at 8. "As one of the chief sponsors of the 2006 amendments to chapter 154 acknowledged, with a few changes not relevant here, 'the Powell Committee Report's recommendations are what is now chapter 154.'" *Id.* at 9 (quoting Senator Jon Kyl). Importantly, the 2006 amendments to Chapter 154 "do not suggest that, in establishing a new role for the Attorney General in certifying state mechanisms, Congress meant to dispense with independent federal review of the adequacy of those mechanisms." *Id.* at 8.

## THE ATTORNEY GENERAL MUST TAKE STEPS TO LESSEN THE EFFECT OF HIS CONFLICT OF INTEREST IN MAKING CERTIFICATION DETERMINATIONS

Shortly after Congress placed authority for deciding which states would receive the procedural benefits of Chapter 154 with the Attorney General, and the first version of regulations were published to implement that responsibility, the public recognized and began to express concern about the conflict faced by the Attorney General in making certification determinations.[4]  A group of academics and practicing lawyers specializing in ethics and professional responsibility concluded that the Attorney General faced "an impossible conflict of interest" in making certification determinations, thoroughly describing the Attorney General's inherent conflict of interest and providing vivid examples demonstrating the conflict. *See* Docket No. DOJ-2007-0110-0080.1 (Comments of Legal Ethics Professors and Professional Responsibility Lawyers on the Office of Justice Programs Docket No. 1464, Certification Process of State Capital Counsel Systems) (Aug. 2, 2007).

---

[4]     *See, e.g., US Moves to Speed Up Executions*, BBC News, Aug. 15, 2007, at http://news.bbc.co.uk/2/hi/americas/6948245.stm; Erwin Chemerinsky, Op-Ed., *Don't Rush to Execution: California must reject the U.S. attorney general's effort to bend death penalty rules*, L.A. Times, Aug. 16, 2007, at A17; Editorial Board, *Death Penalty: Slow AG down*, Seattle Post-Intelligencer, Aug. 17, 2007, at B6; Editorial Board, *Wrong Guy to Make the Call*, Orange County Register, Aug. 17, 2007, at http://www.ocregister.com/ocregister/opinion/homepage/ article1811946.php; Editorial Board, *Change Would Turn Capital Cases into Reckless Affairs*, Tennessean, Aug. 18, 2007, at http://www.tenneesean.com; Adam Liptak, *Greasing the Wheels on the Machinery of Death*, N.Y. Times, Aug. 20, 2007, at A8; Sasha Abramsky, Op-Ed., *Fast Track to Death*, Guardian (London), Aug. 20, 2007, at http://commentisfree.guardian.co.uk/ sasha_abramsky/2007/08/fast_track_death.html; Opinions, *Bad Judgment: The attorney general may soon have unwarranted power in death penalty cases*, Wash. Post, Aug. 22, 2007, at A16; Robert Schehr, *Fast-Tracking Death Penalty Cases is Bad Law*, Ariz. Daily Sun, Aug. 26, 2007, at http://www.azdailysun.com/articles/2007/08/26/news/opinion/guestcolumnist/ 20070826_guest _24.txt. The apparent conflicting interests also provided the basis for comic ridicule of the Attorney General. *See* http://www.colbertnation.com/the-colbert-report-videos/z183235/august-15-2007/the-word---potential (last visited on May 26, 2011) (a segment on The Colbert Report, a Comedy Central program, focused on the inherent unfairness of leaving the certification determination in the hands of the Attorney General).

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 6

The HCRC's comments on the initial proposed regulation documented the Attorney General's efforts in the past ten years to participate in federal review of state habeas proceedings or direct appeal of state convictions in fifty-nine cases before the United States Supreme Court. The Attorney General's stated interest in participating in the cases was based on his consistent position that substantive rulings on constitutional issues in section 2254 cases affect the legal positions of the United States in opposing motions brought pursuant to 28 U.S.C. section 2255. In every instance, the Attorney General sought to participate in these cases to support procedural and substantive limitations and defenses that benefit state prosecutors' defense of criminal convictions and sentences. *See* HCRC Comment, Docket No. DOJ-20070110-0162.1 (Apr. 26, 2007) at 7-11.[5]

The Attorney General's litigation strategies and his role in urging the Supreme Court to uphold state criminal judgments present compelling reasons why the regulations must be revised to protect against biased decision making and the appearance of biased decision making. The Attorney General's legal positions in these cases confirm his inability to objectively evaluate the importance of the right to counsel, counsel's obligations adequately to investigate, prepare, consult with clients, and present a defense, and the need for resources to develop potential claims. *See, e.g.*, Brief for the United States as Amicus Curiae Supporting Affirmance, *Padilla v. Kentucky*, 130 S. Ct. 1473 (2009) (No. 08-651), 2009 WL 2509223 (arguing that counsel's duty to a client is limited to avoiding affirmative misadvice); Brief for the United States as Amicus Curiae Supporting Respondent (Secretary, Pennsylvania Department of Corrections), *Rompilla v. Beard*, 545 U.S. 374 (2005) (No. 04-5462), 2004 WL 2945403 at *11 (asserting that the Sixth Amendment does not require defense counsel to obtain necessary documents before formulating a defense); *id.* at *23 (arguing that the ABA Guidelines "exceed the constitutional minimum of reasonableness and, if viewed as immutable rules, could impose considerable, potentially fruitless, burdens on defense counsel."); Brief for the United States as Amicus Curiae Supporting Respondent (Warden), *Wiggins v. Smith*, 539 U.S. 510 (2003) (No. 02-311), 2003 WL 470211, at *12, *17 (arguing that counsel were "eminently reasonable," and that there was no applicable "standard for counsel's duty to investigate a capital defendant's background[, n]or should any such quasi-mandatory duty be created").[6]

---

[5]    Notably, members of the Senate Judiciary Committee and Justice Elena Kagan have taken the position that Justice Kagan's role as Solicitor General, in which she represented government positions on behalf of the Department of Justice, requires her recusal from cases presenting similar legal questions in the Supreme Court. *See* 156 Cong. Rec. S5812-01, S5813, 2010 WL 2772079 (July 14, 2010) (Kagan Nomination); *see also id.* at S5814 (including in the congressional record a Wall Street Journal editorial stating that "[i]f there is any chance that the public will perceive her to have prejudged the case, or rubber-stamped the views of the President who appointed her, she will damage her own credibility as a Justice and that of the entire Court.").

[6]    In each of these cases, relying upon recognized national standards governing defense counsel's obligations, the Supreme Court rejected the Attorney General's assertions. *See Padilla,* 130 S. Ct. at 1484; *Rompilla*, 545 U.S. at 387, 389; *Wiggins*, 539 U.S. at 524.

The potential for prosecutorial conflict to affect the Attorney General's decision making in the Chapter 154 context became further apparent after litigation by the HCRC to gain access to documents about the promulgation of regulations to implement Chapter 154. This material revealed the Department of Justice's failure, or inability, to recognize or prevent the significant biases of criminal prosecution divisions from affecting the rule making process. *See, e.g.,* Order Granting Plaintiff's Motion for a Preliminary Injunction, *Habeas Corpus Resource Ctr. v. Dep't of Justice,* No. C 08-2649 (N.D. Cal. Jan. 20, 2009), 2009 WL 185423, \*9 (noting that the "chief of the Capital Case Unit in the DOJ's Criminal Division (the agency's prosecutorial branch) was a member of the working group developing the [Chapter 154] regulations and observing that HCRC "raises serious questions on the matter" of whether the Attorney General's "rule was so tainted by bias that it was not a valid exercise of rulemaking authority"). The Capital Case Unit chief who participated in the development of the original regulations to implement Chapter 154, Margaret Griffey, served in the Texas Attorney General's Office prior to her position at the Department of Justice. During her tenure in the state attorney general's office, Ms. Griffey advocated the position that "[n]either the fact that the statewide appointment of counsel mechanism was not in place at the time [petitioner] pursued state habeas review nor the fact that appointment of counsel to assist [petitioner] in state habeas review was not made pursuant to those provisions renders the 'expedited procedures' [of Chapter 154] inapplicable." Respondent-Appellee's Opposition to Application for Certificate of Probable Cause at 9, *Mata v. Johnson,* Case No. 96-20218 (5th Cir. Aug. 12, 1996).

It is well established that "proceedings must not only be fair, they must appear fair to all who observe them." *Indiana v. Edwards,* 554 U.S. 164, 177 (2008) (internal quotation omitted); *see also Withrow v. Larkin,* 421 U.S. 35, 46-47 (1975) (right to "a fair trial in a fair tribunal" is a basic requirement of due process that applies to administrative decision making) (internal quotation omitted). As the United States Supreme Court recognized in the context of a statute that required the Attorney General to certify whether a plaintiff was injured in the scope of employment—where the result was to shield the government from liability—the Attorney General "[i]nevitably . . . will feel a strong tug to certify, even when the merits are cloudy" and "his interest would certainly bias his judgment." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 428 (1995) (internal quotation omitted).

For these reasons, the HCRC repeatedly has urged the Attorney General to take seriously the inherent conflict stemming from his prosecutorial duties and implement meaningful protections to ensure the fairness of the certification process. *See* HCRC Comments, Docket Nos. DOJ-20070110-0162.1 (Apr. 26, 2007), DOJ-OAG-2008-0029-0036.1 (Apr. 6, 2009), DOJ-OAG-2010-0003-0009.1 (June 24, 2010).

The Attorney General previously dismissed these concerns by incorrectly asserting that the certification process "does not involve the Attorney General in assessing or setting standards for the performance of defense counsel in state postconviction proceedings. … Moreover, the Attorney General has no discretion in defining the requirements that states must satisfy to achieve chapter 154 certification." *See* Certification Process for State Capital Counsel Systems Final Rule; Sec. I.A. *Role of the United States Attorney General*, 73 Fed. Reg. 75,327, 75,328-29

(Dec. 11, 2008); *see also id.* at 75,329 (explaining that the Attorney General's certification does not involve "evaluating whether the federal standards are being met"). As the current proposed rule recognizes, the Attorney General has the responsibility to establish minimum standards for complying with Chapter 154 and evaluate whether states have met them. The proposed rule, however, does so without clear, objective criteria to guide the Attorney General's decision making. This unfettered discretion only exacerbates the Attorney General's already substantial conflict.

Particularly because the Attorney General's certification determination affects the ability of those sentenced to death to obtain review of claims that their conviction and/or sentence violates the Constitution, he must ensure that "factfinding procedures aspire to a heightened standard of reliability." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). This means that his decision making must utilize "clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). The Administrative Procedure Act and Due Process require similar protections. *See, e.g., Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) ("We have emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government.") (internal quotation omitted); *West Virginia Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 863 n.75 (D.C. Cir. 1982) ("[A]n exercise of unfettered flexibility too often results in ad hoc judgments and arbitrary decisions, both of which are counterproductive to the greater regulatory goals of consistency in decisions and reasoned guidance upon which affected parties may rely.").

We have grave misgivings about the fairness of any certification process carried out in the manner proposed by the Attorney General and urge the adoption of procedures that guarantee independent and unbiased review of state mechanisms. In the following sections, we will discuss in detail the flaws we have identified in the proposed requirements and certification process and propose alternatives that serve to diminish the effect of the Attorney General's conflict by establishing specific and objective criteria for the certification determination that carry out the purpose of Chapter 154.

## THE REGULATIONS MUST REQUIRE A STATE MECHANISM TO ENSURE THAT APPOINTED COUNSEL ACTUALLY PROVIDE COMPETENT REPRESENTATION

The history and purpose of Chapter 154 demonstrate that its severe limitations on review in federal court are justified and permitted only when the state has guaranteed the opportunity for "one complete and fair course of collateral review" in the state court. Powell Committee Report, 135 Cong. Rec. at S13482; *see also id.* at S13483 ("[w]ith the counsel provided by the statute, there should be no excuse for failure to raise claims in state court."). This quid pro quo scheme is dependent on the appointment of counsel who are capable of ensuring the development and presentation of all potentially meritorious claims the first time a capital habeas petition is filed in state court and who perform in accordance with that expectation.

The Attorney General's proposed rule does not establish these requirements, which are necessary to implement Chapter 154's quid pro quo incentives, or require states to establish a mechanism to "enable those attorneys to provide their capital clients with competent legal representation." Attorney General Memo at 13. As such, the proposed rule is contrary to clear congressional intent, frustrates the purpose of Chapter 154, and exceeds the statutory authority of the Attorney General. *See* 5 U.S.C. § 706 (C) (providing agency action is unlawful when it is "[i]n excess of statutory jurisdiction, authority, or limitations, or short of statutory right"); *Maislin Indus. v. Primary Steel*, 497 U.S. 116, 131 (1990) (rejecting agency interpretation that was "flatly inconsistent with the statutory scheme as a whole"); *Chevron v. NRDC*, 467 U.S. 837, 843 n.9 (1984) (holding that a court must "reject administrative constructions which are contrary to clear congressional intent" as determined by "traditional tools of statutory construction"); Attorney General Memo at 12 n.7 (explaining that the traditional tools of statutory construction include judicial precedent, similar statutes, American Bar Association guidelines, and rules of professional conduct).

### The Competence of Appointed Counsel Must Be Measured by Actual Performance

As the United States Supreme Court has held, counsel competence is reflected by "actual performance" rather than experience.[7] *United States v. Cronic*, 466 U.S. 648, 665 (1984). The Court further directs that the "proper measure of attorney performance" is "reasonableness under prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In enacting Chapter 154, Congress intended that these standards—which, at the time, applied to state trial and appellate counsel—apply to state capital post-conviction representation. *See, e.g.*,

---

[7]     To the extent that experience contributes to measuring counsel performance, requirements must at the very least include experience in capital and post-conviction litigation. *See, e.g.*, *Wright v. Angelone*, 944 F. Supp. 460, 466-67 (E.D. Va. 1996) (holding that Virginia did not qualify for the benefits of Chapter 154 because its 1995 standards of competency permitted an attorney with no experience with capital or post-conviction cases to serve as counsel in state habeas proceedings); *Austin v. Bell*, 927 F. Supp. 1058, 1062 (M.D. Tenn. 1996) (finding Tennessee's standards of competency insufficient because, "[t]hat an attorney has passed the Tennessee bar examination does not mean that the attorney is competent to handle a habeas petition in a capital case"); *Colvin-El v. Nuth*, No. Civ.A. AW 972520 (D. Md. 1998), 1998 WL 386403 at *6 (holding that standards that required experience participating in at least two capital cases at the trial level would be insufficient because, "[g]iven the extraordinarily complex body of law and procedure unique to post-conviction review, an attorney must, at a minimum, have some experience in that area before he or she may be deemed 'competent'"); Guide to Judiciary Policy—Volume 7: Defender Services, Guidelines for Administering the CJA and Related Statutes, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations, §§ 620.50(c), *available at* http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/CJAGuidelinesForms/GuideToJudiciary PolicyVolume7.aspx (CJA Guidelines) (directing court to consider the attorney's experience in federal post-conviction proceedings and in capital post-conviction proceedings); S. Rep. No. 107-315, at 23 (2002) (noting in conjunction with Innocence Protection Act that individuals on trial for their lives should not have to be represented by counsel "with no capital or even criminal law experience"); *see also Spears*, 283 F.3d at 1015 (holding Arizona state mechanism facially compliant with the provisions of Chapter 154 including requirement of at least three years of experience in capital post-conviction or appellate work).

Effective Death Penalty Act of 1995, Antiterrorism and Effective Death Penalty Act of 1996, Committee on the Judiciary Report, H.R. Rep. No. 104-23, 1995 WL 56412, *10 (Feb. 8, 1995) (providing competent counsel in capital post-conviction proceedings "would fill the gap in representation for indigent capital defendants in state proceedings under existing law, since appointment of counsel for indigents is constitutionally required for the state trial and direct appeal").

Given these longstanding measures of counsel competency, it is not surprising that the federal statutes that address counsel competence in capital proceedings, and that are relied upon in the Attorney General's proposed rule, both require similar evaluations of counsel performance.

In the Innocence Protection Act of 2004,[8] Congress made grants available for the purpose of improving the quality of legal representation provided to indigent capital defendants. 42 U.S.C. § 14163 (2004). The Act provides that the grants "shall be used to establish, implement, or improve an effective system for providing competent legal representation" to indigent defendants facing capital charges or seeking appellate or collateral relief of a death sentence in state court or the Supreme Court. *Id.* The definition of an "effective system for providing competent legal representation" was intended to provide "reasonable minimum standards of competence" and identify the "key parameters" of such a system.[9] S. Rep. No. 107-315, at 25, 30 (2002).

The goals of the Innocence Protection Act, as with Chapter 154, were "the appointment of competent, adequately compensated lawyers in capital cases." *See* S. Rep. No. 107-315 at 21 (2002) (recommending passage of the bill). Furthermore, the means for achieving this goal in the Innocence Protection Act—an "effective system for providing competent legal representation," 42 U.S.C. § 14163(e)—is closely related to Chapter 154's "mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel," 28 U.S.C. § 2265(a)(1)(A). For these reasons, the approach taken by Congress in the Innocence Protection Act is particularly relevant to the Attorney General's interpretation of the provisions of Chapter 154. *See, e.g., Wachovia Bank v. Schmidt*, 546 U.S. 303, 305 (2006)

---

[8]  The bill for this statute was introduced into Congress by Senator Patrick Leahy in 2000, S. 2073, 106th Cong. (2000), and the Senate Judiciary Committee recommended passage in 2002. S. Rep. No. 107-315 (2002). The Committee's recommendations were enacted, with several changes, as Title IV of Public Law 108-405 (short title, "Innocence Protection Act of 2004"). Pub. L. No. 108-405, § 401, 118 Stat. 2260, 2278 (2004) (codified in scattered sections of 18 U.S.C. and 42 U.S.C.).

[9]  The statute did not expressly set forth requirements for specific qualifications for counsel, but Congress recognized that a competent defense lawyer, "knows how to probe weaknesses in eyewitness testimony and challenge suggestive identification procedures, and is more apt to recognize police or prosecutorial misconduct than an incompetent lawyer." S. Rep. No. 107-315, at 21 (2002). Congress also recognized several types of incompetent lawyers: "Americans on trial for their lives should not be condemned to rely on sleeping lawyers, disbarred lawyers, lawyers with only a few years or months at the bar, lawyers with no capital or even criminal law experience, lawyers who fail to conduct even a rudimentary investigation, or lawyers who do not have the resources to carry out their constitutionally mandated function." *Id.* at 24.

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 11

(observing that "under the *in pari materia* canon [of statutory construction], statutes addressing the same subject matter generally should be read as if they were one law") (internal quotation omitted). As the United States Supreme Court has explained, the "rule of *in pari materia*—like any canon of statutory construction—is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context" and "necessarily assumes that whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject." *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972).

With these similarities in mind, it therefore is highly significant that one of the primary means of assuring counsel competence under the Innocence Protection Act is to "monitor the performance of attorneys who are appointed and their attendance at [specialized] training programs." 42 U.S.C. § 14163(e)(2)(E). This requires a state to establish and maintain a roster of qualified attorneys, assign two attorneys from the roster in capital cases, conduct, sponsor, or approve specialized training programs, and remove from the roster those who do not provide effective representation or engage in unethical conduct, do not comply with training requirements, or have been sanctioned by a bar association. 42 U.S.C. §§ 14163(e)(2)(B)-(E).

In the proposed rule, the Attorney General nonetheless omits the majority of Innocence Protection Act provisions related to ensuring counsel competency. Instead, the Attorney General asserts that just two requirements of the Innocence Protection Act's effective system for providing competent legal representation—defining the characteristics of the appointing entity, 42 U.S.C. § 14163(e)(1), and requiring that entity to establish attorney qualifications, 42 U.S.C. § 14163(e)(2)(A)—"can be relied on to provide appropriate competency standards." Certification Process for State Capital Counsel Systems Proposed Rule, 76 Fed. Reg. 11,705, 11,708 (Mar. 3, 2011) (limiting minimum standards for Chapter 154 to these two provisions). This position is contrary to the clear intent behind the Innocence Protection Act. As explained in the Report of the Judiciary recommending passage of the Act:

> The Committee defined the term "effective system" with great care. Under section 201(d), such a system must include an entity to identify and appoint capital defense lawyers, and that entity must carry out its core functions independently of the three branches of State government. The entity will also establish qualifications for capital defense counsel, maintain a roster of qualified lawyers from which it will make appointments, conduct training of capital lawyers and monitor their performance. In an effective system, defense attorneys will be compensated at a reasonable rate comparable to the Federal rate for compensating capital defense lawyers, and will receive reasonable reimbursement for litigation expenses. S. Rep. No. 107-315, at 21.

In other words, Congress determined that *all* of the provisions of section 14163(e)—monitoring performance, removal for ineffectiveness, specialized training, etc.—are necessary to assure appropriate competency standards.

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 12

Similarly, federal courts appoint counsel in capital habeas proceedings in accordance with numerous measures of counsel's performance, including "standards endorsed by bar associations and other legal organizations regarding the quality of legal representation in capital cases," recommendations of defender entities with knowledge of counsel's performance, "counsel's commitment to the defense of capital cases," and "distinguished prior experience." Guide to Judiciary Policy—Volume 7: Defender Services, Guidelines for Administering the CJA and Related Statutes, *Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*, §§ 620.30(c) and (e), available at http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/CJAGuidelinesForms/GuideToJudiciaryPolicyVolume7.aspx (CJA Guidelines); *see also McFarland v. Scott*, 512 U.S. 849, 855 (1994) ("Congress' provision of a right to counsel under § [3599, formerly 848(q)(4)(B)] reflects a determination that quality legal representation is necessary in capital habeas corpus proceedings in light of 'the seriousness of the possible penalty and … the unique and complex nature of the litigation.'") (quoting 18 U.S.C. § 3599(d) (formerly 21 U.S.C. § 848(q)(7)).

Furthermore, Congress adopted 28 U.S.C. section 2261(e)—which dictates that incompetence of post-conviction counsel is not a ground for relief in a federal habeas corpus proceeding, but also permits a federal court to remove counsel in a state proceeding "on the basis of the ineffectiveness or incompetence of counsel"—precisely because it determined that "[t]he effectiveness of state and federal post-conviction counsel is a matter that can and must be dealt with in the appointment process." Powell Committee Report, 135 Cong. Rec. at S13484; 28 U.S.C. § 2261(e).

Thus, although the Attorney General states that "the specific minimum standards" for counsel competency that he proposes "are based on judgments by Congress in federal laws concerning adequate capital counsel competency standards and on judicial interpretation of counsel competency requirements," 76 Fed. Reg. at 11,708, the options he provides do not reflect existing and important guidelines provided by those sources.

It is clear that Congress intended the appointment of counsel under Chapter 154 to comport with traditional measures of attorney performance as established by the United States Supreme Court, and as reflected in federal statutes and judicial interpretations addressing similar issues of counsel competency in capital cases. In order to comply with Chapter 154, state competency standards therefore must have provisions to ensure that the performance of appointed counsel comports with well-established national norms for defense representation in capital post-conviction proceedings, including removal of incompetent counsel.[10] *See* Attorney General

---

[10] Of course, the American Bar Association's guidelines for counsel performance remain the preeminent national collection of professional norms in this context. *See* American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (rev. ed. 2003), 31 HOFSTRA L. REV. 913 (2003) ("ABA Guidelines"). These well-accepted guidelines for counsel performance include the appointment of two lawyers who have demonstrated specialized skills and experience, a member of the defense team qualified to identify mental disorders/impairments, limitations on attorney workload to ensure competent representation, specialized training, and monitoring and

Memo at 5 ("As the Supreme Court has made clear, there is a 'general assumption' that 'in the absence of a plain indication to the contrary … Congress when it enacts a statute is not making the application of the federal act dependent on state law.' That general assumption is especially warranted here because the statutory framework at issue appears to have specifically charged a *federal* official with interpretive authority.") (quoting *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989)).

## State Competency Standards Must Be Enforced

As indicated by the history of state efforts to obtain the procedural benefits of Chapter 154 discussed above, state attorneys general often have viewed the mere existence of state competency standards as sufficient to meet the competency requirements of Chapter 154, regardless of whether the state appointment mechanism employs them. Judicial interpretation of the counsel competency requirements of Chapter 154 resoundingly rejected this approach. As the Fourth Circuit held:

> We accordingly conclude that a state must not only enact a "mechanism" and standards for post-conviction review counsel, but those mechanisms and standards must in fact be complied with before the state may invoke the time limitations of [Chapter 154]. Not only is this conclusion consistent with our precedent, but it is also consistent with common sense: It would be an astounding proposition if a state could benefit from the capital-specific provisions of AEDPA by enacting, but not following, procedures promulgated [to meet Chapter 154 requirements].

*Tucker v. Catoe*, 221 F.3d 600, 604-05 (4th Cir. 2000); *see also Baker v. Corcoran*, 220 F.3d 276, 286 (4th Cir. 2000) ("Competency standards are meaningless unless they are actually applied in the appointment process"); *Ashmus v. Woodford*, 202 F.3d 1160, 1168 (9th Cir. 2000) (concluding that "a state's competency standards must be mandatory and binding if the State is to avail itself of Chapter 154"); *Mata v. Johnson*, 99 F.3d 1261, 1267 (5th Cir.1996), *vacated in part on other grounds in* 105 F.3d 209 (5th Cir.1997) (stating that competency standards must be "specific" and "mandatory" in order to satisfy the opt-in requirements); Comprehensive Violent Crime Control Act of 1991, 137 Cong. Rec. S3191-02, S3220 (March 13, 1991) (proposing

---

removal of ineffective counsel. These are all basic requirements that should be included in state competency standards.

Anticipating the importance of evaluating counsel competence under Chapter 154 according to these well-accepted national guidelines, some states already have adopted them to inform representation in state capital post-conviction proceedings. *See, e.g.*, Order Amending Rule 6.8, Arizona Rules of Criminal Procedure (Sept. 18, 2006) (requiring post-conviction counsel in Arizona to be guided by the performance standards in the 2003 ABA Guidelines); Standing Committee on Legal Services to the Poor in Criminal Matters, *State Bar of Texas: Guidelines and Standards for Texas Capital Counsel*, 69 Tex. B.J. 966, 967 (2006) (adopting portions of the ABA Guidelines as part of the Texas Guidelines and Standards, which are, "a Texas-specific version of the American Bar Association's Guidelines … [that] provides detailed practice standards for competent representation in these critical cases").

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 14

amendments based on the Powell Committee Report and explaining requirement that "states electing these procedures *actually appoint* counsel for collateral proceedings") (emphasis added).

The Attorney General's interpretation of Chapter 154 and the resulting regulations must reflect these prior rulings, *see* Attorney General Memo at 12 n.7 (noting that traditional tools of statutory construction include reliance on judicial interpretation); *Maislin Indus.*, 497 U.S. at 131 (ruling that "[o]nce we have determined a statute's clear meaning, we adhere to that determination under the doctrine of *stare decisis*, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning"), and respect the determinations of Article III courts interpreting that aspect of the statute, *see, e.g., Town of Deerfield v. FCC*, 992 F.2d 420 (2d Cir. 1993).

For these reasons, the Attorney General's regulation must require any state that seeks certification to demonstrate how it actually appoints counsel who meet state competency standards, and does so in all state post-conviction proceedings. *See, e.g., Satcher v. Netherland*, 944 F. Supp. 1222, 1245 (E.D. Va. 1996) ("Strict interpretation of the stringent opt-in requirements of the Act is not mere formalism. Rather, strict interpretation is necessary to meaningfully effectuate the quid pro quo arrangement which lies at the core of Chapter 154").

### Compensation and Expenses Must Be Sufficient To Allow Competent Representation

A state mechanism for compensation and payment of expenses must be sufficient "to enable [appointed] attorneys to provide their capital clients with competent legal representation." Attorney General Memo at 14; *see also Tucker*, 221 F.3d at 604 (holding that to comply with Chapter 154 a state must "further ensure that its own habeas proceedings are meaningful").

The Attorney General's regulation must require a state mechanism to provide compensation for representation according to well-established professional norms. Although the preamble to the proposed rule discusses the need to ensure that a state authorizes compensation beyond any presumptive limits, this is not contained in the rule the Attorney General proposes to adopt. The Attorney General's regulations must explicitly provide that any compensation mechanism may not set caps on attorney fees and shall compensate at an hourly rate for all time actually worked. *See* 18 U.S.C. § 3599(g)(1) (directing compensation without caps or distinctions between in-court and out-of-court time); 42 U.S.C. § 14163(e)(2)(F)(II) (establishing an effective system of capital representation is one where defense attorneys are "compensated for actual time and service, computed on an hourly basis"); ABA Guidelines § 9.1(B), 31 Hofstra L. Rev. at 981 (discouraging caps and recommending that no distinction be made between time spent in or out of court).

As with compensation, litigation expenses must be adequate to enable counsel to provide competent representation for their capital post-conviction clients. Although the proposed regulation requires that there must be means to authorize "payment of necessary expenses" above any presumptive limits, it fails to provide any object criteria or guidelines for what expenses are necessary to competent representation. At the very least, necessary expenses must

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 15

include fact investigators, mitigation specialists, and mental health and forensic science experts, and must be made available from an early stage of proceedings when services are needed. *See, e.g., McFarland,* 512 U.S. at 855 ("The services of investigators and other experts may be critical in the preapplication phase of a habeas corpus proceeding, when possible claims and their factual bases are researched and identified"); 42 U.S.C. § 14163(e)(2)(F)(ii)(III) (requiring compensation of non-attorney members of the team, including "investigators, mitigation specialists, and experts"); ABA Guidelines § 9.1(C), 31 Hofstra L. Rev. at 981-82 (recommending funding for investigators, mitigation specialists, and experts services).

## THE PROPOSED REGULATIONS FAIL TO DEFINE KEY TERMS OR ESTABLISH OBJECTIVE CRITERIA UPON WHICH TO BASE THE CERTIFICATION DETERMINATION

The requirements in the Attorney General's proposed rule not only are inconsistent with Chapter 154's purpose and quid pro quo scheme, as described above, but also fail to define key terms and provide objective standards by which to evaluate state mechanisms and make certification determinations. The absence of clear and objective criteria to govern the Attorney General's certification determination impermissibly leaves no measure against which states, individuals, or courts can evaluate compliance with the requirements for certification, determine whether the Attorney General's certification decisions are consistent with the mandate of the statute, or ensure that states are treated equally and according to similar reasoned principles.

### The Attorney General Must Define Key Terms to Implement the Requirements of 28 U.S.C. Sections 2261(c) and (d)

The Attorney General's proposed regulations include the statutory requirements contained in 28 U.S.C. sections 2261(c) and (d). Rather than providing definitions to implement these requirements, the proposed rule simply repeats the statutory language from Chapter 154. *See* 76 Fed. Reg. at 11,712. The Attorney General's regulations must include specific criteria for determining compliance with sections 2261(c) and (d) that are based on the numerous existing judicial interpretations of their provisions.

For example, courts have determined that "[t]he timely appointment of counsel at the conclusion of direct review is an essential requirement in the opt-in structure. Because the abbreviated 180-day statute of limitations begins to run immediately upon the conclusion of direct review, time is of the essence. Without a requirement for the timely appointment of counsel, the system is not in compliance." *Brown v. Puckett,* 2003 WL 21018627, at *3 (N.D. Miss. 2003) (unpublished order); *see also Ashmus v. Calderon,* 123 F.3d 1199, 1204, 1208 (9th Cir. 1997) (concluding that California was not in compliance with Chapter 154, inter alia, because counsel had not been appointed for "over 130 of the condemned California inmates," and "that counsel often is not appointed until years after a prisoner accepts the offer of counsel"); *Mills v. Anderson,* 961 F. Supp. 198, 201 n.4 (S.D. Ohio 1997) (observing that the timing of appointment of counsel, where Ohio statute provided for appointment of counsel after the post-conviction petition had been filed, "might well" preclude the application of Chapter 154); *Hill v. Butterworth,* 941 F. Supp. 1129, 1147 (N.D. Fla. 1996) ("[A]ny offer of counsel pursuant to Section 2261 must be a

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 16

meaningful offer. That is, counsel must be immediately appointed after a capital defendant accepts the state's offer of postconviction counsel. The present backlog of unrepresented capital defendants who are in a position to seek post-conviction review, demonstrates that Florida has not made the requisite meaningful offer of counsel").

As with any task involving statutory construction, these judicial determinations are based on congressional intent in establishing the Chapter 154 quid pro quo scheme. It was clear in the Powell Committee Report that delays in appointments of counsel were a "serious problem" to address. 135 Cong. Rec. at S13482. The Powell Committee determined that counsel were appointed late in post-conviction proceedings and "at this stage, serious constitutional claims may have been waived. The belated entry of a lawyer, under severe time pressure, does not do enough to ensure fairness." *Id.* Early sponsors of amendments based on the Powell Committee Report thus recognized that "[a]t a minimum, the *immediate* benefits to defendants would include the requirement that states electing these procedures *actually appoint* counsel for collateral proceedings." Comprehensive Violent Crime Control Act of 1991, 137 Cong. Rec. S3191-02, S3220 (March 13, 1991) (emphasis added).

Federal courts also determined that the provision that a state mechanism "must offer counsel" requires an affirmative offer that does not depend on the actions or initiative of an individual prisoner or counsel.[11] The requirement that counsel be offered to "all prisoners" was found to require strict, rather than substantial compliance, with the requirements of Chapter 154.[12]

---

[11]    *See, e.g., Hall v. Luebbers*, 341 F.3d 706, 712 (8th Cir. 2003) (holding that Missouri procedure did not comply with the "offer component" of Chapter 154 because the statute only offered the appointment of counsel "to indigent prisoners under a capital sentence who file a petition for post-conviction relief, not all prisoners under a capital sentence"); *Satcher v. Netherland*, 944 F. Supp. 1222, 1243-44 (E.D. Va. 1996) (holding that among the reasons Virginia failed to qualify for Chapter 154 was that it "did not require the State affirmatively to offer counsel to all prisoners, and . . . [t]hus, the Virginia statutory scheme provided no protection to prisoners who either did not know how to go about obtaining counsel for state habeas proceedings"), *rev'd in part on other grounds by* 126 F.3d 561 (4th Cir. 1997); *Zuern v. Tate*, 938 F. Supp. 468, 471 (S.D. Ohio 1996) (concluding that among the reasons Ohio failed to qualify for Chapter 154 was the failure to "offer" counsel as required because "a prisoner might well have to prepare his or her own § 2953.21 petition and hope for appointment thereafter, yet preparation of the petition itself is subject to important technical pleading requirements under Ohio case law").

[12]    *See, e.g., Ashmus v. Calderon*, 31 F. Supp. 2d 1175, 1183 (N.D. Cal. 1998) ("the language of the qualifying procedures and the quid pro quo structure of Chapter 154 demand strict rather than substantial compliance with all preconditions"); *Satcher v. Netherland*, 944 F. Supp. 1222, 1242, 1244-45 (E.D. VA. 1996) ("Strict interpretation" of the opt-in requirements is not "mere formalism," but rather "is necessary to meaningfully effectuate the quid pro quo arrangement which lies at the core of Chapter 154."); *id.* ("If Congress had intended to afford the States the very significant benefits conferred by Chapter 154 on the basis of a finding of substantial compliance based on past performance, it could have done so. However, it elected not to do so"); *Zuern*, 938 F. Supp. at 472 ("Congress did not write § 2261 in terms of substantial compliance").

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 17

Because Congress did not deem it necessary to correct the significant body of prior judicial interpretations of Chapter 154's requirements, they must be given effect in the Attorney General's regulations. *See Laird v. Redwood Trust*, 392 F.3d 661, 664 (4th Cir. 2004) (holding statute that requires the Attorney General to issue regulations to implement a subsection of the Americans with Disabilities Act creates a duty to define terms used in the statute); *Pearson v. Shalala*, 164 F.3d 650, 660 (D.C. Cir. 1999) (holding that the requirement for sufficient "definitional content" to guide agency action is a "proposition [that] is squarely rooted in the prohibition under the APA that an agency not engage in arbitrary and capricious action."); *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-73 (1989) (judicial interpretations have "special force" in statutory interpretation because Congress remains free to alter statutory language if courts incorrectly interpret legislative intent).

## The Options for Establishing Competency, Compensation, and Necessary Expenses Do Not Provide Clear Standards for Fair and Consistent Certification Determinations

Congress enacted the Administrative Procedure Act to create uniformity within the administrative process. *See Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Greenwich Collieries*, 512 U.S. 267, 280-81 (1994). Central to this uniform scheme of procedural fairness is the "APA's function of ensuring that agency actions are based on rational and reasoned decision-making." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*, 384 F.3d 1163, 1181 (9th Cir. 2004); *see also Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (holding that due process protects against arbitrary government action). Thus, a fundamental requirement for any agency's regulatory action is that it provide criteria sufficient to allow for consistent and non-arbitrary decision making. *See, e.g., Airmark Corp. v. FAA*, 758 F.2d 685, 695 (D.C. Cir. 1985) (concluding that it is arbitrary and capricious to fail "to provide a consistent approach that would allow even a guess as to what the decisional criteria would be"); *West Virginia Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 863 n.75 (D.C. Cir. 1982) ("[A]n exercise of unfettered flexibility too often results in ad hoc judgments and arbitrary decisions, both of which are counterproductive to the greater regulatory goals of consistency in decisions and reasoned guidance upon which affected parties may rely.").

The Attorney General's proposed rule, however, does not provide specific, objective criteria for establishing counsel competency, compensation rates, and necessary litigation expenses that are necessary for fair, non-arbitrary decision making. For example, although the Attorney General must "require a threshold of minimum counsel competency" with which a state must comply, *see* 76 Fed. Reg. at 11,707, he does so by proposing "[t]hree broad options" to govern counsel competency, *id.* at 11,708. One option, section 26.22(b)(1), requires five years of practice and three years of felony experience, but these requirements need not be met "in all cases," and a state may instead appoint counsel "whose background, knowledge, or experience would otherwise enable him or her to properly represent the defendant." *Id.* The second option, section 26.22(b)(2), requires only that appointing entities or programs "establish qualifications for attorneys who may be appointed to capital cases," 42 U.S.C. § 14163(e)(2)(A), without providing any standard or other guidelines for the qualifications. The third option, section 26.22(b)(3), requires only the appointment of counsel "satisfying qualification standards that

reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases." *Id.* at 11,712.

The Attorney General expects that the first two options for counsel competency, those based on federal appointments and the Innocence Protection Act, will serve as benchmarks for the third option, though this is not among the requirements set forth in the rule itself. 76 Fed. Reg. at 11,709. In order to serve as a benchmark, however, a minimum federal standard of counsel competency must provide specific, identifiable measures against which state mechanisms may be compared. *See, e.g., Nixon v. United States*, 506 U.S. 224, 246 (1993) (White, J., concurring) (observing that a "manageable standard" must provide an "identifiable" limit). The directive under section 26.22(b)(1) that state competency standards "otherwise enable [counsel] to properly represent the defendant" is so broad as to be meaningless. As discussed above, the key task of implementing Chapter 154—defining what it means to "properly represent" an individual in capital post-conviction proceedings—remains unaddressed. Section 26.22(b)(2) does establish a definite requirement that states establish qualifications for appointed counsel, but this does nothing more than repeat the statutory mandate that states provide standards for competency. *See* 28 U.S.C. § 2265(c). The Attorney General already has recognized that this directive, standing alone, does not provide the minimal federal guidance necessary to enforce Chapter 154's requirements. *See* 76 Fed. Reg. at 11,707 (construing the counsel competency provisions of Chapter 154 to require implementation by federal minimum standards); *see also* Attorney General Memo at 7 (describing the Attorney General's role as evaluating the state competency standards referenced in U.S.C. § 2265(c) according to minimum federal competency standards).

As with the counsel competency standards, the requirements for compensation and litigation expenses fail to provide objective criteria and instead give the Attorney General unlimited discretion in determining adequacy and reasonableness. Section 26.22(c)(1) of the proposed requirements provides several guidelines for compensation, but also allows a state to meet compensation requirements if "the State mechanism is otherwise reasonably designed to ensure the availability for appointment of counsel who meet State standards of competency." 76 Fed. Reg. at 11,712. The requirement that a state pay "necessary expenses" does not offer any criteria for determining what is "necessary." *Id.* at 11,712-13.

These broad and undefined options do not provide meaningful federal standards necessary to implement certification. *See, e.g., Checkosky v. SEC*, 139 F.3d 221, 226 (D.C. Cir. 1998) ("When an agency utterly fails to provide a standard for its decision, it runs afoul of more than one provision of the Administrative Procedure Act. ... An agency's failure to state its reasoning or to adopt an intelligible decisional standard is so glaring that we can declare with confidence that the agency action was arbitrary and capricious."); *Mr. Sprout v. United States*, 8 F.3d 118, 129 (2d Cir. 1993) (a reviewing court must be able to understand the basis of an agency's action so that it may judge the consistency of that action with the agency's mandate); *United States v. Atkins*, 323 F.2d 733, 742 (5th Cir. 1963) ("uniform objective standards" are necessary "to furnish a rejected applicant a definite basis upon which to seek proper judicial review ... [and to]

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 19

furnish reviewing courts something definite to act upon in ascertaining whether [the applicant has] been arbitrarily or unjustly denied").

## THE CERTIFICATION PROCESS MUST ESTABLISH FAIR PROCEDURES TO GATHER RELEVANT INFORMATION AND ENSURE RELIABLE AND TRANSPARENT DECISION MAKING

The Attorney General's proposed rule contains no requirements for a state application other than that it be in writing. 76 Fed. Reg. at 11,713. There are no guidelines to ensure or even allow the Attorney General to obtain sufficient, reliable, and relevant information about a state mechanism in order to determine whether it complies with the requirements of Chapter 154. As with other aspects of the proposed rule, this process fails to establish a minimum showing that must be made to allow for a fair and non-arbitrary certification determination.

First, the Attorney General's proposed rule does not create a process that will provide adequate notice of the information to be considered in the certification determination, either to states interested in obtaining certification or others interested in opposing it. Basic tenets of procedural due process require that those interested in and affected by the certification determination have "notice of the factual basis" upon which a decision is to be made and "a fair opportunity for rebuttal." *Wilkinson v. Austin,* 545 U.S. 209, 225-26 (2005). Although the Attorney General proposes making a certification determination after notice and a public comment period, 76 Fed. Reg. at 11,713, there are no criteria to indicate what type of information will be considered in granting or denying the application, *see* 5 U.S.C. § 553(b)(3) (notice of a proposed rule making must provide "either the terms or substance of the proposed rule or a description of the subjects and issues involved."). Adequate notice must apprise "interested parties of the issues to be addressed in the rule-making proceeding with sufficient clarity and specificity to allow them to participate in the rulemaking in a meaningful and informed manner." *American Medical Ass'n v. United States,* 887 F.2d 760, 767 (7th Cir. 1989). Issuing regulations that contain detailed application criteria based on the requirements of Chapter 154 helps to address this problem.[13]

Requiring states to submit an application that describes compliance with specific requirements in detail also establishes a minimum basis for the certification determination.[14] Without this, the

---

[13]     Given the important issues raised and the direct impact on individuals sentenced to death, the Attorney General also should provide actual notice of a state application to the state's death row inmates, state defenders, and federal defenders for the jurisdiction, as their identities and addresses easily are ascertainable.

[14]     The burden of demonstrating compliance with Chapter 154 properly belongs to the state. As Congress made clear in Chapter 154, "it is entirely the states' decision whether to opt-in—by so choosing the states are properly allocated the burden of proving compliance." *Ashmus v. Calderon,* 31 F. Supp. 2d 1175, 1183 (N.D. Cal. 1998) (citing the Powell Committee Report); *see also Calderon v. Ashmus,* 523 U.S. 740, 747 (1998) (holding that invoking the procedures of Chapter 154 constitutes an affirmative defense employed by the state in habeas corpus proceedings); *Hunter v. Bryant,* 502 U.S. 224, 233 (1991) (government officials bear the burden of establishing their affirmative defenses). This also is in keeping

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 20

Attorney General has no way of ensuring that his decision is based upon sufficient and reliable information. *See, e.g., Int'l Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C. Cir. 1992) (ruling that under the Administrative Procedure Act, an agency must consider relevant information); *NRDC v. Kempthorne*, 506 F. Supp. 2d 322, 371-73 (E.D. Cal. 2007) (holding that agency action was arbitrary and capricious when based on insufficient information that was not current or reliable); *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000) (concluding that agency action is arbitrary and capricious when it "fails to consider important aspects of the problem").

The Attorney General's regulation therefore should provide for an application that requires the following, based on key requirements of Chapter 154 discussed in the previous sections of this comment:

Timely Appointment of Counsel upon a Finding of Indigence:

- What is the average length of time between a finding of indigence and the appointment of competent counsel for state capital post-conviction proceedings?
- What is the range of time, from shortest period to longest, this number reflects?

Appointment of Counsel Who Provide Competent Representation:

- Describe state competency standards.
- How does the state mechanism ensure compliance with these standards prior to appointment of counsel?
- How is the performance and effectiveness of counsel monitored?
- Describe how ineffective counsel are removed and provide the number of cases in which this has occurred.
- Describe how state procedures permit the development and presentation of federal constitutional claims in state post-conviction proceedings and identify any limitations in investigating and presenting potential constitutional claims.

Compensation of Competent Counsel:

- Describe how capital post-conviction counsel are compensated, including any caps, flat fee arrangements, or other limits on compensation.
- If there are limitations on compensation, what is the process for exceeding these limits and in what percentage of cases is this allowed?

Litigation Expenses for Competent Counsel:

---

with the "normal assumption that an applicant is not entitled to benefits unless and until he proves his eligibility." *Lavine v. Milne*, 424 U.S. 577, 584 (1976).

Case4:13-cv-04517-CW Document1 Filed09/30/13 Page68 of 135

- Describe the process for requesting and approving/denying the payment of litigation expenses, including any limitations on the payment of expenses.
- If there are limitations on expenses, what is the process for exceeding those limits and in what percentage of cases is this allowed?
- In cases in which expenses were denied or reduced, what types of services were counsel seeking?

Finally, the proposed rule indicates that the Attorney General's certification determination will be published only if certification is granted. 76 Fed. Reg. at 11,713. This is contrary to procedural requirements that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding." 5 U.S.C. § 555(e). Full justification for granting or denying a request for certification must be made public, as well as all information relied upon by the Attorney General in doing so. *See, e.g., Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548-49 (9th Cir. 1993) (an agency must make public "everything that was before the agency pertaining to the merits of its decision"); *Nat'l Black Media Coal. v. FCC*, 791 F.2d 1016, 1023-24 (2d Cir. 1986) (holding agency action arbitrary and capricious for failure to provide public with information relied upon for its conclusions); *see also Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1140 (D.C. Cir. 2001) ("an agency cannot rest a rule on data that in critical degree, is known only to the agency") (internal quotations and bracket omitted).[15]

## THE ATTORNEY GENERAL'S DEFINITION OF "APPROPRIATE STATE OFFICIAL" IS UNLAWFUL

The Attorney General defines the "appropriate State official" to seek certification as the State Attorney General or the Chief Executive, if the State Attorney General "does not have responsibilities relating to Federal habeas corpus litigation." 76 Fed. Reg. at 11,712. The proposed definition is contrary to congressional intent, interferes with state policy making discretion, and injects into the certification process unconstitutional bias.

### The Attorney General's Definition Unlawfully Intrudes on State Policy Making Discretion

The history and intent behind the amendments to 28 U.S.C. section 2265 and the significance of the statutory language demonstrate that Congress did not intend to interfere with states' authority

---

[15]    The one exception to this is that, to ensure that his certification determination is based upon sufficient relevant information, the Attorney General must provide some process for the submission of confidential information, such as funding requests and pending attorney disciplinary actions. Currently, all information submitted during a public comment period such as the one the Attorney General envisions for certification determination, is included in the public docket file. *See* 76 Fed. Reg. at 11,706 (explaining that material redacted for online publication because of confidentiality issues is placed in the public docket where it can be inspected).

to define the "appropriate State official" according to state law and policy. Thus, the Attorney General's proposed regulations—by dictating the state official responsible for representing the state in requesting certification—exceed his authority under federal law. *See, e.g.,* Attorney General Memo at 7 (describing cooperative federalism, in which states are given latitude for executing state compliance with federal requirements); *Gregory v. Ashcroft*, 501 U.S. 452, 460-61(1991) (holding that principles of federalism dictate that the power of the states to define the duties of their constitutional officers should remain free from interference by the federal government, as such interference "would upset the usual constitutional balance of federal and state powers").

States exercise legislative control over their officers, and state officers may act only within the scope of the powers conferred upon them by state law. *See, e.g., Am. Fed'n of Labor v. Unemployment Ins. Appeals Bd.*, 920 P.2d 1314, 1329, 13 Cal. 4th 1017, 1042 (1996) ("[I]t is well settled that administrative agencies have only the powers conferred on them, either expressly or by implication, by Constitution or statute."). This power of a state to prescribe the qualifications of its officers and the manner in which they are chosen is "a decision of the most fundamental sort for a sovereign entity" that "lies at the heart of representative government" and is fundamental to our federalist system. *Gregory*, 501 U.S. at 460, 463. Therefore, "[i]n a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Parker v. Brown*, 317 U.S. 341, 351 (1943). An agency actor may not construe federal statutes to infringe on state power unless Congress makes its intent to alter the usual constitutional balance between States and the Federal Government "unmistakably clear in the language of the statute." *Id.* at 460-61; *see also Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 787 (2000); *United States v. Bass*, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.").

The history of Chapter 154 demonstrates that Congress did not intend to intrude on this federal-state balance. The proposals of the Powell Committee were based upon efforts to design a scheme that was "more consistent with the federal-state balance." Powell Committee Report, 135 Cong. Rec. at S13483. By proposing a requirement that states establish complying mechanisms via rule of court or state statute, the Powell Committee created a system that it believed maintained the federal-state balance and created safeguards to ensure fair and reliable administration of capital punishment. *See id.* at S13482, S13483. The Committee intended states to be free to decide whether or not "to bring capital litigation within the new statute by providing competent counsel for inmates on state collateral review," noting that "[b]ecause it is optional, the proposal should cause minimal intrusion on state prerogatives." *Id.* at S13482-83; *see also Ashmus*, 31 F. Supp. 2d at 1183 ("As the Powell Committee Report commented, it is entirely the states' decision whether to opt-in."), *aff'd*, 202 F.3d 1160 (9th Cir. 2000).

Originally, Chapter 154 required that a state seeking to opt-in to Chapter 154 demonstrate the existence of a complying mechanism for the appointment and compensation of counsel "by rule of its court of last resort or statute." 28 U.S.C. § 2265 (2005). This construction thus retained

the federal-state constitutional balance by reserving for the states the right to determine the manner by which they arrive at the political decision to qualify for Chapter 154's benefits. As part of the Patriot Act amendments, Congress repealed this AEDPA provision and replaced it with a requirement that a state seeking to opt-in demonstrate its complying mechanism through the application for certification by "the appropriate State official." Pub. L. 109-177 § 507, 120 Stat. 192, 250 (2006); 28 U.S.C. § 2265 (2005). The representations of an appropriate state official are thus equivalent to the former rule of court or statute enacted by a state's court or legislature: both reflect the culmination of state policy in establishing, maintaining, and describing a complying mechanism for purposes of Chapter 154. Neither the statutory language nor the legislative history of the Patriot Act amendments convey any intent by Congress to interfere in these state policy determinations.

Executive Order 13132, which governs the promulgation of federal regulations, further clarifies that such a balance requires the designation of an appropriate state official to be left to each state. The Order directs agencies to adhere to the fundamental principles of federalism when implementing federal policies or taking "any action that would limit the policymaking discretion of the States." Exec. Order No. 13,132, 64 Fed. Reg. 43,255, 43,257 § 4 (Aug. 4, 1999). "With respect to Federal statutes and regulations administered by the States, the national government shall grant the States the maximum administrative discretion possible. Intrusive Federal oversight of State administration is neither necessary nor desirable." *Id.* at 43,256 § 3. Furthermore, federal action limiting the policymaking discretion of the states may only occur where there is constitutional and statutory authority for the action. *Id.* Neither the federal Constitution nor Chapter 154 grant the Attorney General of the United States the power to determine which state official is authorized to administer state applications for certification.

Congress did not empower the Attorney General to usurp state governments' authority to determine the appropriate actors to act on behalf of the state. Indeed, Congress consistently has used the term "appropriate State official" to describe an official designated by the appropriate state law. *See, e.g.,* H.R. Rep. No. 107-479, reprinted in 2002 U.S.C.C.A.N. 827, 830 (2002) (changing the statutory phrase "State officer designated by the appropriate State law to make such certification" to "appropriate state official" in order "to eliminate unnecessary words"). The Attorney General must refrain from dictating state policy and leave the determination of the appropriate state official to state law.

## The Attorney General's Definition Unlawfully Creates a Biased and Incomplete Basis for Making Certification Decisions

As the Attorney General notes, state attorneys general are the most likely to be motivated to seek certification. 76 Fed. Reg. at 11,707. This "motivation," however, is the result of state prosecutors' direct interest in federal habeas corpus litigation and the procedural benefits they receive upon a state's certification. Vesting the state attorney general with authority to dictate the information and representations about a state's compliance with the requirements of Chapter 154 therefore creates an impermissible conflict of interest. *See Hamdi v. Rumsfeld,* 542 U.S. 507, 538 (2004) ("[T]hat even purportedly fair adjudicators are disqualified by their interest in

HCRC Comment—OAG Docket No. 1540
June 1, 2011
Page 24

the controversy to be decided is, of course, the general rule.") (internal quotation omitted). The effects of this interest were apparent under the prior version of Chapter 154. As discussed above, the assertions of state attorneys general at times demonstrated stunning disregard for the rights of indigent individuals sentenced to death, and overall showed little concern for the full and fair proceedings demanded by Chapter 154's quid pro quo arrangement. These interests necessarily taint the state attorney general's objective review and portrayal of the adequacy of the state system for appointing, compensating, and providing expenses for competent counsel to effectively represent habeas petitioners.

The Attorney General's definition of "appropriate State official" also unreasonably limits authority to provide information in support of a state's application for certification to an official who is incapable of accessing, and has no experience with, the relevant body of information that is necessary to a determination whether a state complies with certification requirements. For example, the state attorney general often does not have access to information critical to determining whether the state's mechanism complies with Chapter 154's qualifying requirements because funding requests and orders are confidential in virtually all state post-conviction proceedings. Without knowledge or expertise about whether adequate funding and qualified counsel are being provided in practice, and with significant prosecutorial interests in obtaining certification, state attorneys general are ill-suited to apply for and provide reliable information relevant to certification.

## CONCLUSION

For the reasons detailed above, the proposed regulation must be significantly revised in order to ensure competent representation and full and fair proceedings in state courts and a fair certification process for determining eligibility for the procedural benefits of Chapter 154.

Sincerely,

/s/
Michael Laurence
Executive Director

/s/
Barbara Saavedra
Staff Attorney

# Exhibit 3

## Federal Public Defenders' Comments on Proposed Rule

### Statement of Interest

On behalf of the federal public defender and community defender offices in the fifty states, the District of Columbia, Puerto Rico, the Virgin Islands, and Guam, we offer the following comments on the Proposed Rule – OAG Docket number 1540 – regarding the state certification system for state capital counsel systems.

Federal public defender offices and community defender organizations represent indigent criminal defendants pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A, and the Sixth Amendment to the United States Constitution. Thirty-five states currently have the death penalty. Federal public defenders and community defenders in a number of those states represent indigent death row prisoners in federal habeas corpus actions challenging state court judgments. Specifically, defenders in the following districts have capital habeas units with staff dedicated to the representation of federal capital habeas petitioners who are directly affected by the regulations proposed by the Attorney General: Middle District of Alabama; District of Arizona; District of Arkansas; Central District of California; Eastern District of California; District of Delaware; Northern District of Georgia; District of Idaho; District of Nevada; Northern District of Ohio; Southern District of Ohio; Western District of Oklahoma; Eastern District of Pennsylvania; Middle District of Pennsylvania; Western District of Pennsylvania; Eastern District of Tennessee; and Middle District of Tennessee.

Defenders with the capital habeas units in these districts represent 627 petitioners in federal habeas corpus actions challenging state court death judgments. These districts are located in eight of the top thirteen states ranked by number of death row inmates, and well over one-half of death-sentenced prisoners are located in these states. (According to an October 1, 2006 study, California ranks first in the number of state death row inmates, Pennsylvania fourth, Alabama sixth, Arizona eighth, Tennessee ninth, Georgia tenth, Oklahoma eleventh, and Nevada thirteenth.) Defenders in these districts also give advice and training to private attorneys representing federal habeas petitioners challenging state death judgments. Thus, through their representation of state death row inmates, and in the advice they give to private attorneys working on behalf of the same class of clients, these defenders have a direct stake in the regulations proposed by the Attorney General.

Federal public defender and community defender offices located in states with the death penalty, but who do not have staff dedicated to representing capital habeas petitioners challenging state court judgments, also have an interest in the Attorney General's Proposed Regulations. Some defender offices in these districts represent death-sentenced inmates in federal habeas proceedings on an individual basis; in fact, defender offices in these states represent an additional 27 petitioners in federal habeas corpus actions challenging state court death judgments. Additionally, defenders in these districts often receive inquiries from state death row inmates seeking federal habeas counsel and advice on their cases. These defenders often have to locate private counsel to represent such inmates in federal capital habeas corpus actions, and frequently have to advise these inmates on issues such as the statute of limitations (significantly shortened under Chapter 154) and claim filing (different under Chapter 154, for example, to the extent that the ability to amend a petition is

significantly constrained once the state files an answer).

Defenders located in the fifteen states and other jurisdictions that do not have the death penalty are also affected by the Attorney General's Proposed Regulations. In a number of these states, legislation is pending to reinstate the death penalty. Defenders in these jurisdictions, like the defenders in the thirty-five death penalty states, have unique expertise and experience in dealing with the United States Attorney General and attorneys under his jurisdiction. The Final Rule, relying primarily on comments by two legislators in support of the Act, depict the Attorney General as a neutral arbiter who is capable of promulgating rules that will fairly guide the process for determining whether a state qualifies for Chapter 154 benefits. Defenders in these jurisdictions have unique and important insight to give on the question of the Attorney General's purported neutrality and objectivity in deciding the issues assigned for him/her to determine under the Act and in formulating the Proposed Regulations implementing the Act.

We offer these comments on behalf of our clients, the persons on death rows in our jurisdictions, and those who may become our clients.

## I.    Section 26.20, Purpose

One preliminary matter is that section 26.20, which describes the purpose of the Attorney General's rule, contains incorrect statements about the effect of certification under 28 U.S.C. § 2265. The rule states that "If certification is granted, section 2262, 2263, 2264, and 2266 of chapter 154 of title 28 apply in relation to Federal habeas corpus review of capital cases from the State." 76 Fed. Reg. 11,705, 11,712 (Mar. 3, 2011). Section 2261, however, sets forth two requirements for the application of Chapter 154, one of which is certification by the Attorney General. 28 U.S.C. § 2261(b)(1). The statute provides that "[t]his chapter is applicable if" the Attorney General certifies a state "*and* ... counsel was appointed pursuant to that mechanism, petitioner validly waived counsel, petitioner retained counsel, or petitioner was found not to be indigent." 28 U.S.C. § 2261(b)(2) (emphasis added). Thus, the provisions of Chapter 154 do not apply in an individual case absent a determination under § 2262(b)(2) by the federal courts. *See, e.g.,* Barron, David J., Acting Assistant Attorney General, *Memorandum Opinion for the Attorney General* (Dec. 16, 2009) ("Barron Memo") (noting that the Attorney General's certification is a factor for federal courts to consider "in determining whether the expedited procedures apply").

## II.    Section 26.21, Definitions: Appropriate State Official

28 U.S.C. section 2265(a)(1) provides that certification must be "requested by an appropriate State official," and the Proposed Regulations define "appropriate State official" as "the State Attorney General, except that, in a state in which the State Attorney General does not have responsibility for Federal habeas corpus litigation, it means the Chief Executive thereof." This definition presents a number of problems that we previously addressed.

First, where the State Attorney General is responsible for Federal habeas corpus litigation, it will be in his or her interest to receive the benefits of Chapter 154. As an advocate for the State, the State Attorney General will want the expedited review and other procedural advantages

conferred by Chapter 154. This interest in the outcome of the certification process makes the State Attorney General precisely the wrong person to be responsible for applying for certification. A State Attorney General will be faced with an impermissible conflict of interest if he or she is aware that the state post-conviction mechanism is failing in practice to provide competent and adequately funded post-conviction counsel to the State's indigent death row inmates, but also believes that the mechanism might qualify for certification if one looked only to a description of the mechanism's components. A State Attorney General who is responsible for Federal habeas corpus litigation will also be prone to present the State's post-conviction procedures in a manner most likely to achieve certification irrespective of how the procedures at issue were really intended to function. Because of the State Attorney General's role as an advocate, an unbiased decision about whether to seek certification is impossible.

A second reason why the State Attorney General responsible for Federal habeas corpus litigation should not be designated as the "appropriate State official" for purposes of Section 2265(a)(1) is that the State Attorney General's role as a party in Federal habeas corpus litigation often means that the State Attorney General does not have access to information critical to determining whether the State's mechanism complies with Chapter 154's qualifying requirements. Funding requests and orders are confidential in many state post-conviction proceedings. While some State officials may have access to the information about litigation expenditures, the State Attorney General very well may not. Similarly, State Attorney Generals are likely to be ignorant about the qualifications of the attorneys actually appointed in state post-conviction proceedings given that they are not a party to the appointment process. Without knowledge about whether adequate funding and qualified counsel are being provided in practice, the State Attorney General is ill-suited to be the State official designated to apply for certification.

This proposed definition also is contrary to congressional intent and exceeds the Attorney General's statutory authority. The phrase "appropriate State official" is used by Congress to describe an official designated by the appropriate state law. *See, e.g.*, H.R. Rep. No. 107-479, reprinted in 2002 U.S.C.C.A.N. 827, 830 (2002) (changing the statutory phrase "State officer designated by the appropriate State law to make such certification" to "appropriate state official" in order "to eliminate unnecessary words"). Leaving the designation of this official to state law and policy also is in accordance with Congress's intent to establish a statutory scheme consistent with "the federal-state balance." Ad Hoc Comm. on Fed. Habeas Corpus in Capital Cases Comm. Report, 135 Cong. Rec. S13471-04, S13483 (Oct. 16, 1989) ("Powell Committee Report").

The Attorney General may not construe the statute to infringe on state power unless Congress makes its intent to alter the usual constitutional balance between States and the Federal Government "unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991); *see also Parker v. Brown*, 317 U.S. 341, 351 (1943) ("[A]n unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress."); *United States v. Bass*, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.").

Because the statutory language in 28 U.S.C. § 2265 does not indicate any intent to interfere in state policy decisions, the Attorney General exceeds his statutory authority by seeking to dictate

Page 3 of 26

which state official may apply for certification, preempts state law limitations on the powers of the state Attorney General and/or precludes application by states in which the state Attorney General does not have authority under state law to request certification. Moreover, the Proposed Regulations create a prohibited conflict by designating the state Attorney General, usually counsel the opposing party to a petitioner's federal habeas litigation, as the official responsible for describing the adequacy of the state system for appointing competent counsel and for providing adequate compensation and expenses for that same petitioner.

Notwithstanding these considerations, the Attorney General justifies the definition of "appropriate State official" by reference to the role state attorneys general played in seeking certification under the prior version of Chapter 154. *See* 76 Fed. Reg. at 11,707. Importantly, however, under the prior version of the statute, no state attorney general could seek the benefits of Chapter 154 in federal proceedings unless a qualifying state mechanism had been established "'by statute, rule of its court of last resort, or *by another agency authorized by State law*.'" Barron Memo at 11 (quoting 28 U.S.C. § 2261(b) (2000)) (emphasis added). The predicate for any state attorney general to invoke Chapter 154 was the existence of state law authorizing the mechanism. Leaving states the discretion to designate an appropriate official to seek certification continues this respect for states authorizing such action by their own law.

The proposed rule also reasons that "State attorneys general continue in most instances to be the officials with the capacity and motivation to seek chapter 154 certification for their States." 76 Fed. Reg. at 11,707. This motivation to act is part of the problem we have identified: state attorneys general who are motivated to obtain the benefits of chapter 154 have a significant conflict of interest in fairly representing state compliance with requirements aimed at strengthening defense functions. Furthermore, state prosecutors frequently do not have knowledge or experience in the appointment, compensation, expenses, and competency standards for defense counsel. In terms of ability to collect relevant information to demonstrate objectively whether a state is in compliance with Chapter 154, it is the officials and administrators regularly involved in appointment and oversight of defense counsel and in the payment of their expenses and fees who have the "capacity" to seek certification.

The Attorney General's definition overrides state discretion by designating a specific state official to seek certification. Particularly given the fiscal implications of certification for state institutions—prosecution, defense, and judicial entities that must mobilize sufficient staff to comply with expedited timelines imposed by Chapter 154—as well as for those in the corporate community unable to complete civil litigation due to the precedence of capital cases, the authority for designating an official to seek certification should be left to state policy makers. A prosecutor's motivation to obtain the benefits of certification is not equivalent to authority conferred by state law to do so after reasoned consideration of its impacts on a variety of state functions.

### III.   Sections 26.22(A), 2261 (c) and (d)

Section 26.22(a) contains requirements from 28 U.S.C. §§ 2261 (c) and (d), some of which previously have been interpreted by the federal courts. Congress's decision not to overturn these judicial interpretations or change the terms of the requirements demonstrates congressional

acceptance of them. *See* Barron Memo at 8 (noting that "it is significant that [amendments to Chapter 154 in 2006] did not alter the terms of the substantive requirements that States had to meet in order to qualify for those procedures."); *id.* at 12 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987), and explaining that traditional tools of statutory construction dictate that judicial precedent is a source for giving content to federal standards). These interpretations should be reflected in the minimum federal standards included in the Attorney General's regulations.

Existing judicial interpretations establish that the provision that a state mechanism "must offer counsel" requires an affirmative offer that does not depend on the actions or initiative of an individual prisoner or counsel,[1] and must be "meaningful" in that it actually results in the immediate appointment of counsel.[2] Courts determined that providing for the appointment of counsel "upon a finding that the prisoner is indigent," similarly requires timely appointment of counsel.[3] The

---

[1]    *See, e.g., Hall v. Luebbers*, 341 F.3d 706, 712 (8th Cir. 2003) (holding that Missouri procedure did not comply with the "offer component" of Chapter 154 because statute only offered the appointment of counsel "to indigent prisoners under a capital sentence who file a petition for post-conviction relief, not all prisoners under a capital sentence"); *Satcher v. Netherland*, 944 F. Supp. 1222, 1243-44 (E.D. Va. 1996) (stating that among the reasons Virginia failed to qualify for Chapter 154 was that it "did not require the State affirmatively to offer counsel to all prisoners, and . . . [t]hus, the Virginia statutory scheme provided no protection to prisoners who either did not know how to go about obtaining counsel for state habeas proceedings"), *rev'd in part on other grounds by* 126 F.3d 561 (4th Cir. 1997); *Zuern v. Tate*, 938 F. Supp. 468, 471 (S.D. Ohio 1996) (stating that among the reasons Ohio failed to qualify for Chapter 154 was failure to "offer" counsel as required because "a prisoner might well have to prepare his or her own § 2953.21 petition and hope for appointment thereafter, yet preparation of the petition itself is subject to important technical pleading requirements under Ohio case law").

[2]    *See, e.g., Hill v. Butterworth*, 941 F. Supp. 1129, 1147 (N.D. Fla. 1996) (stating that "any offer of counsel pursuant to Section 2261 must be a meaningful offer. That is, counsel must be immediately appointed after a capital defendant accepts the state's offer of postconviction counsel. The present backlog of unrepresented capital defendants who are in a position to seek post-conviction review, demonstrates that Florida has not made the requisite meaningful offer of counsel.").

[3]    *See, e.g., Ashmus v. Calderon*, 123 F.3d 1199, 1204, 1208 (9th Cir. 1997) ("*Ashmus I*") (concluding that California was not in compliance with Chapter 154, *inter alia*, because counsel had not been appointed for "over 130 of the condemned California inmates," and "that counsel often is not appointed until years after a prisoner accepts the offer of counsel"); *Brown v. Puckett*, 2003 WL 21018627, *3 (N.D. Miss 2003) (unpublished order) ("The timely appointment of counsel at the conclusion of direct review is an essential requirement in the opt-in structure. Because the abbreviated 180-day statute of limitations begins to run immediately upon the conclusion of direct review, time is of the essence. Without a requirement for the timely appointment of counsel, the system is not in compliance."); *Mills v. Anderson*, 961 F. Supp. 198, 201 n.4 (S.D. Ohio 1997) (observing that the timing of appointment of counsel, where Ohio statute provided for appointment of counsel after the post-conviction petition had been filed, "might well" preclude the application

provision that counsel must be offered to "all prisoners" was found to require strict, rather than substantial compliance, with the requirements of Chapter 154.[4]

In keeping with well-established law, the requirement of a "finding, . . . that the prisoner rejected the offer of counsel . . . with an understanding of its legal consequences," 28 U.S.C. § 2261(c)(2), must include case-specific findings sufficient to establish a knowing, intelligent, and sufficiently informed decision. *See, e.g., Iowa v. Tovar*, 541 U.S. 77, 89 (2004) ("The information a defendant must possess in order to make an intelligent election . . . will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceedings").

Similarly, the Attorney General must provide a definition of section 2261(d) – which prohibits the appointment of trial counsel for postconviction representation "unless the prisoner and counsel expressly request continued representation," 28 U.S.C. § 2261 (d) – that includes an opportunity for the prisoner to make a knowing and intelligent determination regarding trial counsel's conflict, and have a full understanding of the potential conflict, and the assistance of independent counsel to explain the risks of the conflict. *See, e.g., United States v. Kliti*, 156 F.3d 150, 153 n.4 (2d Cir. 1998); *United States v. Martin*, 965 F.2d 839, 843 (10th Cir. 1992); *United States v. Allen*, 831 F.2d 1487, 1501-02 (9th Cir. 1987). By not having the type of rigorous process described in the cases, there is a significant chance that violations of the Sixth Amendment right to effective assistance of counsel at trial will not be raised and vindicated.

States seeking certification bear the burden of affirmatively establishing compliance with 2261(c) and (d) as well as other certification requirements. *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998) (holding that invoking the procedures of Chapter 154 constitutes an affirmative defense employed by the state in habeas corpus proceedings); *Hunter v. Bryant*, 502 U.S. 224, 233 (1991) (holding that government officials bear the burden of establishing their affirmative defenses). The

---

of Chapter 154); *Hill*, 941 F. Supp. at 1147 ("counsel must be immediately appointed after a capital defendant accepts the state's offer of postconviction counsel"); *Ashmus I*, 935 F. Supp. at 1074-75 ("The failure to appoint counsel after an indigent prisoner has accepted such an offer contravenes the express requirement of § 2261(c), ... see also 1991 Analysis, 137 Cong. Rec. at S3220 ('*At a minimum*, the *immediate* benefits to defendants would include the requirement that states electing these procedures *actually appoint* counsel for the collateral proceedings ...').").

[4]      *See, e.g., Ashmus v. Calderon*, 31 F. Supp. 2d 1175, 1183 (N.D. Cal. 1998) ("*Ashmus II*") (stating that "the language of the qualifying procedures and the *quid pro quo* structure of Chapter 154 demand strict rather than substantial compliance with all preconditions"); *Satcher v. Netherland*, 944 F. Supp. 1222, 1242, 1244-45 (E.D. Va. 1996) ("'[S]trict interpretation" of the opt-in requirements is not "mere formalism," but rather is necessary in order to meaningfully effectuate the quid pro quo arrangement which lies at the core of Chapter 154."); *id.* ("If Congress had intended to afford the States the very significant benefits conferred by Chapter 154 on the basis of a finding of substantial compliance based on past performance, it could have done so. However, it elected not to do.); *Zuern*, 938 F. Supp. at 472 ("Congress did not write § 2261 in terms of substantial compliance").

Attorney General's regulations therefore should make it clear that states that apply for certification must document how the state mechanism accomplishes each requirement of §§ 2261 (c) and (d), as established through existing judicial interpretations of the statutory terms. *See, e.g., Deerfield v. FCC*, 992 F.2d 420 (2d Cir. 1993) (ruling that an agency official exceeds his constitutional power by "refusing to recognize the conclusive effect of the judgment [of an Article III court]" and "insisting that [he] is entitled to decide anew questions decided by the courts.") (citing 5 U.S.C. § 706(2)(B)).

## IV.    Section 26.22(b), Competent counsel

Section 26.22(b) conflates two different inquiries: (1) whether the state has established a mechanism for the appointment of competent counsel, and (2) whether state standards utilized in the appointment of counsel are in keeping with federal minimum standards for counsel competence. These two different questions will be discussed below in turn.

### A.    Mechanism for the appointment of competent counsel

Whether the state has established a mechanism for the appointment of competent counsel as set forth in 28 U.S.C. § 2265(a)(1)(A), "may reasonably be construed to require the Attorney General to determine whether a particular state mechanism would, *in fact*, ensure appointment of competent counsel ... [and] enable those attorneys to provide their capital clients with competent legal representation." Barron Memo at 13 (emphasis added). This is in keeping with "[t]he express purpose of the structure envisioned by the Powell Committee Report ... to ensure that collateral review of capital convictions would 'be fair, thorough, and the product of capable and committed advocacy.'" *Id.* at 9 (quoting the Powell Committee Proposal, 135 Cong. Rec. 24,696 (1989)); *see also id.* (quoting Senator Kyl and stating that "the Powell Committee Report's recommendations are what is now chapter 154").

The Attorney General's proposed rule fails to expressly provide for his evaluation of these fundamental components of a state mechanism for the appointment of competent counsel.

### 1.    Whether a state mechanism enables attorneys to provide their clients with competent legal representation.

A state mechanism to provide fair and thorough review must be free of procedural obstacles that prevent otherwise competent counsel from providing competent legal representation. This is directly related to the purpose of Chapter 154, and also has been recognized by the federal courts. *See, e.g., Ashmus I*, 123 F.3d at 1204, 1208 (holding that a state mechanism that limits counsel's responsibility fails to comply with Chapter 154).

Obstacles to competent representation occur in many different ways. For example, in some states, severe time limits on when a habeas petition may be presented leave counsel just months to investigate, develop, and present federal constitutional claims for the first time in state post-

conviction proceedings.[5] Rules that prohibit counsel from supplementing or amending petitions within a reasonable period of time also prevent counsel from presenting relevant evidence in support of federal claims. In some states that appear to compensate and provide expenses to counsel, fees and funding are not approved or paid at the time when counsel are working to preparing the state habeas petition, leaving them unable to expend the time or utilize expert and investigative services needed to develop and present their federal claims.[6] Some state jurisdictions even refuse to treat some federal constitutional claims as cognizable in state post-conviction proceedings, a clear barrier to counsel's ability to obtain fair review in those tribunals.[7]

The regulations must therefore provide for the evaluation of state procedures that undermine the purpose of the state mechanism defined in Chapter 154. Some simple measures can accomplish this. In the federal system, one clear indication of incomplete proceedings in the state courts is the development and presentation of claims for the first time in federal court. In some states, this results in a return to state court for exhaustion. In others, where no state remedy exists for exhaustion, procedural default analysis may occur. *See, e.g., Williams v. Thaler*, 602 F.3d 291, 305 (5th Cir. 2010) (stating that a claim of ineffective assistance of counsel that was not exhausted in state court was procedurally defaulted); *Castillo v. McFadden*, 399 F.3d 993 (9th Cir. 2005) (holding that a claim of due process violation related to admission of confession was procedurally defaulted for failure to exhaust). Asking a state seeking certification to tally the number of cases in which federal habeas counsel develop and present new claims for relief will provide a good starting point for understanding whether the state mechanism enables attorneys to provide their clients with competent legal representation. Other inquiry should include the number of cases in which a state evidentiary hearing is conducted, time limits on the presentation of evidence in state court, and the availability of discovery, fees, and funding at a timely stage of the proceedings.

    2.    **Whether a state mechanism ensures the appointment of**

---

[5]    *See* Missouri Supreme Court Rule 29.15 (providing 60 days for counsel to submit a petition for post-conviction relief, which may be extended by only one 30-day period); *State v. White*, 873 S.W.2d 590, 594 (1994) (reiterating strict adherence to requirement that all claims not timely filed are waived); *Oliver v. Smith*, 2008 WL 2813330 (E.D. Mo. 2008) (unpublished) (stating that under Missouri law, the state court lacks jurisdiction to consider claims raised in an untimely motion for post-conviction relief).

[6]    The Virginia Supreme Court, which has exclusive original jurisdiction over capital habeas petitions, takes the position that it has no jurisdiction until a petition is filed, and therefore refuses to authorize investigative and expert expenses prior to the filing of the petition. As a practical matter, however, it is impossible to amend a petition in Virginia to include facts discovered after its initial filing. *See* Comment of the Virginia Capital Representation and Resource Center, Docket No. DOJ-OAG-2008-0029-0018.1 (April 6, 2009).

[7]    *See, e.g., Granger v. Norris*, Case No. 08-979 (Nov. 13, 2008) (unpublished order) (reiterating ruling that an ineffective assistance of counsel claim is not cognizable by writ of habeas corpus).

**competent counsel in fact.**

The mere existence of state requirements for the appointment, compensation, and expenses of competent counsel does not ensure that that they are applied and enforced in practice. The history and purpose of Chapter 154 demonstrate that enforcement of state requirements is a necessary element of a state mechanism. Existing judicial interpretations bear this out. *See Tucker v. Catoe*, 221 F.3d 600, 604-05 (4th Cir. 2000) (ruling that South Carolina did not qualify for Chapter 154 provisions and stating that, "a state must not only enact a 'mechanism' and standards for post-conviction review counsel, but those mechanisms and standards must in fact be complied with before the state may invoke" Chapter 154); *Baker v. Corcoran*, 220 F.3d 276, 286 (4th Cir. 2000) (Maryland did not qualify for Chapter 154 provisions because the state's competency standards were not applied in the appointment process and stating that "[c]ompetency standards are meaningless unless they are actually applied in the appointment process"); *Ashmus II*, 202 F.3d at 1168 n.13 (stating that California must abide by its competency standards when appointing counsel); *Oken v. Nuth*, 30 F. Supp. 2d 877, 880 n.3 (D. Md. 1998) (stating that Chapter 154 requires state to have *and apply* selection criteria).

The true measure of counsel competence, however, is his or her actual performance. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984) (measuring counsel competence by performance according to prevailing professional norms). To ensure appointment of competent counsel, a state mechanism must utilize well-established performance standards, such as the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, (rev. ed. 2003), 31 Hofstra L. Rev. 913 (2003), as a guide to evaluating counsel performance. *See* Barron Memo at 12 n.7 (explaining that minimum federal standards for counsel competency may be informed by ABA Guidelines, which have been recognized by the United States Supreme Court as a guide to reasonable performance).

Appointed counsel must be able to competently perform *all* duties included in "postconviction proceedings." 28 U.S.C. § 2265 (stating that a mechanism must provide for the "appointment, … of competent counsel in State postconviction proceedings."). Because the regulations define "postconviction proceedings" as "State collateral proceedings," 72 Fed. Reg. at 31,219, § 22.61, counsel's qualifications and performance must be sufficient to provide competent representation in recognized collateral proceedings such as competency to be executed, *see Giarratano*, 492 U.S. at 9-10, motions for DNA testing, *see, e.g., McDonald v. Smith*, No. 02-CV-6743 (JBW), 03-MISC-0066 (JBW), 2003 WL 22284131, *5-6 (E.D.N.Y. Aug. 21, 2003) (unpublished order); 18 U.S.C. § 3600(a) (describing the procedures for post-conviction motions for DNA testing in federal court), and other potentially specialized areas in which counsel must be proficient.

To ensure appointment of competent counsel, the state mechanism must also provide for the removal of counsel who do not provide competent representation. Congress adopted 28 U.S.C. § 2261(e), which dictates that incompetence of post-conviction counsel is not a ground for relief in a federal habeas corpus proceeding, because it determined that "[t]he effectiveness of state and federal post-conviction counsel is a matter that can and must be dealt with in the appointment process." Powell Committee Report, 135 Cong. Rec. at S13484; 28 U.S.C. § 2261(e); *see also*

*Menzies v. Galetka*, 150 P.3d 480, 508 (Utah 2006) (acknowledging that an attorney may meet statutory requirements for appointment but still fail to provide effective assistance of counsel and holding that petitioner was entitled to set aside the dismissal of his post-conviction petition where his post-conviction counsel, who was appointed pursuant to Utah's mechanism, provided "grossly negligent" and ineffective assistance).

> **3.**  **Whether state standards utilized in the appointment of counsel are in keeping with federal minimum standards for counsel competence.**

An additional issue in determining whether the state mechanism appoints competent counsel is whether the competency standards utilized for the appointment of counsel adhere to minimum federal standards for counsel competency. *See* Barron Memo at 12 (concluding that section 2265(a)(1) permits the Attorney General to certify "only those state mechanisms that provide for the appointment of counsel who meet a minimum federal threshold of competency"). The proposed rule claims that the "specific minimum standards set forth in [26.22(b)] are based on judgments by Congress in federal laws concerning adequate capital counsel competency standards and on judicial interpretation of the counsel competency requirements of chapter 154. As discussed in detail below, there are numerous ways in which the options for counsel competency ignore critical elements congressional or judicial judgments on these standards, and thus involve an unreasonable interpretation of the requirements of Chapter 154.

The options also fail to establish minimum criteria sufficient to ensure that the Attorney General's certification determination is fair and not arbitrary. The APA requires implementing regulations to provide sufficient criteria or "definitional content" for the statutory terms used to guide an agency's action. *Pearson v. Shalala*, 164 F.3d 650, 660 (D.C. Cir. 1999) (noting that "this proposition is squarely rooted in the prohibition under the APA that an agency not engage in arbitrary and capricious action"); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (stating that an agency action is arbitrary and capricious if agency is not able to "articulate a satisfactory explanation for its action"); *United States v. Atkins*, 323 F.2d 733, 742 (5th Cir. 1963) (stating that "uniform objective standards" are necessary "to furnish a rejected applicant a definite basis upon which to seek proper judicial review … [and to] furnish reviewing courts something definite to act upon in ascertaining whether [the applicant has] been arbitrarily or unjustly denied); *S. Terminal Corp. v. EPA*, 504 F.2d 646, 670 (1st Cir. 1974) (stating that a vague standard invited arbitrary and unequal application). In addition, the requirements for certification must include clear objective standards and criteria so that states wishing to invest in a mechanism to comply with Chapter 154 have sufficient guidance to do so. *See, e.g., id.* at 670 (stating that the vague standard discussed above left the prospective applicants "utterly without guidance"). Finally, the failure to clearly define the standards and criteria that will apply to certification determinations deprives interested persons of sufficient information about the manner in which the Attorney General intends to implement the certification procedures and permit meaningful public comment. *See, e.g., Am. Med. Ass'n v. United States*, 887 F.2d 760, 767 (7th Cir. 1989) (stating that interested persons must be able to "participate in the rulemaking in a meaningful and informed manner.").

> **B.**  **Competency based on 18 U.S.C. section 3599**

The current regulations propose as one measure of counsel competency the federal standards for appointment of counsel in capital cases contained in 18 U.S.C. section 3599. Section 3599 addresses both pre-judgment and post-judgment appointments. Although the proposed regulation addresses the appointment of counsel for state post-conviction proceedings, it utilizes the federal requirement for pre-trial appointments found in 18 U.S.C. section 3599 (b). The correct equivalent instead would be the federal requirement that counsel appointed post-judgment "must have been admitted to practice in the court of appeals for not less than five years, and must have had not less than three years experience in the handling of appeals in that court in felony cases." 18 U.S.C. § 3599(c).

The proposed regulations also omit the additional guidelines governing federal appointments in capital cases set forth in the Guide to Judiciary Policy—Volume 7: Defender Services, Guidelines for Administering the CJA and Related Statutes, *Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*, available at http://www.uscourts.gov/ FederalCourts/AppointmentOfCounsel/CJAGuidelinesForms/GuideToJudiciaryPolicyVolume7.aspx ("Guidelines"). The Guidelines provide the following Special Considerations in the Appointment of Counsel in Post-Conviction Proceedings:

> In appointing post-conviction counsel in a case where the defendant is sentenced to death, courts should consider the attorney's experience in federal post-conviction proceedings and in capital post-conviction proceedings, as well as the general qualifications identified in § 620.30 and § 620.60.20.

Guidelines at § 620.50.

The additional relevant qualifications for the appointment of counsel in capital post-conviction proceedings in federal courts include the following:

> (1) minimum experience standards set forth in 18 U.S.C. § 3599(b)-(d), 18 U.S.C. § 3005, and other applicable laws or rules;
>
> (2) qualification standards endorsed by bar associations and other legal organizations regarding the quality of legal representation in capital cases;
>
> (3) recommendations of other federal public and community defender organizations, and local and national criminal defense organizations;
>
> (4) proposed counsel's commitment to the defense of capital cases; and
>
> (5) availability and willingness of proposed counsel to accept the appointment and to represent effectively the interests of the client.

*Id.* at § 620.30(c). These qualifications include the requirement that counsel be "learned in the law applicable to capital cases." 18 U.S.C. § 3005. The Guidelines explain that learned counsel "should

have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in state death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high-quality representation." *Id.* at § 620.30(e).

Finally, the Guidelines direct the courts to "ensure that all attorneys appointed in federal death penalty cases are well qualified, by virtue of their prior defense experience, training, and commitment, to serve as counsel in this highly specialized and demanding litigation." *Id.* at § 620.30(d). The Guidelines also require courts to consider the recommendation of a defender entity that "should consult with counsel (if counsel has already been appointed or retained) and the court regarding the facts and circumstances of the case to determine the qualifications which may be required to provide effective representation." *Id.* at §§ 620.30 (a), (b).

As a report for the Judicial Conference Committee on Defender Services has stated, "[h]eightened standards are required to ensure that representation in federal death penalty cases is both cost-effective and commensurate with the complexity and high stakes of the litigation. Counsel in a federal death penalty case must not only be skilled in defending the charged offense, *e.g.*, a homicide, but also must be thoroughly knowledgeable about a complex body of constitutional law and special procedures that do not apply in other criminal cases." Gould, Jon B., Greenman, Lisa, *Report to the Committee on Defender Services Judicial Conference of the United States Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases* (Sept. 2010) ("Cost and Quality of Defense Representation") at 92.

This report reiterates previous findings endorsed by the Judicial Conference. In 1998, a subcommittee of the Judicial Conference evaluated the quality and availability of defense representation in federal death penalty cases by conducting "extensive interviews with lawyers and judges representing a wide range of perspectives, and covering more than half of the judicial districts in which a federal death penalty prosecution has been authorized." Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, *Recommendations Concerning the Cost and Quality of Defense Representation* (Spencer Report, May 1998). Its findings included the following:

> Federal death penalty cases require knowledge of the extensive and complex body of law governing capital punishment and the intricacies of federal criminal practice and procedure. Neither one alone is sufficient to assure high quality representation. Lawyers and judges recounted cases in which seasoned federal criminal lawyers who lacked death penalty experience missed important issues. For example, one judge described a situation in which experienced and highly esteemed felony trial lawyers who had no capital experience simply did not know how to pursue the mitigation investigation required by the case.

Spencer Report, Analysis and Findings, Section C.1. *Importance of "Learned" Counsel.*

Federal appointments thus require capital as well as post-conviction experience, a necessity also recognized by courts interpreting Chapter 154. *See Wright v. Angelone*, 944 F. Supp. 460, 467

(E.D. Va. 1996) (holding that Virginia's standards were inadequate because they did not require capital or state habeas corpus experience); *Austin v. Bell*, 927 F. Supp. 1058, 1062 (D. Tenn. 1996) (finding Tennessee's standards of competency insufficient because, "[t]hat an attorney has passed the Tennessee bar examination does not mean that the attorney is competent to handle a habeas petition in a capital case"); *Colvin-El v. Nuth*, No. Civ.A. AQ 972520, 1998 WL 386403, *6 (D. Md. 1998) (unpublished) (holding that standards that required experience participating in at least two capital cases at the trial level would be insufficient because, "[g]iven the extraordinarily complex body of law and procedure unique to post-conviction review, an attorney must, at a minimum, have some experience in that area before he or she may be deemed 'competent'"). Federal appointments also require consideration of qualifications endorsed by bar associations, recommendations of defense entities, training, and the performance and distinctions of counsel in the past.

Any minimum standard for counsel competency based on federal appointments of counsel must include the full range of factors that apply in that context.

### C. Competency based on the Innocence Protection Act

A second option for counsel competency is based on the Innocence Protection Act. The proposed rule explains that rather than establishing specific qualifications that apply to the appointment of counsel, that statute "assumes that the specifications regarding the nature of the appointment or selection authority and the associated requirements for establishment of qualifications can be relied on to provide appropriate competency standards." 76 Fed. Reg. at 11,708. Although the Attorney General recognizes that the Innocence Protection Act provisions function as a whole to ensure competency, the proposed rule inexplicably omits the vast majority of them.

The proposed rule requires state to comply only with 42 U.S.C. §§ 14163(e)(1) and (e)(2)(A). Those provisions require certain types of programs or entities to be responsible for appointment of counsel, 42 U.S.C. §§ 14163(e)(1), and that those programs or entities "establish qualifications for attorneys who may be appointed to represent indigents in capital cases," 42 U.S.C. §§ 14163(e)(2)(A). This directive to have particular entities establish "qualifications" without further requirement or guidance fails to establish any minimum standard to guide the Attorney General's certification determination or provide objective guidance to potential applicants who may wish to seek certification. The omitted provisions of the Innocence Protection Act scheme for the appointment of competent counsel are as follows:

(B) establish and maintain a roster of qualified attorneys;

(C) except in the case of a selection committee or similar entity described in paragraph (1)(C), assign 2 attorneys from the roster to represent an indigent in a capital case, or provide the trial judge a list of not more than 2 pairs of attorneys from the roster, from which 1 pair shall be assigned, provided that, in any case in which the State elects not to seek the death penalty, a court may find, subject to any requirement of State law, that a second attorney need not remain assigned to represent the indigent to ensure competent representation;

(D) conduct, sponsor, or approve specialized training programs for attorneys representing defendants in capital cases;

(E)    (i) monitor the performance of attorneys who are appointed and their attendance at training programs; and

    (ii) remove from the roster attorneys who –

        (I) fail to deliver effective representation or engage in unethical conduct;

        (II) fail to comply with such requirements as such program, entity, or selection committee or similar entity may establish regarding participation in training programs; or

        (III) during the past 5 years, have been sanctioned by a bar association or court for ethical misconduct relating to the attorney's conduct as defense counsel in a criminal case in Federal or State court; and

(F) ensure funding for the cost of competent legal representation by the defense team and outside experts selected by counsel, …

42 U.S.C. § 14163(e)(2).

Notably, a key element of the Innocence Protection Act scheme are detailed provisions for the monitoring and removal of attorneys who fail to deliver effective representation or participate in specialized training. If the Innocence Protection Act is to serve as a model for state standards, these additional requirements must be included in the Attorney General's regulations.

## D.    Competency based on other standards reasonably assuring proficiency

In the interest of providing increased flexibility to states, the proposed regulation includes an option for state competency standards that requires only "Appointment of counsel satisfying qualification standards that reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases." 76 Fed. Reg. at 11,712. As with the Innocence Protection Act standard that similarly requires only some type of undefined qualifications, this option fails to establish any minimum standard to guide the Attorney General's certification determination or otherwise provide objective guidance his interpretation of minimum standards of competency required under Chapter 154.

Any federal minimum standard must include, at the very least, requirements for experience in post-conviction as well as capital proceedings, specialized training, demonstrated competence

according to well-established performance standards, and removal of capital post-conviction counsel who fail to provide effective representation.

### V. Section 26.22(c), Compensation

Although the preamble to the proposed rule discusses the need to ensure that a state authorizes compensation beyond any presumptive limits, this is not contained in the rule the Attorney General proposes to adopt. The Attorney General's regulations must explicitly provide that any compensation mechanism may not set caps on attorney fees and shall compensate at an hourly rate for all time actually worked. *See* 18 U.S.C. § 3599(g)(1) (directing compensation without caps or distinctions between in-court and out-of-court time); 42 U.S.C. § 14163(e)(2)(F)(II) (stating that an effective system of capital representation is one where defense attorneys are "compensated for actual time and service, computed on an hourly basis"); ABA Guidelines § 9.1(B), 31 Hofstra L. Rev. at 981 (discouraging caps and recommending that no distinction be made between time spent in or out of court).

A state mechanism may undermine effective representation when the types of activities for which counsel may be compensated are restricted. A state mechanism for compensation must be sufficient "to enable [appointed] attorneys to provide their capital clients with competent legal representation." Barron Memo at 14. Therefore, the Attorney General's regulation also should explicitly state that a state mechanism must provide compensation for representation that meets well-established professional norms. This requirement must apply across all compensation options, as in many states the compensation level of retained or agency lawyers that serves as a benchmark in sections 26.22(c)(1)(ii)-(iv) is woefully inadequate to ensure competent representation.

As with competency options that fail to establish any minimum standard to guide the Attorney General's certification determination, section 26.22(c)(2) abandons any effort to provide objective guidance for the payment of attorney compensation and should be removed. At the very least, the Attorney General should provide in the rule itself the measures and benchmarks listed in the preamble that will guide the evaluation of compliance with this option, including experience, knowledge, skills, training, education, and the benchmarks provided by federal appointment guidelines, including judicial policy requirements, and *all* the relevant provisions of the Innocence Protection Act.

### VI. Section 26.22(d), Reasonable litigation expenses

As with compensation, litigation expenses must be adequate to enable counsel to provide competent representation for their capital post-conviction clients. Although the proposed regulation requires that there must be means to authorize "payment of necessary expenses" above any presumptive limits, it fails to provide any object criteria or guidelines for what expenses are necessary to competent representation. The federal courts have endeavored to answer this question. A 2010 report endorsed by the Judicial Conference Committee on Defender Services identified several key areas of expert services frequently relied upon in capital cases. Interviews with judges and lawyers further detailed the significance of these expert services in capital cases and the

necessity of the costs associated with them. *See Cost and Quality of Defense Representation* at 71 (noting that "both the prosecution and the defense make more extensive use of investigators, expert witnesses, and other case-related services than they do in non-capital cases"). In terms of necessary guilt phase expenses, the report found that

> [t]o investigate, prepare, and present evidence of guilt, the government most often is able to rely on salaried employees of such agencies as the Federal Bureau of Investigation, the Drug Enforcement Agency, the Bureau of Alcohol, Tobacco, Firearms and Explosives, and others. Defense counsel, however, must retain, and courts therefore must authorize payment for, private individuals to carry out similar functions. Likewise, with respect to the many types of specialized forensic science expertise that may be relevant during the guilt phase (e.g., ballistics, DNA, serology, narcotics), the prosecution often can utilize salaried members of law enforcement agencies, while the defense generally must hire experts who charge an hourly rate for their services. Fact investigators and forensic science evaluators are common in both capital and non-capital cases.

*Id.* at 72.

Other types of routine expert services mental health experts, including psychologists, neuropsychologists, psychiatrists, and others, which were found to be "relied upon to a much greater extent in capital than in non-capital matters" by both defense and prosecution. *Id.* at 72. Mitigation specialists, who have "a graduate level degree as well as extensive training and experience in the defense of capital cases," victim liaisons, and prison condition experts, were among the other expert services regularly utilized in capital cases. *Id.* at 74-77.

The Attorney General's regulation should include minimum guidelines for what constitutes necessary expenses for competent representation. As indicated above, this would include fact investigators, mitigation specialists, and mental health and forensic science experts. *See also* 42 U.S.C. § 14163(e)(2)(F)(ii)(III) (Innocence Protection Act requiring compensation of non-attorney members of the team, including "investigators, mitigation specialists, and experts"); ABA Guidelines § 9.1(C), 31 Hofstra L. Rev. at 981-82 (recommending funding for investigators, mitigation specialists, and experts services).

## VII. Section 26.23, Certification process

The proposed regulations fail to place any burden on the state to establish its entitlement to the benefits of Chapter 154. There is no requirement that the state official provide any information about the state mechanism or why the state official believes that the mechanism qualifies under Chapter 154. This is contrary to congressional intent. Prior judicial interpretations of Chapter 154 eligibility require the state seeking eligibility to bear the burden of demonstrating compliance with Chapter 154 and make an affirmative showing of strict compliance with the statute's requirements. *See, e.g., Ashmus v. Calderon*, 31 F. Supp. 2d 1175, 1182-83 (N.D. Cal. 1998) (stating that "as the party seeking to obtain the benefit of Chapter 154's expedited review provisions, the burden is properly placed on the state to demonstrate that all of the qualifying procedures have been

established. As the Powell Committee Report commented, it is entirely the states' decision whether to opt-in—by so choosing the states are properly allocated the burden of proving compliance"); *Satcher v. Netherland*, 944 F. Supp. 1222, 1242, 1244-45 (E.D. Va. 1996) ("If Congress had intended to afford the States the very significant benefits conferred by Chapter 154 on the basis of a finding of substantial compliance based on past performance, it could have done so. However, it elected not to do so."); *see also Lavine v. Milne*, 424 U.S. 577, 584 (1976) (stating that there is a "normal assumption that an applicant is not entitled to benefits unless and until he proves his eligibility."). Absent clear language in the statute to the contrary, the Attorney General's regulations must implement the certification process in keeping with these prior judicial interpretations. *See, e.g., Keene Corp. v. United States*, 508 U.S. 200, 212 (1993); *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-73 (1989).

Although the Proposed Regulations provide for a state's request for certification to be subject to public notice and comment, the failure to require any information upon which the certification determination will be made, including ex parte contacts, denies the public notice of and deprives interested persons the opportunity to participate in the certification determination in a meaningful and informed manner and violates due process. Notice "not only allows adversarial critique of the agency but is perhaps one of the few ways that the public may be apprised of what the agency thinks it knows in its capacity as a repository of expert opinion." *Home Box Office. v. FCC*, 567 F.2d 9, 55 (D.C. Cir. 1977); *see also Am. Med. Ass'n*, 887 F.2d at 767 (stating that notice must apprise "interested parties of the issues to be addressed in the rule-making proceeding with sufficient clarity and specificity to allow them to participate in the rulemaking in a meaningful and informed manner").

The Attorney General's regulations should include an application that requires states to provide specific information that allows the Attorney General whether the state mechanism in fact provides for the appointment, compensation, and reasonable litigation expenses of competent counsel, including the adequacy of state competency standards, including the following questions:

1. What is the state authority by which the official seeking certification is authorized to submit an application?

2. Document how the state mechanism accomplishes the following requirements provided by 28 U.S.C. §§ 2261(c), (d):

   A. Ensures that counsel is offered to all prisoners under sentence of death in state post-conviction proceedings

   B. Determines whether counsel previously represented the prisoner at trial and if so, whether the prisoner and counsel expressly requested continued representation

   C. Provides appointment of counsel at the time indigence is established

   D. Determines whether prisoners are competent to accept or

Page 17 of 26

reject an offer of counsel

E. Finds that prisoners who reject counsel made the decision with an understanding of its legal consequences

F. Concludes that a prisoner is not indigent

3. Provide the source of and describe state standards for competency, including the following:

A. If the state mechanism utilizes different standards, describe each.

B. The official or entity responsible for ensuring compliance with state standards in the appointment process.

C. If your state permits appointment of attorneys who do not meet specified experience and/or training requirements based on a determination that the attorneys are nevertheless qualified to provide competent representation, provide the percentage of appointments in which this occurs.

D. If your state has specified experience and/or training requirements for appointed counsel, provide the percentage of appointments which did not meet the requirements.

4. Provide the source for and describe the compensation of counsel, including the following:

A. If the state mechanism compensates counsel differently in different settings, describe each type of compensation.

B. If there is a cap on compensation, the process for allowing compensation to exceed the cap and the percentage of requests to exceed the cap that are approved entirely and the percentage that are approved in part.

C. If flat fees are provided, the resulting average hourly rate of compensation.

D. Duties of counsel for which compensation is provided and limitations on the compensation of counsel.

E. If time and fees are subject to revision by a state entity prior to approval of compensation, the percentage of cases in which

compensation is reduced and the average difference between requested compensation and compensation paid.

5. Provide the source for and describe the payment of litigation expenses, including the following:

A. The process for requesting, revising, approving, and denying expenses.

B. The entity responsible for approving, reducing, or denying requests for funding.

C. Guidelines for the approval, reduction, or denial of funding requests.

D. Whether approval and payment of expenses occur before or after the filing of a habeas petition.

E. Whether there are limits on the type of assistance that the mechanism will fund, e.g., attorney experts.

F. Whether there are rate or fee caps for investigators and experts and what those caps are.

G. Percentage of requested expenses approved for payment of investigative services.

H. Percentage of requested expenses approved for payment of forensic experts and testing.

I. Percentage of requested expenses approved for payment of mental health experts.

J. Percentage of requested expenses approved for payment of a mitigation specialist.

K. Percentage of funding requests reduced and the average difference between requested and approved funds.

L. Percentage of funding requests that are denied.

M. The average expenses provided for investigative services.

N. The average expenses provided for forensic experts and testing.

O. The average expenses provided for mental health experts.

Page 19 of 26

    P.      The average expenses provided for mitigation specialists.

6.    Provide the following to establish how the appointment mechanism monitors the effectiveness of capital post-conviction counsel:

    A.      Description of how the appointing entity monitors counsel performance

    B.      Description of the mechanisms for removing counsel from a specific case and/or precluding future appointments

    C.      Percentage of petitions filed that contain only record-based claims

    D.      Percentage of petitions filed that are 50 pages long or shorter

    E.      Percentage of cases in which post-conviction counsel seek discovery

    F.      Percentage of cases in which counsel seek funding for investigation

    G.      Percentage of cases in which counsel seek funding for forensic experts and testing

    H.      Percentage of cases in which counsel seek funding for mental health experts

    I.      Percentage of cases in which counsel seek funding for a mitigation specialist

    J.      Percentage of cases in which an inmate has sought removal of counsel

    K.      Percentage of cases in which counsel have been removed from a specific case

    L.      Percentage of cases in which qualified counsel have been denied further appointments based on past performance

    M.     Circumstances that have justified removal of counsel

7.    Provide the following information related to the adequacy of state review of capital post-conviction claims:

A.   Any time limits on the development, presentation, and/or resolution of state post-conviction claims;

B.   Any page limits on the post-conviction petition and/or any subsequent filings;

C.   Availability of and any limitations on discovery in post-conviction proceedings;

D.   Case law or other limitations on the cognizability of federal constitutional claims in state proceedings;

E.   Case law or other limitations on the challenges that appointed counsel can raise related to the capital conviction and/or sentence, e.g., bringing a collateral attack on a prior conviction used as a factor in aggravation at the capital trial.

F.   Procedures related to the presentation of evidence, such as amending or supplementing the habeas petition and the ability to call and cross-examine witnesses;

G.   Percentage of cases in which a state evidentiary hearing is conducted;

H.   Percentage of initial federal habeas petitions filed by capital inmates in your state that were found to contain claims that had not been exhausted in state post-conviction proceedings.

8.   The effective date of the mechanism you seek to certify

Given the important issues raised and the direct impact on individuals sentenced to death, the Attorney General should provide actual notice of a state application, at the very least to state defenders and federal defenders for that jurisdiction, whose identities and addresses easily are ascertainable.

### VIII.   The Attorney General's conflict of interest

As the chief law enforcement officer for the United States Government, the Attorney General enforces the law of the United States, defends against challenges to federal criminal prosecutions, regularly cooperates with, and provides training, funding, and support for, local law enforcement, and participates directly in joint law-enforcement operations with the states. Given these roles, the Attorney General's decisionmaking inherently involves the risk of bias. *See, e.g., Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 428 (1995) (stating that under a statute that required the Attorney General to certify plaintiff was injured in the scope of employment – where the result was to shield the government from liability – the Attorney General "[i]nevitably . . . will feel a strong tug to certify, even when the merits are cloudy" and "his interest would certainly bias his judgment")

(internal quotation omitted).

Due process applies to administrative decision making such as that required of the Attorney General under § 2265. In particular, due process requires the Attorney General's certification decision making to be "impartial and disinterested." *Marshall v. Jerrico*, 446 U.S. 238, 242 (1980); *see also Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975) (holding that the right to "a fair trial in a fair tribunal" is a basic requirement of due process that applies to administrative decision making) (internal quotation omitted). In addition to prohibiting actual bias, the Due Process Clause operates "to prevent even the probability of unfairness." *Withrow*, 421 U.S. at 47; *see also Wildberger v. Am. Fed'n of Gov't Emps., AFL-CIO*, 86 F.3d 1188, 1196 (D.C. Cir. 1996) (stating that the Due Process Clause prohibits procedures based "not just on actual bias, but also on circumstances that could create a significant risk of actual bias"). In situations in which bias or the appearance of impropriety may infect a decision, procedural protections, such as adversarial proceedings, cross-examination, and insulation from political pressures, are critical. *See, e.g., In re Murchison*, 349 U.S. at 138 (finding bias where judgment was based in part on prior impression, "the accuracy of which could not be tested by adequate cross-examination").

As we have suggested before, designating the Office of the Inspector General to conduct evaluations of the adequacy of state mechanisms is one way to minimize the appearance of bias and diminish the effect of the Attorney General's conflict. Another way is to address many of the flaws in the requirements that we have discussed above. Although the Attorney General has stated that he intends to provide minimum federal standards to govern certification determinations, the requirements in the proposed regulations are vague and leave the determination of adequacy of a state mechanism almost entirely to the Attorney General's discretion. Clear, detailed, and objective standards to govern certification requirements, together with a detailed application requiring specific showings by the state, not only creates a fairer process but also establishes criteria for the certification determination that are needed for agency decision making and public notice.

### IX.    Conclusion

Changes to the Proposed Rule implementing Chapter 154 are necessary prior to initiation of this policy initiative and are, in fact, required by law. For all of the foregoing reasons, we ask that our comments be fully considered and we urge the Attorney General to move forward in developing a new propsed rule in a comprehensive, objective, and transparent manner to faithfully carry out the *quid pro quo* scheme of Chapter 154.

Christine A. Freeman
Executive Director, Federal Defender
Program, Inc.
Middle District of Alabama

Carlos Williams
Executive Director, Southern Federal
Defender Program, Inc.
Southern District of Alabama

Fred Richard Curtner
Federal Public Defender
District of Alaska

Jon M. Sands
Federal Public Defender
District of Arizona

Jenniffer Morris Horan

Federal Public Defender
Eastern District of Arkansas

Sean K. Kennedy
Federal Public Defender
Central District of California

Daniel J. Broderick
Federal Public Defender
Eastern District of California

Barry J. Portman
Federal Public Defender
Northern District of California

Reuben Cahn
Executive Director, Federal Defenders of San
Diego, Inc.
Southern District of California

Raymond P. Moore
Federal Public Defender
Districts of Colorado and Wyoming

Gary D. Weinberger
Federal Public Defender
District of Connecticut

Edson A. Bostic
Federal Public Defender
District of Delaware

A. J. Kramer
Federal Public Defender
District of District of Columbia

Donna Lee Elm
Federal Public Defender
Middle District of Florida

Randolph P. Murrell
Federal Public Defender
Northern District of Florida

Kathleen M. Williams
Federal Public Defender
Southern District of Florida

Cynthia Roseberry
Executive Director, Federal Defenders of the
Middle District of Georgia, Inc.
Middle District of Georgia

Stephanie Kearns
Executive Director, Georgia Federal Defender
Program, Inc.
Northern District of Georgia

John T. Gorman
Federal Public Defender
District of Guam

Peter C. Wolff
Federal Public Defender
District of Hawaii

Samuel Richard Rubin
Executive Director, Federal Defender
Services of Idaho, Inc.
District of Idaho

Richard H. Parsons
Federal Public Defender
Central District of Illinois

Carol Brook
Executive Director, Illinois Federal Defender
Program, Inc.
Northern District of Illinois

Phillip J. Kavanaugh
Federal Public Defender
Southern District of Illinois

Jerome T. Flynn
Executive Director, Federal Community
Defenders, Inc.
Northern District of Indiana

William E. Marsh
Executive Director, Indiana Federal
Community Defender, Inc.
Southern District of Indiana

Nicholas T. Drees
Federal Public Defender
Southern District of Iowa

Cyd Gilman
Federal Public Defender
District of Kansas

Scott T. Wendelsdorf
Executive Director, Western Kentucky
Federal Community Defender, Inc.
Western District of Kentucky

Virginia L. Schlueter
Federal Public Defender
Eastern District of Louisiana

Rebecca L. Hudsmith
Federal Public Defender
Middle and Western Districts of Louisiana

David Beneman
Federal Public Defender
District of Maine

James Wyda
Federal Public Defender
District of Maryland

Miriam Conrad
Federal Public Defender
Districts of Massachusetts, New Hampshire
and Rhode Island

Miriam L. Siefer
Chief Federal Defender, Legal Aid &
Defender Association of Detroit
Eastern District of Michigan

Raymond Kent

Federal Public Defender
Western District of Michigan

Katherian D. Roe
Federal Public Defender
District of Minnesota

Samuel Dennis Joiner
Federal Public Defender
Southern District of Mississippi

Lee Lawless
Federal Public Defender
Eastern District of Missouri

Raymond C. Conrad
Federal Public Defender
Western District of Missouri

Anthony R. Gallagher
Executive Director, Federal Defenders of
Montana
District of Montana

David R. Stickman
Federal Public Defender
District of Nebraska

Frances A. Forsman
Federal Public Defender
District of Nevada

Richard Coughlin
Federal Public Defender
District of New Jersey

Stephen P. McCue
Federal Public Defender
District of New Mexico

Lisa Peebles
Federal Public Defender
Northern District of New York

Page 24 of 26

John Byrnes
Executive Director, Southern District of New York Community Defender
Southern District of New York

Marianne Mariano
Federal Public Defender
Western District of New York

Thomas P. McNamera
Federal Public Defender
Eastern District of North Carolina

Louis C. Allen III
Federal Public Defender
Middle District of North Carolina

Claire J. Rausher
Executive Director, Federal Defenders of Western North Carolina, Inc.
Western District of North Carolina

Dennis G. Terez
Federal Public Defender
Northern District of Ohio

S. S. Nolder
Federal Public Defender
Southern District of Ohio

Julia L. O'Connell
Federal Public Defender
Northern and Eastern Districts of Oklahoma

Susan M. Otto
Federal Public Defender
Western District of Oklahoma

Steven T. Wax
Federal Public Defender
District of Oregon

Leigh Skipper
Chief Federal Defender, Defender Association
of Philadelphia

Eastern District of Pennsylvania

James V. Wade
Federal Public Defender
Middle District of Pennsylvania

Lisa B. Freeland
Federal Public Defender
Western District of Pennsylvania

Hector E. Guzman, Jr.
Acting Federal Public Defender
District of Puerto Rico

Parks N. Small
Federal Public Defender
District of South Carolina

Neil Fulton
Acting Federal Public Defender
Districts of North Dakota and South Dakota

Elizabeth B. Ford
Executive Director, Federal Defender
Services of Eastern Tennessee, Inc.
Eastern District of Tennessee

Henry A. Martin
Federal Public Defender
Middle District of Tennessee

Stephen B. Shankman
Federal Public Defender
Western District of Tennessee

G. Patrick Black
Federal Public Defender
Eastern District of Texas

Richard A. Anderson
Federal Public Defender
Northern District of Texas

Marjorie A. Meyers
Federal Public Defender

Page 25 of 26

Southern District of Texas

Henry J. Bemporad
Federal Public Defender
Western District of Texas

Steven B. Killpack
Federal Public Defender
District of Utah

Michael L. Desautels
Federal Public Defender
District of Vermont

Thurston T. McKelvin
Federal Public Defender
District of Virgin Islands

Michael S. Nachmanoff
Federal Public Defender
Eastern District of Virginia

Larry W. Shelton
Federal Public Defender
Western District of Virginia

Roger Peven
Executive Director, Federal Defenders of
Eastern Washington
Eastern District of Washington

Thomas W. Hillier II
Federal Public Defender
Western District of Washington

Brian J. Kornbrath
Federal Public Defender
Northern District of West Virginia

Mary Lou Newberger
Federal Public Defender
Southern District of West Virginia

Daniel Stiller
Federal Defender, Federal Defender Services

of Wisconsin, Inc.
Eastern and Western Districts of Wisconsin

# Exhibit 4



# HABEAS CORPUS RESOURCE CENTER

303 Second Street, Suite 400 South
San Francisco, CA 94107
Tel 415-348-3800 ◆ Fax 415-348-3873
www.hcrc.ca.gov

**Board of Directors**
*MR. CHARLES A. BIRD, Chair*
*DEAN DRUCILLA STENDER RAMEY*
*HON. ARLEIGH WOODS*
*MR. JOSEPH SCHLESINGER*
*PROF. MARGARET RUSSELL*

*MICHAEL LAURENCE, Executive Director*

*JEAN FIELD, Assistant Director*
*JEANNIE STERNBERG, Deputy Director*

March 14, 2012

Regulations Docket Clerk
Office of Legal Policy, Department Justice
950 Pennsylvania Avenue NW, Room 4234
Washington, D.C. 20530

Re:     Supplemental Notice of Proposed Rulemaking
        Certification Process for State Capital Counsel Systems, OAG Docket No. 1540

Dear Regulations Docket Clerk:

The Habeas Corpus Resource Center (HCRC) is an entity of the Judicial Branch of the State of
California. The HCRC provides legal representation for indigent petitioners in death penalty
habeas corpus proceedings before the California Supreme Court and the federal courts, assists
the California Supreme Court by identifying and recruiting private counsel qualified to accept
appointments in capital habeas corpus proceedings, and provides training and serves as a
resource to those attorneys. *See* Cal. Gov't Code § 68661 (West 2012). The HCRC has been
appointed to represent death row prisoners in ninety-eight state and federal habeas corpus
proceedings.

The HCRC has a substantial interest in the proposed regulations and the potential certification of
state mechanisms pursuant to 28 U.S.C. sections 2261 and 2265 (or "Chapter 154"), both in its
capacity as appointed counsel to death row inmates and in its more expansive role as a resource
for private counsel. We submit these comments on behalf of the HCRC, the clients for whom
the agency has been, or will be, appointed to represent, and all of the California death-sentenced
inmates and their attorneys who are served by the HCRC's resource mandate.[1] As a result of
HCRC's substantial interest in regulations to implement Chapter 154 certification, we have

---

[1]     In addition, we join the comments submitted by the Federal Public Defenders, the National
Association of Criminal Defense Lawyers, the American Bar Association, the Innocence Project, and the
issues raised by Senator Patrick Leahy's staff in the meeting with Department of Justice staff on March 1,
2012.

participated in prior public comment periods and regularly raised concerns about various aspects of proposed and final rules. *See* Comments by HCRC, Department of Justice Docket Nos. DOJ-2007-0110-0007 (July 2007); DOJ-2007-0110-0162 (Sept. 2007); DOJ-OAG-2008-0029-0036 (April 2009); DOJ-OAG-2010-0003-0009 (July 2010); DOJ-OAG-2011-0004-0022 (June 2011); *see also Habeas Corpus Resource Center v. U.S. Dep't of Justice*, 2009 WL 185423 (N.D. Cal. Jan. 20, 2009).

In December 2008, the Attorney General published a Final Rule that did not define key statutory terms or set standards for counsel competency, compensation, or litigation expenses. Instead, it "treated the definition of such standards as a matter of State discretion" and declined to provide federal guidance on the requirements contained in Chapter 154 that must be met prior to certification. *Certification Process for State Capital Counsel Systems, Proposed Rule*, 76 Fed. Reg. 11705, 11707 (Mar. 3, 2011). As a result of these and other deficiencies, the Attorney General withdrew the December 2008 Final Rule. *Certification Process for State Capital Counsel Systems, Removal of Final Rule*, 75 Fed. Reg. 71353 (Nov. 23, 2010).

The current Proposed Rule, and recent Supplemental Notice, *Certification Process for State Capital Counsel Systems, Supplemental notice of proposed rulemaking*, 77 Fed. Reg. 7559 (Feb. 13, 2012), indicate that the Attorney General recognizes the need not only to provide federal standards for certification, but also to consider how those standards function in individual state contexts. These changes are firmly grounded in the extensive case law interpreting Chapter 154, its legislative history, and the Attorney General's administrative responsibilities, and have resulted in needed improvements to the Proposed Rule.

The issues addressed in the Supplemental Notice—counsel competence, timely appointment, evidence required to gain certification, and conditions for maintaining certification—are critical aspects of the certification process with far-reaching implications for indigent individuals sentenced to death and the attorneys appointed to represent them. Accordingly, we provide comments to highlight our experience with these issues, our views on the Proposed Rule and new proposals, and additional suggestions to ensure fair implementation of Chapter 154.

## I.      THE REGULATIONS MUST INCLUDE NATIONAL STANDARDS FOR COUNSEL COMPETENCY.

When the Powell Committee proposed solutions to the problems of piecemeal litigation and delay in death penalty cases, it stressed that "provision of competent counsel for prisoners under capital sentence throughout both state and federal collateral review is crucial to ensuring fairness and protecting the constitutional rights of capital litigants." 135 Cong. Rec. S13471-04, at S13481, S13482 (daily ed. Oct. 16, 1989) (Judicial Conference of the United States Ad Hoc Committee on Federal Habeas Corpus in Capital Cases, Committee Report, Aug. 23, 1989 (Oct. 16, 1989)) ("Powell Committee Report"). Throughout the rule making process, the HCRC has urged the Attorney General to establish a minimum federal standard for counsel competency. *See, e.g.*, Comments by HCRC, Department of Justice Docket No. DOJ-OAG-2008-0029-0036 (April 2009), at 27-34. Although the Proposed Rule characterizes its three "broad options" as "specific minimum standards," 76 Fed. Reg. at 11708, the proposed counsel competency

requirements do not fulfill the Attorney General's obligations to establish a minimum federal standard that assures the appointment of competent counsel in state capital post-conviction proceedings.

### A. PROPOSED CHANGES TO SECTIONS 26.22(B)(1) AND (2) ARE NOT MEANINGFUL UNLESS SECTION 26.22(B)(3) ALSO IS DELETED OR MODIFIED.

The Supplemental Notice proposes changes and additions to sections 26.22(b)(1) and (2) that advance the goal of implementing minimum standards for the appointment of competent counsel by adopting the standards contained in 18 U.S.C. section 3599 and 42 U.S.C. section 14163(e).[2] 77 Fed. Reg. at 7560. The fundamental problem with these improved sections is that any standards they establish are undermined by section 26.22(b)(3), which allows states the option of seeking and obtaining certification if the state standards "reasonably assure a level of proficiency appropriate for State postconviction litigation in capital cases." 76 Fed. Reg. at 11712. This option for complying with certification requirements does not provide any meaningful guidelines or criteria to ensure that minimum standards for counsel competency will be enforced or that appointed counsel's subsequent representation will sufficiently protect capital petitioners' constitutional rights. Apparently recognizing that state mechanisms may fail to adequately ensure the appointment of competent counsel, the summary accompanying the Proposed Rule suggested that states applying for certification under option (b)(3) would have to establish that their mechanism for appointment of counsel resulted in similar or higher proficiency levels as under options (b)(1) and (b)(2). 76 Fed. Reg. at 11709. This requirement, however, does not appear in the Proposed Rule or in the proposals in the Supplemental Notice. As a result, the determination of what level of proficiency is appropriate under (b)(3) is entirely discretionary.

The Proposed Rule should be revised to omit option (b)(3) entirely. The Attorney General stated that he seeks to "require a threshold of minimum counsel competency, while recognizing substantial State discretion in setting counsel competency standards." 76 Fed. Reg. at 11707. His efforts to establish minimum counsel competency standards in options (b)(1) and (b)(2), however, have been eviscerated by the unguided discretion allowed in option (b)(3). Allowing "some flexibility in the regulations does not mean that regulatory uniformity is not vital to the [statute's] success." *Chae v. SLM Corp.*, 593 F.3d 936, 946 (9th Cir.), *cert. denied*, 131 S. Ct. 458, (2010).

Indeed, it is well-established that "federal statutes are generally intended to have uniform nationwide application." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989). A regulatory framework for establishing counsel competency that allows states either to meet specific minimum standards derived from congressional and judicial determinations, or

---

[2]  Proposed Change 1 would substitute three years of post-conviction experience for the three years of felony litigation experience contained in the Proposed Rule. As the Supplemental Notice recognizes, this change reflects the standards contained in 18 U.S.C. section 3599 and comports with federal courts' holdings that Chapter 154 requires a state to appoint attorneys with post-conviction litigation experience to qualify for Chapter 154's benefits. 77 Fed. Reg. at 7560. Proposed Change 2 would incorporate additional provisions of the Innocence Protection Act codified at 42 U.S.C. section 14163(e). 77 Fed. Reg. at 7560.

simply to "reasonably assure" an "appropriate" level of proficiency, 76 Fed. Reg. at 11712, does not create such uniformity. The more critical result of failing to consistently employ minimum standards for counsel competency is that states may be certified for the expedited and limited procedures of Chapter 154 without a rigorous method for determining whether state appointments provide competent counsel that are "crucial to ensuring fairness." 135 Cong. Rec. at S13482. As the Proposed Rule permits states to substitute an undefined set of standards for national minimum standards, option (3)(b) thwarts Congress's will and undermines the carefully crafted national standards that are contained in 18 U.S.C. section 3599 and 42 U.S.C. section 14163(e).

In the alternative, if option (b)(3) remains in the Final Rule, it must be modified to include clear guidelines as to what a state must do in order to demonstrate that its mechanism ensures the appointment of competent counsel and how the Attorney General will review such a showing. As noted above, no such requirements are contained in the Proposed Rule. The Attorney General previously has noted the importance of informing states and members of the public as to the "standards [the Attorney General] will apply in making chapter 154 decisions." 75 Fed. Reg. at 71354-55. More fundamentally, a regulation is impermissibly vague when it fails to "indicate how the permitting authority is to judge" whether the regulation's conditions are met. *Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 224 (D.C. Cir. 2007) (noting in once case the agency impermissibly failed to indicate how it would judge whether there was "interference" with air quality standards, but that in another, the agency reasonably based its decision on promulgated standards a "list of relatively detailed factors"); *see also West Virginia Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 863 n.75 (D.C. Cir. 1982) ("an exercise of unfettered flexibility too often results in ad hoc judgments and arbitrary decisions, both of which are counterproductive to the greater regulatory goals of consistency in decisions and reasoned guidance upon which affected parties may rely.").

## B. PROPOSED CHANGES TO SECTION 26.22(B)(1) MUST INCLUDE ALL THE GUIDELINES APPLICABLE TO FEDERAL APPOINTMENTS UNDER 18 U.S.C. SECTION 3599.

The Attorney General based section 26.22(b)(1) on the standard for appointed counsel in capital cases in federal court, because "Congress has determined that such a counsel competency standard is adequate for capital cases." 76 Fed. Reg. at 11708. The Supplemental Notice raises the question of whether requiring three years of post-conviction litigation experience "is an appropriate measure of competency in postconviction proceedings and whether more years, fewer years, or alternative measures would constitute a more appropriate benchmark." 77 Fed. Reg. at 7560. As we previously commented, and detail further here, post-conviction as well as capital experience are critical requirements to ensure counsel competency, and we believe that including a minimum number of years of experience is a necessary but not sufficient requirement for ensuring the appointment of competent counsel. Critically, a requirement that counsel have three years of post-conviction and capital experience must be accompanied by the additional requirements and guidelines that apply to federal appointments, most of which are absent from section 26.22(b)(1) of the Proposed Rule.

Section 3006A of Title 18 requires federal courts to develop and maintain a comprehensive plan for providing representation to financially eligible people who, among other categories of individuals, seek federal habeas corpus relief pursuant to 28 U.S.C. section 2254. *See* 18 U.S.C. § 3006A(a)(2)(B). Additional sections of Title 18 provide further guidance for appointments in death penalty cases. *See* 18 U.S.C. §§ 3005, 3599. As part of this scheme of federal representation, section 3006A authorizes the Judicial Conference to "issue rules and regulations governing the operation of plans formulated under this section." 18 U.S.C. § 3006A(h). Thus, similar to the Attorney General's regulations to implement Chapter 154, the Judicial Conference's rules and regulations implement the standards and procedures governing federal appointments and are contained in its Guide to Judiciary Policy—Volume 7: Defender Services, Guidelines for Administering the CJA and Related Statutes, *Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*, http://www.uscourts.gov/FederalCourts/ AppointmentOfCounsel/CJAGuidelinesForms/GuideToJudiciaryPolicyVolume7.aspx ("Judicial Guidelines"). The combination of these statutory sections, and the rules governing their implementation, comprise the standard for counsel competency applicable to federal appointments. Such a standard directs courts to consider the following in making appointments:

- The recommendation of a local defender entity that has consulted with counsel and the court regarding the facts and circumstances of the case to determine the qualifications that may be required to provide effective representation. *See* 18 U.S.C. § 3005; Judicial Guidelines at §§ 620.30 (a), (b), and (c)(3).

- An attorney's experience in federal post-conviction proceedings and in capital post-conviction proceedings. *See* Judicial Guidelines at § 620.50.

- Minimum experience standards set forth in 18 U.S.C. § 3599(b)-(d), 18 U.S.C. § 3005, and other applicable laws or rules. *Id.* at § 620.30 (c)(1).

- Qualification standards endorsed by bar associations and other legal organizations regarding the quality of legal representation in capital cases. *Id.* at § 620.30 (c)(2).

- Proposed counsel's commitment to the defense of capital cases. *Id.* at § 620.30 (c)(4).

- Availability and willingness of proposed counsel to accept the appointment and to represent effectively the interests of the client. *Id.* at § 620.30 (c)(5).

The guidelines and requirements applicable to federal appointments are, not surprisingly, similar to those contained in the Innocence Protection Act (IPA). The federal appointment standards, if taken in their entirety, and the IPA standards thus represent relatively consistent minimum standards to ensure the appointment of competent counsel. Rather than utilizing experience measures similar to those contained in 18 U.S.C. section 3599 in isolation, section 26.22(b)(1) must incorporate the guidelines and requirements detailed above in order to reflect the standard for federal appointments. These additional guidelines also are critical to ensure that the provision that courts may appoint counsel who "would otherwise qualify for appointment

pursuant to the standards for Federal habeas corpus proceedings," 76 Fed. Reg. at 11712, is limited and defined by the appropriate standards for appointment and does not function as another standardless option that eliminates the efficacy of minimum standards.

### C. PROPOSED CHANGES TO SECTION 26.22(B)(2) DO NOT INDICATE WHAT PORTIONS OF THE INNOCENCE PROTECTION ACT WILL BE INCLUDED IN THAT OPTION FOR ASSURING COUNSEL COMPETENCY.

The Attorney General based section 26.22(b)(2) on a standard for appointed counsel "consistent with" the Innocence Protection Act ("IPA"). 76 Fed. Reg. at 11708. The Supplemental Notice specifically identifies 42 U.S.C. sections 14163(e)(2)(B), (D), and (E) as provisions that will be incorporated into the rule, and states that "to the extent that the rule uses the IPA standard as a benchmark for counsel competency, it would incorporate all directly relevant elements of that Act." 77 Fed. Reg. at 7560. Without having the text of the proposed amendments to the existing language of section 26.22(b)(2), it is not possible to determine what the Attorney General considers to be "directly relevant elements" of the IPA. Thus, the Attorney General should publish a proposed rule containing the full text of the amendments to permit the public to participate meaningfully in the rulemaking process. *See, e.g., American Iron & Steel Ins. v. EPA*, 568 F.2d 284, 291 (3d Cir. 1977) (notice of regulations must be "sufficient to fairly apprise interested parties of all significant subjects and issues involved").

The omission of 42 U.S.C. section 14163(e)(2)(C) from the list of subsections referenced in the Supplemental Notice suggests that the Attorney General may not include a requirement of appointing two attorneys in the IPA option. This omission would be detrimental in any jurisdiction and is particularly harmful in California, where trial records and case materials often consist of hundreds of thousands of pages, and litigation routinely is required simply to obtain minimal discovery. If state proceedings are to be fair and complete for purposes of Chapter 154, two attorneys are necessary to conduct a reasonably competent review and investigation, litigate collateral matters, and develop and present potentially meritorious claims in the course of state court proceedings. Such responsibilities further are complicated by limitations in federal court when a habeas corpus petitioner has failed to fully develop and present all potentially meritorious claims and supporting evidence in the state court proceedings. *See, e.g., Cullen v. Pinholster*, 131 S. Ct. 1388 (2010) (limiting federal habeas review of state court proceedings pursuant to 28 U.S.C. section 2254(d)(1) to the record before the state court). As Congress recognized in the IPA, the size and complexity of capital cases warrants the appointment of two lawyers. The severe consequences under Chapter 154 of counsel's inability to fully develop a capital case in state court only further highlight the need for such a requirement in the context of Chapter 154 certification.

### II. THE REGULATIONS MUST REQUIRE THE TIMELY APPOINTMENT OF COUNSEL.

The proposed addition of a requirement for timely appointment of state post-conviction counsel is critical to ensure competent representation, and also a necessary aspect of any reasonable interpretation of Chapter 154 certification requirements. When Congress amended Chapter 154 to authorize the Attorney General to create and implement a certification process, it did not alter

HCRC's Comments on Supplemental Notice of Proposed Rulemaking
Certification Process for State Capital Counsel Systems, OAG Docket No. 1540
March 14, 2012
Page 7

the terms and requirements of the statute. Under cannons of statutory interpretation, Congress is presumed to be aware of the court decisions interpreting the requirements for certification embodied in the terms of the statute, *see Keene Corp. v. United States,* 508 U.S. 200, 212 (1993), and to act to alter statutory language if judicial rulings incorrectly interpret congressional intent, *see Patterson v. McLean Credit Union,* 491 U.S. 164, 172-73 (1989). Because no changes were made to the statutory terms that form the requirements for certification, the Attorney General's regulations must reflect the interpretations of prior judicial rulings, which almost uniformly held that timely appointment was a required feature of the *quid pro quo* arrangement of Chapter 154.[3]

In prior comments, the HCRC has emphasized that the certification process must include consideration of state-created obstacles to counsel's ability to conduct a full investigation and develop and present potentially meritorious claims on behalf of indigent capital petitioners during state post-conviction proceedings. In California, delay in the appointment of counsel is one of the most insidious and harmful obstacles confronting state capital post-conviction counsel. Although the Supplemental Notice details some of the problems with delayed appointment that relate to filing deadlines, there are numerous other obstacles to fair and complete development of claims during state proceedings that result from the failure to timely appoint counsel.

The California Commission on the Fair Administration of Justice was established by the California State Senate to study and review the administration of criminal justice in California, examine ways of providing safeguards and making improvements, and make recommendations to ensure that the application and administration of criminal justice in California is just, fair, and accurate. Among its charges was a thorough review and analysis of the administration of the death penalty in California. *See* California Commission on the Fair Administration of Justice, *Report and Recommendations on the Administration of the death Penalty in California* (June 30, 2008), http://www.ccfaj.org/rr-dp-official.html (Commission Report). In the course of its review, the Commission identified several sources of excessive delay in California, including

---

[3]      *See, e.g., Ashmus v. Calderon,* 123 F.3d 1199, 1204, 1208 (9th Cir. 1997) (concluding that California was not in compliance with Chapter 154, *inter alia,* because counsel had not been appointed for "over 130 of the condemned California inmates," and "that counsel often is not appointed until years after a prisoner accepts the offer of counsel"); *Brown v. Puckett,* 2003 WL 21018627, *3 (N.D. Miss. 2003) (unpublished order) ("The timely appointment of counsel at the conclusion of direct review is an essential requirement in the opt-in structure. Because the abbreviated 180-day statute of limitations begins to run immediately upon the conclusion of direct review, time is of the essence. Without a requirement for the timely appointment of counsel, the system is not in compliance."); *Mills v. Anderson,* 961 F. Supp. 198, 201 n.4 (S.D. Ohio 1997) (observing that the timing of appointment of counsel, where Ohio statute provided for appointment of counsel after the post-conviction petition had been filed, "might well" preclude the application of Chapter 154); *Hill v. Butterworth,* 941 F. Supp. 1129, 1147 (N.D. Fla. 1996) ("counsel must be immediately appointed after a capital defendant accepts the state's offer of postconviction counsel"); *Ashmus v. Calderon,* 935 F. Supp. 1048, 1074-75 (N.D. Cal. 1996) ("The failure to appoint counsel after an indigent prisoner has accepted such an offer contravenes the express requirement of § 2261(c), ... see also 1991 Analysis, 137 Cong. Rec. at S3220 ('*At a minimum,* the *immediate* benefits to defendants would include the requirement that states electing these procedures *actually appoint* counsel for the collateral proceedings ...').") (emphasis in opinion).

delays of 8 to 10 years after sentencing for the appointment of state post-conviction counsel. *Id.* at 24.

The extraordinary delay in the appointment of counsel interferes in the full and fair investigation and development of claims in numerous ways. Collection and review of records to inform investigation and support post-conviction claims is a well-recognized obligation of any capital counsel. *See, e.g.*, *Porter v. McCollum*, 130 S. Ct. 447, 453 (2009) (counsel ineffective for failing to collect school, medical, or military service records); *Rompilla v. Beard*, 545 U.S. 374, 383 (2005) (counsel ineffective for failing to obtain and review court file); ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (rev. ed. 2003), 31 Hofstra L. Rev. 913, 1024-25 (2003) (discussing and listing range of relevant records competent counsel must attempt to obtain). For post-conviction counsel, however, the lengthy passage of time frequently leads to the destruction, loss, contamination, or scattering of numerous critical records including sealed trial records; defense and prosecution files; forensic evidence; education, employment, mental health, and medical records; state bar records of disciplined trial attorneys; and many other relevant records.

In addition to lost trial and evidentiary material, the death of key witnesses—such as trial counsel, eyewitnesses, alibi witnesses, or witnesses to the defendant's mental state or mental functioning—or the fading of their memories over time, are devastating casualties of the long delay between sentencing and the appointment of capital post-conviction counsel. This attrition only increases as state habeas petitions languish in the state court. In California, there is a significant delay from the time a state habeas petition is filed to the time it is heard and resolved in the California Supreme Court. The Commission on the Fair Administration of Justice found an average delay of 22 months from the filing of a petition to a decision. *See* Commission Report at 24; *see also* Judge Arthur L. Alarcon, *Remedies for California's Death Row Gridlock*, 80 S. Cal. L. Rev. 697, 741 (2007) (noting that, in 2007, taking into consideration both capital and non-capital cases, which are resolved more quickly, the average delay between the filing of a state petition and the issuance of this Court's decision was twenty-two months). In the experience of our office, it is not uncommon to wait 3 to 4 years or longer for a decision after the filing of a petition. By the time state proceedings are complete and the case enters federal court, an even greater number of witness and memories are lost.

Delays in the appointment of counsel thus are responsible for such significant losses of evidence and ability to develop and present claims that they prevent the primary goal of Chapter 154—providing "one complete and fair course of collateral review in the state and federal system." 135 Cong. Rec. at S13482. Thus, we applaud the change in the Proposed Regulation that recognizes the requirement of "reasonably timely" appointment of counsel, 77 Fed. Reg. at 7560, and urge the Attorney General to clarify that the timing of appointment must be reasonable in light of state and federal statutes of limitations, as well as the preservation of evidence immediately following sentencing.

Case4:13-cv-04517-CW Document1 Filed09/30/13 Page108 of 135

HCRC's Comments on Supplemental Notice of Proposed Rulemaking
Certification Process for State Capital Counsel Systems, OAG Docket No. 1540
March 14, 2012
Page 9

## III.   THE REGULATIONS MUST BE MODIFIED TO DETAIL THE SHOWING NECESSARY FOR MEETING OR REBUTTING THE PRESUMPTIVE CERTIFICATION.

In proposing presumptive certification, the Attorney General acknowledges that a Chapter 154 certification process must consider not only a state's showing of compliance with specified requirements, but also "whether the presumption that the standards described in the rule are adequate may be overcome in light of unusual circumstances presented by a particular State system." 77 Fed. Reg. at 7561. The object of allowing the presumption to be overcome is to ensure that "the mechanism, as implemented in the particular State, is in fact reasonably likely to lead to the timely provision of competent counsel to State habeas petitioners." *Id.*

Ensuring that a state mechanism functions in practice to timely provide competent counsel is a requirement of the Chapter 154 *quid pro quo* scheme that already has been established in judicial interpretations of the statute. *See, e.g., Tucker v. Catoe,* 221 F.3d 600, 604-05 (4th Cir. 2000) (noting that "[i]t would be an astounding proposition if a state could benefit from the capital-specific provisions of AEDPA by enacting, but not following, procedures promulgated [to meet Chapter 154 requirements]."). The Attorney General's proposed revision therefore is an important correction necessary to ensure the purpose of the statute and fulfill the intent of Congress. Nonetheless, certain modifications to the proposed amendments are necessary to guarantee that the states' burdens of establishing their entitlement to the benefits of Chapter 154 are maintained.

### A. A PRESUMPTION SHOULD NOT ATTACH UNTIL A STATE HAS CARRIED THE BURDEN OF DEMONSTRATING THAT REQUIRED STANDARDS ARE IN FACT IMPLEMENTED IN THE STATE.

Any final regulation must require states to bear the burden of demonstrating not only the existence of specific standards set forth in the rule, but also how the mechanism's various provisions are "implemented in the particular State" in compliance with those standards. 77 Fed. Reg. at 7561.

As Congress made clear in Chapter 154, "it is entirely the states' decision whether to opt-in—by so choosing the states are properly allocated the burden of proving compliance." *Ashmus v. Calderon,* 31 F. Supp. 2d 1175, 1183 (N.D. Cal. 1998) (citing the Powell Committee Report); *see also Calderon v. Ashmus,* 523 U.S. 740, 747 (1998) (holding that invoking the procedures of Chapter 154 constitutes an affirmative defense employed by the state in habeas corpus proceedings); *Hunter v. Bryant,* 502 U.S. 224, 233 (1991) (government officials bear the burden of establishing their affirmative defenses). This also is in keeping with the "normal assumption that an applicant is not entitled to benefits unless and until he proves his eligibility." *Lavine v. Milne,* 424 U.S. 577, 584 (1976).

A certification process that allows state applicants to be presumptively certified on the basis of minimal facial showings is contrary to the purpose of Chapter 154, and intolerably unfair to state capital petitioners. First, such a certification process would improperly allow states to demand that capital petitioners who proceed to federal court comply with Chapter 154 without the state

making any showing that the state mechanism is implemented throughout the state's cases. For states, where, for example, litigation expenses are theoretically promised but not provided, all affected petitioners who did not have the opportunity to fully develop their cases in state court nonetheless would be bound by the expedited and limited procedures of Chapter 154 unless they were able to individually and successfully challenge its application in Federal court. Second, allowing states to be certified without making proper showings simply shifts the responsibility for identifying state failures to the federal courts. This is contrary to the purpose of the amendments to Chapter 154 that designated the Attorney General as the federal authority responsible for determining whether state mechanisms comply with Chapter 154, and unfairly taxes both the federal courts and capital petitioners.

Finally, the Attorney General would be acting contrary to his statutory authority and responsibilities as well as the purpose of Chapter 154 if he were to certify a state based on a minimal written request and leave the job of demonstrating state-wide *non-compliance* to indigent capital petitioners and their counsel. It often will be virtually impossible for individual defense counsel or defense organizations to develop and present the systemic failures of a state mechanism upon which the Attorney General should rely. This job belongs in the first instance to the states that wish to obtain the benefits of certification.

## B. THE SUPPLEMENTAL NOTICE DOES NOT PROVIDE ANY MEASURE BY WHICH THE ATTORNEY GENERAL WILL PRESUME COMPLIANCE WITH SPECIFIC STANDARDS OR DETERMINE THAT THE PRESUMPTION HAS BEEN OVERCOME.

The Supplemental Notice does not indicate how the Attorney General will determine whether a state mechanism has satisfied "the specific standards for competency and compensation" that are provided in a final rule. 77 Fed. Reg. at 7561. Currently, the only requirement for state applicants is to submit a "request in writing that the Attorney General determine whether the State meets the requirements of certification under § 26.22." 76 Fed. Reg. at 11713.

The Attorney General has acknowledged that in some cases a state mechanism, though it appears to meet required standards, may not be adequate "in the context of the State in which it operates." *Id.* The Proposed Regulation must be modified to provide clear guidelines for determining when a state mechanism is not functioning adequately. When the Powell Committee proposed what became the Chapter 154 *quid pro quo* scheme, it "aimed at achieving this goal: Capital cases should be subject to one complete and fair course of collateral review in the state and federal system." 135 Cong. Rec. at S13482. This straightforward statement suggests that a state mechanism should function adequately in all state cases, an interpretation that federal courts have adopted. *See, e.g., Satcher v. Netherland,* 944 F. Supp. 1222, 1245 (E.D. Va. 1996) ("Strict interpretation of the stringent opt-in requirements of the Act is not mere formalism. Rather, strict interpretation is necessary to meaningfully effectuate the quid pro quo arrangement which lies at the core of Chapter 154"). The Attorney General should make this clear in any amendment that includes presumptive certification, or provide clear guidelines for any different measure he will utilize to determine when a state mechanism is "adequate."

### C. THE PROPOSED RULE MUST INCLUDE PAYMENT OF LITIGATION EXPENSES TO BE CONSIDERED DURING CERTIFICATION PROCEEDINGS.

The Supplemental Notice states that the Attorney General is considering amending sections 26.22 (b) and (c) of the Proposed Rule "to state that the Attorney General will 'presumptively' certify that a State has established a sufficient mechanism for the appointment of competent counsel if he determines that the mechanism satisfies the specific standards for competency and compensation set out" in the regulation. 77 Fed. Reg. at 7561. It appears that the omission from this proposal of section 26.22 (d)—the requirement that a state mechanism provide for payment of reasonable litigation expenses—may be inadvertent, as payment of reasonable litigation expenses, along with competency and compensation, unquestionably is among the requirements of the Proposed Rule and Chapter 154. *See, e.g.,* 28 U.S.C. § 2265(a)(1)(A).

As with the mechanism for counsel competency and compensation, the Attorney General must be able to consider whether, in keeping with section 26.22 (d) requirements, a state mechanism that includes presumptive limits on the payment of litigation expenses, is implemented in the particular state in a manner that *in fact* authorizes for payment of expenses above such limits. For example, some state mechanisms provide for funding of expenses above presumptive limits and courts may approve them, but the source from which payment is to be drawn has been defunded or eliminated.   Systemic financial problems that prevent state mechanism from functioning properly have become increasingly common over the years of state budget crises. The Attorney General must amend the Proposed Regulation to allow for his consideration of these issues as they relate to litigation expenses, as well as the other requirements.

### D. HABEAS PETITIONERS AND DEFENSE COUNSEL MUST HAVE ACTUAL NOTICE OF A STATE APPLICATION FOR CERTIFICATION

As notice is currently proposed—with a state's application for certification appearing only in the Federal Register—a state's certification could proceed without local capital defense counsel, defense organizations, or capital petitioners ever knowing that a state submitted an application. Greater notice of a state application is required; particularly if defense counsel will be required to bear some or all of the burden of evaluating a state application to ensure a state's compliance with the requirements of Chapter 154. At the very least, the state official who seeks certification on behalf of a state should be required to provide individual notice to all death-row inmates and defense counsel of record in capital post-conviction cases in the state, as well as to state-wide and national organizations that provide assistance to such counsel.

### E. THE SUPPLEMENTAL NOTICE FAILS TO PROVIDE PROPOSED LANGUAGE FOR AMENDING SECTION 26.22 TO INCLUDE PRESUMPTIVE CERTIFICATION.

In making these comments, we have raised a variety of possibilities that seem plausible from the discussion of presumptive certification contained in the Supplemental Notice. Without the text of proposed amendments to section 26.22, however, we are unable to anticipate how the proposal might function and fully address it during this comment period. The Attorney General should publish an amended section 26.22 for public comment before issuing a final rule containing the proposed language.

## IV. THE PROPOSED RULE MUST CLARIFY THE PUBLIC'S RIGHT TO SEEK REPEAL OF A STATE'S CERTIFICATION AND INCLUDE DECERTIFICATION PROCEDURES.

The Attorney General suggests changing the Proposed Rule to require renewal of state certification every five years. 77 Fed. Reg. at 7562. This change appropriately recognizes the potential for changes in a state mechanism, or a state's ability to comply with its mechanism, that may be necessary to address through periodic renewal. The Attorney General's rule should also clarify, however, that, regardless of any provisions related to periodic renewal, interested parties always are allowed to request the Attorney General's reconsideration, amendment, or repeal of existing rules establishing certification. To suggest otherwise would be contrary to the Administrative Procedure Act, which "requires agencies to give interested parties the right to petition for the issuance, amendment, or repeal of a rule ... [and] give prompt notice and a brief explanation of the grounds for the denial of such a petition." *National Wrestling Coaches Ass'n v. Dept. of Educ.*, 366 F.3d 930, 948 (D.C. Cir. 2004) (citing 5 U.S.C. sections 553(e) and 555(e)); *see also Natural Resources Defense Council v. Abraham*, 355 F.3d 179, 203 (2d Cir. 2004) (5 U.S.C. section 553(e) "establishes a party's right to petition an agency to initiate a new rulemaking, including a rulemaking to amend or rescind a final rule prescribed by an agency.").

In addition to providing information about interested parties' ability to petition to rescind or repeal a state's certification, the Attorney General's rule should include specific provisions for decertifying states that no longer comply with the state mechanism that initially was presented to the Attorney General for certification. The Innocence Protection Act provides a model for how Congress envisioned regular enforcement and decertification of a scheme that seeks to promote adequate representation for indigent capital defendants. In the IPA, Congress established a grant program to improve capital representation and included extensive requirements for regular review of compliance by the Inspector General, reporting of compliance findings for public comment, penalties for non-compliance, and discontinuation of funding for failure to take corrective actions after a finding of non-compliance. *See* 42 U.S.C. § 14163d. The Proposed Rule should include these provisions as part of the decertification process.

## V. CONCLUSION

The Attorney General's Proposed Rule and Supplemental Notice reflect important developments in the Attorney General's understanding about his responsibility in promulgating regulations to implement Chapter 154 certification and the standards and procedures that will govern that process. Many descriptions of the process and standards the Attorney General is considering—and that are critical to implementation of the statute—remain in the language of preamble and summary descriptions and are not contained the in specific proposed language to govern certification. We encourage the Attorney General to ensure that the specific requirements of Chapter 154 are expressly enforced in the final rule and the Attorney General continue to improve the Proposed Rule with specific regulatory requirements that fully reflect minimum standards, burdens of proof, and critical procedures necessary for a fair certification process.

HCRC's Comments on Supplemental Notice of Proposed Rulemaking
Certification Process for State Capital Counsel Systems, OAG Docket No. 1540
March 14, 2012
Page 13

We appreciate providing our input on these critical issues and hope that the Attorney General affords the HCRC and other interested parties the opportunity to submit further comments as the formulation of the final rule progresses.

Sincerely,


/s/ Michael Laurence
Michael Laurence
Executive Director


/s/ Barbara Saavedra
Barbara Saavedra
Staff Attorney

# Exhibit 5

**Comments by Federal Public Defenders and Community Defenders**
**re: Supplemental Notice of Proposed Rulemaking**

On behalf of the federal public defender and community defender offices in the fifty states, the District of Columbia, Puerto Rico, the Virgin Islands, and Guam, we offer the following comments on the Supplemental Notice of Proposed Rulemaking – OAG Docket number 1540 – regarding the certification process for state capital counsel systems.

**Statement of Interest**

Federal public defender offices and community defender organizations represent indigent criminal defendants pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A, and the Sixth Amendment to the United States Constitution. Thirty-four states currently have the death penalty. Federal public defenders and community defenders in a number of those states represent indigent death row prisoners in federal habeas corpus actions challenging state court judgments. Specifically, defenders in the following districts have capital habeas units with staff dedicated to the representation of federal capital habeas petitioners who are directly affected by the regulations proposed by the Attorney General:  Middle District of Alabama; District of Arizona; District of Arkansas; Central District of California; Eastern District of California; District of Delaware; Northern District of Georgia; District of Idaho; District of Nevada; Northern District of Ohio; Southern District of Ohio; Western District of Oklahoma; Eastern District of Pennsylvania; Middle District of Pennsylvania; Western District of Pennsylvania; Eastern District of Tennessee; and Middle District of Tennessee. An additional capital habeas unit has been authorized in the Northern District of California, but it is not yet operational.

Defenders with the capital habeas units in these districts represent 685 petitioners in federal habeas corpus actions challenging state court death judgments. These districts are located in eight of the top thirteen states ranked by number of death row prisoners, and well over one-half of death-sentenced prisoners are located in these states. (According to an October 1, 2006 study, California ranks first in the number of state death row prisoners, Pennsylvania fourth, Alabama sixth, Arizona eighth, Tennessee ninth, Georgia tenth, Oklahoma eleventh, and Nevada thirteenth.) Defenders in these districts also give advice and training to private attorneys representing federal habeas petitioners challenging state death judgments. Thus, through their representation of state death row prisoners, and in the advice they provide to private attorneys working on behalf of the same class of clients, these defenders are directly and critically affected by the regulations proposed by the Attorney General.

Federal public defender and community defender offices located in states with the death penalty, but who do not have staff dedicated to representing capital habeas petitioners challenging state court judgments, also have an interest in the regulations. Some defender offices in these districts represent death-sentenced prisoners in federal habeas proceedings on an individual basis: at this time, there are 36 additional federal capital habeas corpus cases handled by federal defender or community defender offices without a designated capital habeas unit. Additionally, defenders in

these districts often receive inquiries from state death row prisoners seeking federal habeas corpus counsel and advice on their cases. These defenders often locate private counsel to represent such prisoners in federal capital habeas corpus actions, and frequently advise these prisoners on issues such as the statute of limitations (significantly shortened under Chapter 154) and claim filing (different under Chapter 154, for example, to the extent that the ability to amend a petition is significantly constrained once the state files an answer).

Defenders located in the fifteen states and other jurisdictions that do not have the death penalty are also affected by the Attorney General's Proposed Regulations. In a number of these states, legislation is pending to reinstate the death penalty. Defenders in these jurisdictions, like the defenders in the thirty-four death penalty states, have unique expertise and experience in dealing with the United States Attorney General and attorneys under his jurisdiction. The Final Rule, relying primarily on comments by two legislators in support of the Act, depict the Attorney General as a neutral arbiter who is capable of promulgating rules that will fairly guide the process for determining whether a state qualifies for Chapter 154 benefits. Defenders in these jurisdictions have unique and important insight to give on the question of the Attorney General's purported neutrality and objectivity in deciding the issues assigned for him/her to determine under the Act and in formulating the Proposed Regulations implementing the Act.

We offer these comments on behalf of our clients, the persons on death rows in our jurisdictions, and those who may become our clients.

## Comments on Proposed Changes

### I.    Proposed Change 1

The Department of Justice proposal to replace "felony litigation" experience in the counsel competency requirements contained in section 26.22(b)(1) of the proposed rule, with the requirement of "postconviction litigation" experience, is an important improvement to the requirements a state must meet prior to certification under Chapter 154 of Title 28. *Certification Process for State Capital Counsel Systems, Supplemental notice of proposed rulemaking*, 77 Fed. Reg. 7559, 7560 (Feb. 13, 2012) ("supplemental notice"); *Certification Process for State Capital Counsel Systems, Proposed rule*, 76 Fed. Reg. 11705 (Mar. 3, 2011) ("proposed rule"). The change appropriately acknowledges that the demands of post-conviction litigation differ from other aspects of criminal defense representation and require unique expertise.

The requirements for section 26.22(b)(1), however, still are less demanding than the minimum federal requirements for capital post-conviction counsel that apply to appointments made pursuant to 18 U.S.C. section 3599, on which section 26.22(b)(1) of the rule is based. The rule to implement Chapter 154 must be further improved to reflect minimum Federal standards.

As the Department acknowledges, the Federal guidelines for the appointment of capital post-conviction counsel include experience in *capital* post-conviction proceedings. *See* 77 Fed. Reg.

at 7560 (citing Judicial Conference of the United States, Committee on Defender Services, Subcommittee on Federal Death Penalty Cases, Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation (May 1998) ("1998 Recommendations")). The 1998 Recommendations explain that "Federal death penalty cases require knowledge of the extensive and complex body of law governing capital punishment and the intricacies of federal criminal practice and procedure. Neither one alone is sufficient to assure high quality representation." 1998 Recommendations at 11 (emphasis in original).

Requirements for the appointment of capital post-conviction counsel in federal cases are based not only on the requirements set forth in 18 U.S.C. section 3599, but also on those in 18 U.S.C. section 3005, which requires the appointment of counsel "learned in the law applicable to capital cases." 18 U.S.C. § 3005. The Federal guidelines for appointment of counsel in capital cases, define "learned counsel" in the following way: "Ordinarily, 'learned counsel' (see: 18 U.S.C. § 3005) should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in state death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high-quality representation." Guide to Judiciary Policy-Volume 7: Defender Services, *Guidelines for Administering the CJA and Related Statutes, Chapter 6: Federal Death Penalty and Capital Habeas Corpus Representations*, Procedures for Appointment of Counsel in Federal Death Penalty Cases, § 620.30(e), http://www.uscourts.gov/FederalCourts/AppointmentOfCounsel/ CJAGuidelinesForms/vol7PartA/vol7PartAChapter6.aspx ("Federal Guidelines"). *See also id.* at § 620.50 (mandating that when "appointing post-conviction counsel in a case where the defendant is sentenced to death, courts should consider the attorney's experience in federal post-conviction proceedings and in capital post-conviction proceedings, as well as the general qualifications identified in § 620.30 and § 620.60.20.").

The requirement of capital experience is warranted for many, well-established reasons, including the fact that there is no equivalent for post-conviction litigation that involves the penalty phase of a capital case. As the 1998 Recommendations summarized, "Lawyers and judges recounted cases in which seasoned federal criminal lawyers who lacked death penalty experience missed important issues. For example, one judge described a situation in which experienced and highly esteemed felony trial lawyers who had no capital experience simply did not know how to pursue the mitigation investigation required by the case." 1998 Recommendations at 11-12.

Mastery of state procedural default rules and Federal statutes of limitation for capital cases are other areas of expertise that are essential to ensuring full and fair review of potentially meritorious claims of constitutional violation. We have seen, for example, that appointed post-conviction counsel who lack capital experience and are not well versed in federal procedural requirements fail to comply with Federal deadlines for filing or preserve claims while in state court, thus forfeiting Federal review of potentially meritorious claims for relief from a capital conviction. *See, e.g.*, Comment of Mark Olive, Dept. of Justice Docket No. DOJ-OAG-2011-0004-0013 (June 1, 2011) at 2-4. In several jurisdictions, state post-conviction counsel do not continue their representation into Federal court; in that context counsel are even more likely to be unfamiliar with

critical Federal procedures and deadlines-including those of Chapter 154 should their state become certified.

Requiring a state mechanism to provide for the appointment of counsel with capital post-conviction experience therefore is a necessary component of any standard for ensuring competent counsel. We continue to maintain, as we detailed in our prior comments, that any measure of experience alone is insufficient to ensure the appointment of counsel who perform competently. Any federal minimum standard must include, at the very least, requirements for experience in capital and post-conviction capital proceedings, as well as specialized training, demonstrated competence according to well-established performance standards, and removal of capital post-conviction counsel who fail to provide effective representation.

## II.    Proposed Change 2

The Department of Justice proposal to include additional provisions of the Innocence Protection Act ("IPA") in section 26.22(b)(2) that are "integral elements of the IPA's comprehensive approach to counsel qualifications," also is an improvement to the requirements a state must meet prior to certification under Chapter 154. 77 Fed. Reg. at 7560. As we noted above, the requirements of specialized training, performance monitoring, and removal of inadequately performing attorneys contained in the IPA are important elements of any federal minimum standard to ensure counsel competency.

It is not apparent from the supplemental notice, however, which of the IPA elements the Department is considering including in the rule. The supplemental notice identifies 42 U.S.C. sections 14163(e)(2)(B), (D), and (E) as specific provisions to incorporate into the rule, but also states that "to the extent that the rule uses the IPA standard as a benchmark for counsel competency, it would incorporate all directly relevant elements of that Act." 77 Fed. Reg. at 7560. Because the supplemental notice does not provide specific proposed amendments to the existing proposed language of section 26.22(b)(2), it is impossible to determine what the Department considers to be "directly relevant elements" of the IPA, and we are unable to comment on the scope of the possible change.

The failure to include 42 U.S.C. section 14163(e)(2)(C) along with the other subsections of 14163(e)(2) in the supplemental notice suggests that the Department does not consider the appointment of two attorneys to be "integral" to the counsel qualifications of the IPA. This omission is inappropriate. Federal guidelines counsel that "[d]ue to the complex, demanding, and protracted nature of death penalty proceedings, judicial officers should consider appointing at least two attorneys." Federal Guidelines, § 620.10.20 (addressing the number of counsel to appoint in Federal habeas corpus proceedings). Because certification results in expedited and limited proceedings in the Federal courts, full representation by two qualified attorneys during state post-conviction proceedings should be required of any state mechanism.

As we indicated in the prior section, IPA requirements of specialized training, performance monitoring, and removal of inadequately performing attorneys, along with requirements for

experience in capital and post-conviction capital proceedings, should be part of any federal minimum standard to ensure counsel competency. By allowing states to use measures of experience only, as in section 26.22(b)(1), or to avoid specific measures of any kind, as in section 26.22(b)(3), the Department fails to establish minimum Federal guidance to ensure counsel competency that Congress intended the Attorney General to provide.

### III.    Proposed Change 3

As the Department of Justice recognizes, Federal courts previously have determined that timely provision of competent counsel is one of the most important aspects of the Chapter 154 scheme. 77 Fed. Reg. at 7561 (citing Federal court interpretations of Chapter 154 as requiring timely appointment of counsel). This is necessary not only to ensure full and fair development of potentially meritorious claims prior to state and Federal deadlines for filing such claims, but also to preserve critical physical evidence, records, witnesses, and memories. The requirement of "timely" provision of competent counsel therefore should be considered not only in terms of state and federal procedural deadlines, but also in terms of proximity to the capital trial and conviction.

### IV.    Proposed Change 4

The Department of Justice proposes the addition of presumptive certification to the final rule, but there is no indication how this might be accomplished, or specifically what it would require of state applicants or those seeking to challenge state applications for certification. The supplemental notice states that the Department of Justice is considering amending sections 26.22 (b) and (c) of the proposed rule, but does not include the amended sections for consideration or disclose the language that would comprise the final rule. As a result, we are unable to understand or meaningfully comment on, the full range of potential issues raised by this suggested change.

The Department of Justice proposal of "presumptively" certifying states that meet certain requirements recognizes that a state that appears in a written application to meet Chapter 154 requirements may not be adequate "in the context of the State in which it operates." 77 Fed. Reg. at 7561. Thus, the Department seems to acknowledge that defense counsel must be allowed to raise the inadequacy of the mechanism during the state application for certification or in individual cases in federal court. *See id.* (noting that "the Department remains of the view that whether a State has complied with its mechanism in an individual case is a question the statue assigns to the Federal habeas courts"). Though opportunities to challenge a state's assertion of compliance with Chapter 154 are necessary features of any certification scheme, they must not be the only means of ensuring compliance with the statute's requirements.

First, states seeking certification bear the burden of affirmatively establishing compliance with 2261(c) and (d) as well as other certification requirements. *See Calderon v. Ashmus*, 523 U.S. 740, 747 (1998) (holding that invoking the procedures of Chapter 154 constitutes an affirmative defense employed by the state in habeas corpus proceedings); *Hunter v. Bryant*, 502 U.S. 224, 233 (1991) (stating that government officials bear the burden of establishing their affirmative defenses).

The Attorney General's regulations therefore must make it clear that states that apply for certification must document how the state mechanism accomplishes each requirement of certification. This should include a showing of the average length of time from a capital conviction to the appointment of post-conviction counsel, and the qualifications, compensation rates, and paid litigation expenses of specific counsel appointed under the mechanism prior to an application for certification.

In order to hold state applicants to their burden of proof, the Attorney General must also provide a measure for how he will determine whether a state mechanism is likely to result in the timely provision of competent counsel. The Attorney General may require appointments to comply with Chapter 154 in all, most, or a majority of cases in a particular period of time, or could use a variety of other measures of a state mechanism's effectiveness. State applicants and defense interests responsible for responding to a state application must know what measures will be applied to evaluate the effectiveness of the state mechanism so that they can evaluate their respective positions and efforts regarding certification.

Allowing for presumptive certification without requiring a specific initial showing of compliance by state applicants leaves Federal courts to correct the systemic failure of the state's mechanism in all individual cases affected by it. This approach impermissibly allows states to insist on compliance with Chapter 154 until a court determines otherwise, and frustrates Congress's intent of having systematic review of a state mechanism by amending Chapter 154 and placing the authority for state certification with the Attorney General.

Finally, it is not appropriate to provide notice of a state application for certification only through the Federal Register. Affected individuals and defense counsel and organizations must receive actual notice when a state applies for certification, especially if they are expected to provide critical information about whether the state mechanism functions effectively in a sufficient number of cases. Federal Defender offices in states applying for certification should be included among the organizations immediately notified of a state application so that they may help ensure that appropriate notice of relevant application materials and deadlines reaches interested parties.

## V. Proposed Change 5

The Department of Justice proposes changes to the proposed rule that require periodic renewal of state certification. This change appropriately recognizes the potential for changes in a state mechanism, or a state's ability to comply with its mechanism, that may require regular regulatory attention. There should also be included in the rule procedures for decertification if necessary prior to renewal of certification. Barring specific provisions for decertification, the Department should clarify that in making Proposed Change 5, it is not attempting to preclude other standard procedures for requesting agency action that are granted by the Administrative Procedure Act.

## Conclusion

We urge the Attorney General to implement these additional comments and concerns, and to provide the full text of proposed changes raised in the supplemental notice for full consideration by the public prior to issuance of a final rule.

Christine Freeman
Executive Director, Federal Defender
Program, Inc.
Middle District of Alabama

Kevin Butler
Executive Director, Alabama Northern
Federal Public Defender
Northern District of Alabama

Carlos Williams
Executive Director, Southern Federal
Defender Program, Inc.
Southern District of Alabama

Fred Richard Curtner
Federal Public Defender
District of Alaska

Jon M. Sands
Federal Public Defender
District of Arizona

Jenniffer Morris Horan
Federal Public Defender
Eastern District of Arkansas

Sean K. Kennedy
Federal Public Defender
Central District of California

Daniel J. Broderick
Federal Public Defender
Eastern District of California

Geoffrey A. Hansen
Acting Federal Public Defender
Northern District of California

Reuben Cahn
Executive Director, Federal Defenders of San
Diego, Inc.
Southern District of California

Raymond P. Moore
Federal Public Defender
Districts of Colorado and Wyoming

Terence S. Ward
Federal Public Defender
District of Connecticut

Edson A. Bostic
Federal Public Defender
District of Delaware

A. J. Kramer
Federal Public Defender
District of District of Columbia

Donna Lee Elm
Federal Public Defender
Middle District of Florida

Randolph P. Murrell
Federal Public Defender
Northern District of Florida

Michael Caruso
Federal Public Defender
Southern District of Florida

Cynthia Roseberry
Executive Director, Federal Defenders of the
Middle District of Georgia, Inc.
Middle District of Georgia

Stephanie Kearns
Executive Director, Georgia Federal Defender
Program, Inc.
Northern District of Georgia

John T. Gorman
Federal Public Defender
District of Guam

Peter C. Wolff
Federal Public Defender
District of Hawaii

Samuel Richard Rubin
Executive Director, Federal Defender Services
of Idaho, Inc.
District of Idaho

Jonathan E. Hawley
Federal Public Defender
Central District of Illinois

Carol Brook
Executive Director, Illinois Federal Defender
Program, Inc.
Northern District of Illinois

Phillip J. Kavanaugh
Federal Public Defender
Southern District of Illinois

Jerome T. Flynn
Executive Director, Federal Community
Defenders, Inc.
Northern District of Indiana

William E. Marsh
Executive Director, Indiana Federal
Community Defender, Inc.
Southern District of Indiana

James F. Whalen
Federal Public Defender
Southern District of Iowa

Cyd Gilman
Federal Public Defender
District of Kansas

Scott T. Wendelsdorf
Executive Director, Western Kentucky
Federal Community Defender, Inc.
Western District of Kentucky

Virginia L. Schlueter
Federal Public Defender
Eastern District of Louisiana

Rebecca L. Hudsmith
Federal Public Defender
Middle and Western Districts of Louisiana

David Beneman
Federal Public Defender
District of Maine

James Wyda
Federal Public Defender
District of Maryland

Miriam Conrad
Federal Public Defender
Districts of Massachusetts, New Hampshire
and Rhode Island

Miriam L. Siefer
Chief Federal Defender, Legal Aid &
Defender Association of Detroit
Eastern District of Michigan

Page 8 of 11

Raymond Kent
Federal Public Defender
Western District of Michigan

Katherian D. Roe
Federal Public Defender
District of Minnesota

Samuel Dennis Joiner
Federal Public Defender
Southern District of Mississippi

Lee Lawless
Federal Public Defender
Eastern District of Missouri

Raymond C. Conrad
Federal Public Defender
Western District of Missouri

Anthony R. Gallagher
Executive Director, Federal Defenders of
Montana
District of Montana

David R. Stickman
Federal Public Defender
District of Nebraska

R. L. Valladares
Federal Public Defender
District of Nevada

Richard Coughlin
Federal Public Defender
District of New Jersey

Stephen P. McCue
Federal Public Defender
District of New Mexico

Lisa Peebles
Federal Public Defender
Northern District of New York

David Patton
Executive Director, Federal Defenders of New
York, Inc.
Southern District of New York

Marianne Mariano
Federal Public Defender
Western District of New York

Thomas P. McNamera
Federal Public Defender
Eastern District of North Carolina

Louis C. Allen III
Federal Public Defender
Middle District of North Carolina

Henderson Hill
Executive Director, Federal Defenders of
Western North Carolina, Inc.
Western District of North Carolina

Dennis G. Terez
Federal Public Defender
Northern District of Ohio

S. S. Nolder
Federal Public Defender
Southern District of Ohio

Julia L. O'Connell
Federal Public Defender
Northern and Eastern Districts of Oklahoma

Susan M. Otto
Federal Public Defender
Western District of Oklahoma

Steven T. Wax
Federal Public Defender
District of Oregon

Leigh Skipper
Chief Federal Defender, Defender Association
of Philadelphia
Eastern District of Pennsylvania

James V. Wade
Federal Public Defender
Middle District of Pennsylvania

Lisa B. Freeland
Federal Public Defender
Western District of Pennsylvania

Hector E. Guzman, Jr.
Federal Public Defender
District of Puerto Rico

Parks Nolan Small
Federal Public Defender
District of South Carolina

Neil Fulton
Federal Public Defender
Districts of North Dakota and South Dakota

Elizabeth B. Ford
Executive Director, Federal Defender Services
of Eastern Tennessee, Inc.
Eastern District of Tennessee

Henry A. Martin
Federal Public Defender
Middle District of Tennessee

Stephen B. Shankman
Federal Public Defender
Western District of Tennessee

G. Patrick Black
Federal Public Defender
Eastern District of Texas

Richard A. Anderson
Federal Public Defender
Northern District of Texas

Marjorie A. Meyers
Federal Public Defender
Southern District of Texas

Henry J. Bemporad
Federal Public Defender
Western District of Texas

Kathryn N. Nester
Federal Public Defender
District of Utah

Michael L. Desautels
Federal Public Defender
District of Vermont

Edson A. Bostic
Federal Public Defender
District of Virgin Islands

Michael S. Nachmanoff
Federal Public Defender
Eastern District of Virginia

Larry W. Shelton
Federal Public Defender
Western District of Virginia

Andrea George
Executive Director, Federal Defenders of
Eastern Washington
Eastern District of Washington

Thomas W. Hillier II
Federal Public Defender
Western District of Washington

Brian J. Kornbrath
Federal Public Defender
Northern District of West Virginia

Mary Lou Newberger
Federal Public Defender
Southern District of West Virginia

Daniel Stiller
Federal Defender, Federal Defender Services
of Wisconsin, Inc.
Eastern and Western Districts of Wisconsin

# Exhibit 6



TOM HORNE
ATTORNEY GENERAL

OFFICE OF THE ATTORNEY GENERAL
STATE OF ARIZONA

April 18, 2013

Honorable Eric H. Holder, Jr.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530–0001

### RE: Opt-in under 28 U.S.C. § 2265(a)

Dear General Holder:

I write to request certification that Arizona qualifies for "opt-in" status entitling Arizona to take advantage of the expedited federal habeas corpus review procedures in capital cases under chapter 154, *Special Habeas Corpus Procedures in Capital Cases*, 28 U.S.C. §§ 2261–2266. I believe that Arizona meets the statutory requirements for opt-in status, and that Arizona's system of appointing qualified, well-compensated counsel in state post-conviction proceedings entitles Arizona to qualify to "opt-in" under the statute.

Chapter 154 provides for expedited federal habeas corpus review in capital cases for states that establish a mechanism for providing qualified counsel to indigent capital defendants in state post-conviction proceedings. These procedures have been in place since the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2261.

The statutory requirements under Section 2261 provide that a state seeking certification (1) "establish a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent prisoners who have been sentenced to death," 28 U.S.C. § 2265(a)(1)(A); (2) "offer counsel to all State prisoners under capital sentence," 28 U.S.C. § 2261(c); and (3) provide for the entry of an order by a court of record that (a) appoints counsel upon finding either that the defendant is indigent and accepts the offer of counsel or that the defendant is unable competently to accept or reject the offer, § 2261(c)(1); (b) finds that the defendant declined the offer of counsel with an understanding of its legal consequences, § 2261(c)(2); or (c) denies the appointment of counsel upon finding the defendant is not indigent, § 2261(c)(3).

In 1998, Arizona established procedures to appoint qualified counsel in capital post-conviction proceedings. Pursuant to both statute and rule, after the Arizona Supreme Court has affirmed an indigent capital defendant's conviction and sentence, post-conviction counsel is automatically appointed. A.R.S. § 13–4041(B); Ariz. R. Crim. P. 32.4(c). As required by 28 U.S.C. § 2261(d) under

Honorable Eric H. Holder, Jr.
April 18, 2013
Page 2

the certification process, appointed counsel cannot have previously represented the defendant at trial or on direct appeal, unless both counsel and the defendant otherwise consent. A.R.S. § 13–4041(C)(3).

Arizona provides for the reasonable compensation for appointed counsel as required by 28 U.S.C. § 2265(a)(1)(A). Indigent capital defendants are represented during post-conviction proceedings either by the Public Defender or other publicly funded offices, or by appointed private counsel. A.R.S. § 13–4041(A), (B) & (C). Counsel employed by publicly funded offices are compensated by salary. A.R.S. § 41–4041 (A). Appointed private counsel are compensated at an hourly rate of up to $100 per hour for up to 200 hours of representation. A.R.S. § 13–4041(F); Ariz. R. Crim. P. 6.7(a), (b). Upon a showing of good cause, appointed counsel may be compensated for representation exceeding 200 hours. A.R.S. § 13–4041(G). In addition, Arizona provides for the payment of reasonable litigation expenses required by 28 U.S.C. § 2265 (a)(1)(A). *See* A.R.S. § 13–4041(I) ("The trial court may authorize additional monies to pay for investigative and expert services that are reasonably necessary to adequately litigate those claims that are not precluded by § 13–4232.") On average, Arizona spends well over $200,000 in attorney fees and litigation costs for each capital post-conviction case.

The statutory certification also requires the appointment of "competent" counsel in a State's capital post-conviction mechanism. 28 U.S.C. § 2265(A). Arizona requires appointed counsel to meet strict competency standards. Counsel must:

    1.    Be a member in good standing of the State Bar of Arizona for at least five years immediately preceding appointment;

    2.    Have practiced criminal litigation for 3 years immediately preceding appointment;

    3.    Must have demonstrated the necessary proficiency and commitment which exemplify the quality of representation appropriate to capital cases;

    4.    Within 3 years immediately preceding appointment, must have been lead counsel in an appeal or post-conviction proceeding in a case in which a death sentence was imposed, as well as prior experience as lead counsel in the appeal of at least 3 felony convictions and at least one post-conviction proceeding that resulted in an evidentiary hearing. Alternatively, to be appointed an attorney must have been lead counsel in the appeal of at least 6 felony convictions, at least two of which were appeals from first or second degree murder convictions, and lead counsel in at least two post-conviction proceedings that resulted in evidentiary hearings;

    5.    Have attended and successfully completed, within one year prior to the initial appointment, at least six hours of relevant training or educational programs in the area of capital defense, and within one year prior to any subsequent appointment, at least 12 hours of relevant training or educational programs in the area of criminal defense; and

    6.    Must be familiar with and guided by the performance standards in the 2003 American Bar Association Guidelines for the Appointment and Performance of Defense counsel in Death Penalty Cases.

Honorable Eric H. Holder, Jr.
April 18, 2013
Page 3

Ariz. R. Crim. P. 6.8(a), (c).[1] These competency requirements, mandated by the Arizona Supreme Court, exceed more general competency requirements set out in A.R.S. § 13–4041(C).

Additionally, although not required for opt-in status, Arizona also contemporaneously adopted heightened standards for counsel who handle capital *trials*. Under Arizona law, Rule 6.2, Ariz. R. Crim. P., a defendant charged with capital murder is entitled to two highly qualified attorneys – a procedure that presumably lessens the likelihood of ineffective assistance of trial counsel and makes post-conviction counsel's job easier.

In 2002, the United States Circuit Court of Appeals for the Ninth Circuit found that as of July 17, 1998, Arizona's postconviction procedures for capital defendants established a qualified procedure under chapter 154. *Spears v. Stewart*, 283 F.3d 992, 1007 (9th Cir. 2002). The court declined, however, to apply the expedited procedures due to delay in the appointment of postconviction counsel for Spears (notwithstanding any claim of prejudice resulting from the delay).

In 2005, Congress abrogated *Spears* and amended 28 U.S.C. §§ 2261–66 by enacting the USA PATRIOT Improvement and Reauthorization Act of 2005. Senator Kyl, who sponsored the amendments, explained:

> In *Spears v. Stewart* . . . the Ninth Circuit held that even though Arizona had established a qualifying system and even though the State court had appointed counsel under that system, the Federal Court could still deny the State the benefit of qualification because of a delay in appointing counsel . . . [T]his bill abrogates . . . th[is] holding and removes the qualification decision to a neutral forum . . . . Paragraph (a)(3) of new section 2265 forbids creation of additional requirements not expressly stated in the chapter, as was done in the *Spears* case.

152 Cong. Rec. S1620, 1624–25 (daily ed. Mar. 3, 2006).

The 2005 amendments did not change the requirement that a qualifying State establish a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State capital postconviction proceedings. The amendments provide that the Attorney General promulgate regulations to implement the certification procedure. As of this date, the Department of Justice has not promulgated regulations for the certification procedure. The statute permissibly allows the Department of Justice to promulgate regulations, but it does not authorize indefinite suspension of the expedited procedures. Nor does the statute require States to wait for the Department of Justice to promulgate regulations prior to seeking certification.

I believe that it is clear that Arizona's post-conviction mechanism for appointing qualified counsel in capital cases meets the statutory requirements for certification. Given the Ninth Circuit's finding that Arizona satisfies what Congress has now confirmed to be the universe of requirements that must be

---

[1] In exceptional circumstances, and with consent of the Arizona Supreme Court, attorneys who do not meet these requirements may be appointed, provided that the attorney's experience, stature and record enables the Court to conclude that the attorney's ability significantly exceeds the standards set forth above. However, all appointed counsel must be familiar with, and guided by, the 2003 American Bar Association Guidelines for the Appointment and Performance of Defense counsel in Death Penalty Cases. Ariz. R. Crim. P. 6.8(d).

Honorable Eric H. Holder, Jr.
April 18, 2013
Page 4

met, Arizona should be deemed to have "opted-in" to the accelerated review procedures contemplated under AEDPA.

My staff and I would be happy to address any questions you may have regarding Arizona's capital case procedures. We request that a determination regarding opt-in status be made within 90 days. If we do not receive a decision in 90 days we will treat that as a wrongful denial and seek relief in the United States Court of Appeals for the District of Columbia, which has judicial review under the relevant statute.

Sincerely,

Tom Horne

Tom Horne

cc: Eric J. Bistrow, Chief Deputy
    Robert Ellman
    Jeffrey Zick

3206344

# Exhibit 7

Office of the
## FEDERAL PUBLIC DEFENDER
for the District of Arizona
**Capital Habeas Unit**

**Jon M. Sands**
Federal Public Defender

**direct line:** (602) 382-2816
**email:** dale_baich@fd.org

June 4, 2013

The Honorable Eric H. Holder, Jr.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

RE:  April 18, 2013 correspondence regarding opt-in under 28 U.S.C. § 2265(a)

Dear Mr. Attorney General:

I am writing in regard to the letter sent to you by Arizona Attorney General Tom
Horne on April 18, 2013, in which he discussed certification of Arizona's capital post-
conviction mechanism to allow Arizona to opt into the expedited federal habeas corpus
procedures pursuant to 28 U.S.C. §§ 2261-2266. Our office represents a substantial
portion of Arizona death-row prisoners in their federal habeas corpus proceedings.
Accordingly, I request that we are notified of any correspondence or communication
between the U.S. Department of Justice and the Arizona Attorney General's Office
regarding this letter or the subjects addressed therein.

Thank you for your assistance in this matter, and please let me know if you need
any additional information or have any questions regarding this request.

Sincerely,

Dale A. Baich
Supervisor
Capital Habeas Unit

DAB/jyg

cc:    Tom Horne, Arizona Attorney General
       Jeffrey Zick, Assistant Attorney General

# Exhibit 8



**U.S. Department of Justice**

_____

*Washington, D.C. 20530*

RECEIVED

JUL 1 9 2013

ATTORNEY GENERAL
EXECUTIVE OFFICE

JUL 1 6 2013

The Honorable Tom Horne
Attorney General
Office of the Attorney General
State of Arizona
1275 West Washington Street
Phoenix, AZ 85007-2926

Dear General Horne:

This responds to your letter to the Attorney General dated April 18, 2013, requesting certification of the State of Arizona under 28 U.S.C. § 2265.

The Department has been and remains engaged in a rulemaking process in connection with the requirements of Section 2265. *See Certification Process for State Capital Counsel System,* 76 Fed. Reg. 11705 (Notice of Proposed Rulemaking, or NPRM); *Certification Process for State Capital Counsel System,* 77 Fed. Reg. 7559 (Supplemental Notice of Proposed Rulemaking, or SNPRM). The NPRM proposed a certification procedure by which the Department would solicit and consider public comments on any request for certification with the goal of enabling the Attorney General to make sound certification decisions on the basis of a robust record that takes into account views of all interested parties. The NPRM also proposed defining, within reasonable bounds, Chapter 154's requirements for certification, in part to provide notice to interested parties of the standards that the Attorney General would apply in making certification decisions.

In formulating the final rule, the Department has given careful consideration to the comments submitted by interested parties. We continue to make progress on the rulemaking—as our recent submission of the final rule for review under Executive Order 12866 indicates. We expect that the final rule will be issued in the near future. In the meantime, the Department will begin reviewing now Arizona's request for certification on the expectation that it may help speed up the ultimate determination of the certification you requested. As part of that review, we will seek to ascertain whether there is any additional information that you can provide now, even though it may not be possible for us to immediately determine all information that is needed.

While we cannot provide at this time a precise date certain by which a decision will be made, please do not hesitate to contact this office should you or another attorney in your office have any questions about the status of the Department's progress in this area. If there is any updated information we are then in a position to provide, we will be glad to provide it.

Sincerely,

Alexa Chappell
Intergovernmental Liaison